## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x
                         :

**In re**                       :      **Chapter 11**
                         :

**INSYS THERAPEUTICS, INC.,** *et al.,*  :      **Case No. 19-_____ (___)**
                       :

**Debtors.**[1]             :      **Joint Administration Requested**
                       :

-------------------------------------------------------x

### MOTION OF DEBTORS PURSUANT TO
### 11 U.S.C. §§ 105(a), 363 AND 507(a) FOR (I) AUTHORITY
### TO (A) PAY CERTAIN PREPETITION WAGES AND
### REIMBURSABLE EMPLOYEE EXPENSES, (B) PAY AND HONOR
### EMPLOYEE MEDICAL AND OTHER BENEFITS, AND (C) CONTINUE
### EMPLOYEE BENEFITS PROGRAMS, AND (II) RELATED RELIEF

Insys Therapeutics, Inc. ("**Insys**") and its affiliated debtors in the above-captioned

chapter 11 cases (the "**Chapter 11 Cases**"), as debtors and debtors in possession (collectively, the

"**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Relief Requested

1.      By this Motion, pursuant to sections 105(a), 363, and 507(a) of the United

States Code (the "**Bankruptcy Code**"), the Debtors request (i) the authority, but not direction, to

pay and honor certain prepetition claims and obligations, in the exercise of their sole discretion,

relating to, the business practices, programs, and policies for their employees and supplemental

workforce, including, among other things: (a) Unpaid Compensation, Deductions, and Payroll

Taxes; (b) compensation for the Supplemental Workforce; (c) Reimbursable Expenses; (d) the

Amex Program; (e) Employee Benefit Programs; (f) the Severance Program; (g) the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Insys Therapeutics, Inc. (7886); IC Operations, LLC (9659); Insys Development Company, Inc. (3020); Insys Manufacturing, LLC (0789); Insys Pharma, Inc. (9410); IPSC, LLC (6577); and IPT 355, LLC (0155).  The Debtors' mailing address is 1333 South Spectrum Blvd #100, Chandler, Arizona 85286.

401(k) Savings Plan; and (h) the Other Employee Programs (each as defined herein, and collectively, the "**Employee Obligations**"), and (ii) related relief.

2.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").

## Jurisdiction

3.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     Pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Background

5.     On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

6.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

7.      Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and the Debtors' business and capital structure is set forth in the declaration of Andrew G. Long, the Debtors' Chief Executive Officer, filed contemporaneously herewith, in support of the Debtors' chapter 11 petitions and related first day relief (the "**Long Declaration**").[2]

### The Debtors' Compensation and Benefits Programs

8.      As with other large companies, the Debtors maintain various compensation and benefits programs and pay various administrative fees and premiums in connection therewith (the "**Compensation and Benefits Programs**").  The Debtors believe that the vast majority of their Employees (as defined below) rely exclusively or primarily on the compensation and benefits they receive through the Compensation and Benefits Programs to pay their daily living expenses and support their families.  Employees will face significant financial consequences if the Debtors are not permitted to pay or continue to administer the Compensation and Benefits Programs in the ordinary course of business.  Further, the Debtors' failure to honor their Employee Obligations in connection with the Compensation and Benefits Programs likely would result in attrition at a time when the Debtors need their workforce to perform at peak efficiency.

9.      Subject to the Court's approval and the terms and conditions set forth herein, the Debtors intend to continue to administer their Compensation and Benefits Programs in

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Long Declaration.

3

the ordinary course.  The Debtors further request confirmation of their right to modify, change, and discontinue any of their Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course of business during these Chapter 11 Cases, in their discretion and without the need for further Court approval, subject to applicable orders entered in these Chapter 11 Cases, and the requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

10.     The Debtors estimate that, as of the Petition Date, they have accrued, in the aggregate, approximately $1,343,120 of unpaid Employee Obligations, $733,120 of which will become due and payable during the period between the Petition Date and the final hearing on the Motion (the "**Interim Period**").

| Compensation and Benefits Program | Interim Amount | Final Amount (inclusive of Interim Amount) |
|---|---|---|
| Employee Compensation Obligations | $398,000 | $1,008,000 |
| Employee Benefit Obligations | $335,120 | $335,120 |
| Other Employee Programs | $0 | $0 |
| **Total Employee Obligations** | $733,120 | $1,343,120 |

## I.     The Debtors' Employees

11.     As of the Petition Date, the Debtors employ approximately 156 employees, of which (a) 155 are full-time employees who work at least thirty hours per week (the "**Full-Time Employees**")[3] and (b) one is a part-time employee who is not in a temporary status and who works

---

[3] Three Full-Time Employees are currently on leave.

4

fewer hours per week than the Full-Time Employees (the "**Part-Time Employee**").  In addition, the Debtors retain approximately twelve temporary employees and/or independent contractors and consultants who provide services related to the Debtors' operations (collectively, the "**Supplemental Workforce,**" and collectively with the Full-Time Employees and Part-Time Employee, the "**Employees**").  Other than independent contractors, the Debtors procure, manage, and pay the Supplemental Workforce through third parties, including staffing supply agencies such as Corporate Job Bank, Signature Staff Resources, LLC, and Major, Lindsey & Africa, LLC (collectively, the "**Supplemental Workforce Agencies**").  Independent contractors are directly employed or paid by the Debtors.  Approximately twenty-three of the Debtors' Employees are paid on an hourly basis and the remaining Employees are paid on a salaried basis.  None of the Debtors' Employees are unionized.

12.     The Debtors' Employees perform a wide variety of critical functions, including sales, marketing, clinical development, research and development, quality operations, manufacturing, information technology, administrative, compliance, legal, finance, and management-related tasks.  The skills and expertise of the Debtors' Employees, as well as their relationships with the Debtors' customers and vendors and knowledge of the Debtors' infrastructure, are essential to the Debtors' ongoing operations and ability to operate their business effectively during these Chapter 11 Cases.  The Debtors believe that having the authority to satisfy the Employee Obligations is essential to maintain morale and enhance the Debtors' ability to retain their employees during these Chapter 11 Cases.

5

## II.    Employee Compensation Obligations

13.    The Debtors' outstanding prepetition obligations related to compensation of Employees (collectively, the "**Employee Compensation Obligations**") are summarized in the following chart and described in further detail below:

| Employee Compensation Obligations | Interim Amount | Final Amount (inclusive of Interim Amounts) |
|---|---|---|
| Unpaid Compensation[4] | $310,000 | $310,000 |
| Employer Payroll Taxes | $22,500 | $22,500 |
| Payroll Processing Fees | $5,500 | $5,500 |
| Employee Bonus Programs[5] | $0 | $610,000[6] |
| Supplemental Workforce Obligations | $47,000 | $47,000 |
| Reimbursement Programs | $13,000 | $13,000 |
| **Total Employee Compensation Obligations** | $398,000 | $1,008,000 |

---

[4] All Withholdings and Deductions (each as defined below) for pay periods for which the Employees have not received their compensation are included in the number set forth herein for Unpaid Compensation (*i.e.*, the Unpaid Compensation number is the gross payroll number). All Withholdings and Deductions will be withheld and remitted accordingly upon the grant of the relief requested herein by the Court.

[5] As discussed more fully below, the Debtors are not seeking authority in this Motion to make any retention or incentive award payments to insiders.

[6] The amount reflected under Employee Bonus Programs includes ordinary course bonus payments for the non-insider Salesforce Employees described below that will be earned and come due in June 2019 and September 2019, totaling an aggregate amount of $430,000.  As discussed more fully below, the Debtors believe the payments are ordinary course postpetition payments that do not require Court approval and are not included in the amounts subject to the cap imposed by section 507(a)(4) of the Bankruptcy Code; however, out of the abundance of caution, the Debtors seek authority to pay the Salesforce Bonus (as defined below) awards in the order approving this Motion on a final basis.

6

A.      **Unpaid Compensation**

14.      The Debtors' payroll obligations generally include wages, salaries, taxes, and payments on account of paid time off (the "**Unpaid Compensation**").   The Debtors' Employees are paid on bi-weekly or monthly payment cycles.   Most of the Debtors' Employees are paid one week in arrears, on a bi-weekly basis.   The Debtors' recent monthly gross payroll totaled approximately $1,350,000.   The majority of the Debtors' payroll is paid by direct deposit through electronic transfer of funds to the Employees' bank accounts and through payroll cards.

15.      The Debtors rely on a third-party, ADP Payroll Processing ("**ADP**"), to process and administer payroll and other funds in connection with their other Employee Obligations.   ADP provides the Debtors' processing system, ensures proper tax and benefits withholdings are made, and provides electronic timesheet management for Employees.   On average, the Debtors pay ADP administration fees (the "**Payroll Processing Fees**") of approximately $200,000 each year.   As of the Petition Date, the Debtors estimate owing ADP approximately $5,500 in Payroll Processing Fees.   Payment of these modest fees is crucial for the Debtors' seamless entry into chapter 11 and to ensure the smooth functioning of the Debtors' payroll system.   The Debtors seek authority to pay all such Payroll Processing Fees as they come due in the ordinary course of business.

16.      As of the Petition Date, the Debtors estimate that they owe approximately $310,000 to Employees on account of prepetition Unpaid Compensation, including accrued but unpaid wages and salaries.   The Debtors' Unpaid Compensation obligations reflect one week of accrued amounts due to Employees, and, the Debtors believe that no Employee is owed Unpaid Compensation in an amount exceeding the $13,650 cap imposed by section 507(a)(4) of the Bankruptcy Code.   For the avoidance of doubt, the Debtors seek authority to pay all Unpaid

7

Compensation, in an amount not to exceed $13,650 for each individual Employee, in the ordinary course of business during these Chapter 11 Cases.

### B.    Employee Bonus Programs

17.    As part of overall compensation, the Debtors maintain a quarterly bonus program (the "**Commission Bonus Program**") pursuant to which they make payments to qualifying non-insider, non-senior management, sales Employees (the "**Salesforce Employees**") approximately forty-five days after the end of each quarter.  Payments under the Commission Bonus Program are based on the identification by Salesforce Employees of appropriate patients for the Debtors' commercial pharmaceutical products, the sales of such pharmaceutical products, and various other metrics as determined in advance by an executive director for the Debtors' commercial business and the Compensation Committee of the Debtors' Board of Directors (the "**Compensation Committee**"). No insiders or senior management of the Debtors are part of the Commission Bonus Program.  In February 2019, the Debtors made discretionary bonus payments to approximately sixty-five Salesforce Employees totaling approximately $490,000.  The Debtors do not owe any payments pursuant to the Commission Bonus Program during the Interim Period. However, the Debtors estimate that, as of the Petition Date, they owe approximately $180,000 in earned bonuses under the Commission Bonus Program during the second quarter 2019 that will come due during the pendency of the Chapter 11 Cases during the month of August 2019.  Based on payments made under the Commission Bonus Program over the course of the last twelve months, the Debtors expect that no participant under the Commission Bonus Program will be entitled to an award for the prepetition period in excess of $30,000.  The Debtors seek authority to pay such amounts in the ordinary course and continue the Commission Bonus Program in the ordinary course and solely for non-insiders.

8

18.      In addition, to incentivize Employee performance, the Debtors also maintain an annual corporate incentive bonus program, for the benefit of all Employees (including insiders of the Debtors and sales Employees who are considered senior management and excluding sales Employees eligible for the Commission Bonus Program and the Supplemental Workforce) (the **"Annual Incentive Program"**).  Payments made under the Annual Incentive Program are based on individual employee performance evaluated by the head of the respective department and the Chief Executive Officer at the end of the calendar year, coupled with various metrics established by the Compensation Committee to determine the bonus pool, including revenue targets, litigation resolution milestones, progress on products still in development and not yet available for commercial use, manufacturing optimization, and talent retention.  Bonus awards under the Annual Incentive Program for any given year are paid in either January or February of the following calendar year.  On February 15, 2019, the Debtors made discretionary bonus payments under the Annual Incentive Program for the 2018 calendar year to approximately 174 Employees, totaling approximately $2.61 million.  The Debtors expect to determine amounts due to all eligible Employees (who remain employed by the Debtors) under the Annual Incentive Program for the 2019 calendar year in December 2019 and payment of any such amounts would not occur until 2020.  The Debtors are not seeking approval in this Motion to make any payments to Employees under the Annual Incentive Program.

19.      In the ordinary course, the Debtors also establish and implement various retention programs for certain eligible key employees.  In November 2018 and June 2019, non-insider Salesforce Employees were awarded retention bonuses (the "**Salesforce Retention Bonus**") pursuant to signed agreements (the "**Retention Agreements**") entered into with the Debtors, which Salesforce Retention Bonus will come due on or about June 30, 2019 and on or

9

about September 6, 2019, respectively, should the applicable Salesforce Employee: (a) be actively employed at the time of payment; (b) not have given notice of an intent to resign; (c) not been given a notice of termination by the Debtors (unless such notice of termination was other than for cause, as determined in the Debtors' sole discretion); and (d) have his or her performance adjudged satisfactory by the Debtors, in the Debtors' sole discretion. None of the Salesforce Retention Bonus payments exceed $10,000 per award payment for any participating Salesforce Employee and, as noted above, no Salesforce Retention Bonus is scheduled to be paid to an insider of the Debtors. The total aggregate cost of both the June and September Salesforce Retention Bonus payments is $430,000. The Debtors are not seeking authority to pay the Salesforce Retention Bonus awards in the Interim Order. The Debtors believe the Salesforce Retention Bonus awards are postpetition ordinary course transactions that do not require Court approval; however, out of the abundance of caution, authority to honor such obligation is included in the Motion.

20.     In April and May of 2019, to retain and incentivize key employees to focus their efforts during the Debtors' exploration and pursuit of a restructuring transaction, the Debtors, with input from an independent compensation consultant, adopted and implemented a key employee retention program (the "**KERP**") for thirty key employees (the "**Key Employees**"), including certain insiders. Under the KERP, each Key Employee was entitled to a cash retention payment payable in one installment, subject to the terms and conditions of each Key Employee's retention payment letter. The KERP provides that the Key Employees are entitled to receive the cash retention payment if they are employed through the earlier of (a) the consummation of a change of control over either a controlling share amount of the common stock or over at least half of the assets of certain of the Debtors and (b) the twelve-month anniversary following the execution date of the respective Key Employee's retention payment letter or if terminated without

10

cause (the "**Retention Date**").[7]  The KERP award payment is subject to clawback on the terms

described in the respective award letters.  The Debtors have paid all amounts due under the KERP,

which payments totaled approximately $4,876,000 (excluding, among other things, payroll taxes

and 401(k) matching obligations).  Accordingly, the Debtors are not seeking authority to make any

payments under the KERP during the pendency of these Chapter 11 Cases.

### C.    Gross Pay Deductions, Governmental Withholdings, and Payroll Taxes

21.    For each applicable pay period, certain amounts are deducted from each

Employee's gross pay, including, without limitation, garnishments, 401(k) contributions, child

support, spousal support, service charges and similar deductions, and other pre- and after-tax

deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an

Employee's share of health care benefits and insurance premiums, contributions under flexible

spending plans, and miscellaneous deductions)[8] (collectively, the "**Deductions**").  The Debtors

withhold an aggregate amount of approximately $100,000 on a bi-weekly basis from Employees

(other than Supplemental Workforce) in Deductions, and such amounts are subsequently remitted

by the Debtors to the appropriate third-party recipients.  The Debtors have not forwarded

approximately $75,000 in certain of the Deductions already deducted from prior payrolls to the

appropriate third-party recipients before the Petition Date.  As noted above, amounts that are

---

[7] For twenty-eight of the Key Employees, the Retention Date is April 18, 2019. For the remaining two Key Employees, the Retention Dates are May 10, 2019 and May 13, 2019, respectively.

[8] Prepetition, the Debtors maintained the employee stock purchase plan (the "**ESPP**"), pursuant to which eligible Employees were granted a right to purchase shares of Insys' common stock, not to exceed fifteen percent (15%) of their earnings, at the lesser of an amount equal to eighty-five percent (85%) of the fair market value of the shares on the offering date or eighty-five percent (85%) of the fair market value of the shares on the purchase date; the ESPP was suspended on May 3, 2019 and amounts withheld from Employees but not yet used to purchase shares were returned to the Employees upon the ESPP's suspension.

11

deducted from payroll but not yet remitted are included in the Unpaid Compensation number above and will be remitted to the appropriate third-party recipients postpetition.

22.    In addition to the Deductions, federal and state laws require the Debtors to withhold amounts from an Employee's gross pay related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "**Withholdings**").  The Debtors must then match, from their own funds, amounts for Social Security and Medicare taxes and pay additional amounts for federal and state unemployment insurance based on a percentage of gross payroll (collectively, the "**Employer Payroll Taxes**" and, together with the Withholdings, the "**Payroll Taxes**").  In the aggregate, the Employer Payroll Taxes, which are not included in the outstanding Unpaid Compensation amounts set forth above, total approximately $50,000 per payroll for Employees paid on a bi-weekly basis and approximately $100,000 for Employees paid on a monthly basis.[9]  As of the Petition Date, the Debtors estimate that they will owe, or be required to remit, approximately $22,500 on account of prepetition Employer Payroll Taxes, of which $22,500 will become due and owing during the Interim Period.

23.    The Debtors seek authority to pay any Employer Payroll Taxes as they come due in the ordinary course of business.  The Debtors also seek authority to forward any prepetition Deductions or Withholdings (and to continue to forward Deductions and Withholdings on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

---

[9] The Debtors have separately sought authority to pay Employees' workers compensation claims through the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b) (I) for Authority to (A) Continue to Maintain their Insurance Policies and Surety Bonds and (B) Honor All Obligations with Respect Thereto, and (II) to Modify the Automatic Stay with Respect to the Workers' Compensation Policies*, filed contemporaneously herewith.

D.      **Supplemental Workforce Obligations**

24.      As noted above, the Debtors procure and manage their Supplemental Workforce, other than independent contractors, through third-party Supplemental Workforce Agencies.  The Debtors remit compensation for the applicable Supplemental Workforce to the Supplemental Workforce Agencies as part of their regular accounts payable processes, with the frequency of payment varying by Supplemental Workforce Agency.  The Debtors believe that it is necessary to satisfy their obligations owed to the Supplemental Workforce Agencies to ensure their Supplemental Workforce continues to provide uninterrupted critical services and so that the Supplemental Workforce Agencies will continue to assist the Debtors with their staffing needs. The Debtors employ and pay their independent contractors directly in accordance with the terms of the agreements entered into with such parties.

25.      As of the Petition Date, the Debtors estimate that they owe the Supplemental Workforce approximately $47,000 in the aggregate for unpaid prepetition services provided, of which the entire amount will become due and owing during the Interim Period.  For the avoidance of doubt, the Debtors do not seek authority to pay any individual of the Supplemental Workforce compensation for prepetition services in excess of the statutory cap of $13,650 imposed by section 507(a)(4) of the Bankruptcy Code.

26.      Accordingly, the Debtors request the authority to continue to retain the Supplemental Workforce in the ordinary course of business and consistent with past practices, and to continue to pay members of the Supplemental Workforce.

E.      **Reimbursement Programs**

27.      In the ordinary course of business, the Debtors reimburse certain Employees and all directors for their expenses incurred in connection with their employment duties, including

13

business-related travel, business office expenses, mileage payments, business phone calls, gas for car rentals, postage, parking, taxis, and tolls (the "**Business-Related Expenses**" and the related programs, the "**Reimbursement Programs**").

28.    Generally, Employees directly pay for their respective Business-Related Expenses with a corporate credit card issued in both their name and Insys' name, pursuant to an agreement between the Debtors and American Express (the "**Amex Program**" and the credit cards issued and used thereunder, the "**Amex Credit Cards**"). The Debtors' policy is that all Business-Related Expenses must be charged to Amex Cards. Employees are reimbursed for the costs associated with paying for qualifying Business-Related Expenses by submitting requests for reimbursement through the Debtors' reimbursement software provider, Concur Technologies, Inc. ("**Concur Technologies**"), a third-party expense consolidator, in accordance with the Debtors' travel and expense policy. Directors seek reimbursement of their respective Business-Related Expenses by submitting receipts to the Debtors' accounting department and, upon review and approval by the Debtors' Director of Accounting, the reimbursement request is funded through the Debtors' accounts payable system. Business-Related Expenses are typically reimbursed within forty-eight hours after the expense report or qualifying receipt of a director is approved by the appropriate department manager or Director of Accounting, as applicable.

29.    To prevent Employees from being held liable for any underlying purchases charged under the Amex Program, to provide assurance to Employees incurring Business-Related Expenses under the Amex Credit Cards that such expenses will be reimbursed, and to avoid any associated negative impact on the Employees' credit scores for unpaid amounts incurred on account of Business-Related Expenses, the Debtors seek authority, but not the direction, to pay all

14

prepetition amounts accrued and outstanding under the Amex Credit Cards, as well as authority to continue the Amex Program, as needed, in the ordinary course.

30.     As of the Petition Date, not all reimbursement requests have been processed by the Debtors and, in some cases, Employees may not have submitted reimbursement requests in time to be processed prior to the Petition Date.  Based on historical averages, the Debtors estimate that they could owe Employees at least $14,000 on account of prepetition Business-Related Expenses charged to the Amex Credit Cards as of the Petition Date, of which $14,000 will become due and owing during the Interim Period.  The Debtors do not believe that their directors have any outstanding prepetition Business-Related Expenses.  However, out of the abundance of caution, to the extent it is later determined that a director has a valid prepetition Business-Related Expense, the Debtor seek authority to reimburse such director in the ordinary course of business.   The Debtors seek authority to pay all prepetition amounts owed with respect to the Business-Related Expenses and to continue the Amex Program in the ordinary course of business during the Chapter 11 Cases.

31.     In addition to the Business-Related Expenses paid under the Amex Program, the Debtors also reimburse their Salesforce Employees for the mileage incurred as a result of significant travel between customer locations through an application called Motus, LLC ("**Motus**").  Motus uses GPS to track the Salesforce Employees' mileage as they are driving to and from customer locations.  Motus compiles all data received from the GPS into monthly reports for the Debtors, and the Debtors remit the funds due for reimbursement, as set forth therein, to Motus for disbursement to the applicable Salesforce Employees (the "**Mileage Expenses**").  Based on historical figures, in the aggregate, the Debtors' Salesforce Employees incur approximately $50,000 in Mileage Expenses per month.  Due to the Debtors making recent reductions to their

15

workforce, the Debtors expect that Mileage Expenses will decrease to approximately $38,500 per month.

32.     The Debtors seek authority to pay all prepetition Mileage Expenses owed and to continue to reimburse their Salesforce Employees for such expenses in the ordinary course of business during the Chapter 11 Cases.  The Debtors anticipate they will owe $13,000 in Mileage Expenses as of the Petition Date, all of which will become due and owing during the Interim Period.

**III.     Employee Benefit Programs**

33.     In the ordinary course of business, the Debtors maintain various employment benefit plans and policies, including, without limitation, a medical plan, a dental plan, a vision plan, Debtors-paid and Employee-paid life insurance, Debtors-paid and Employee-paid accidental death and dismemberment insurance ("**AD&D**"), Debtors-paid short and long term disability insurance, statutory disability benefit programs, health care and dependent care spending accounts, Employee-paid accident insurance, travel assistance, Employee-paid legal shield and identity theft assistance, grievance counseling, Employee-paid pet insurance, an Employee Assistance Program (as defined below), Voluntary Benefit Plans (as defined below), vacation and other paid time off policies, Employee discount programs, and other Employee programs (collectively, the "**Employee Benefit Programs**").  The Employee Benefit Programs are generally available to active, Full-Time Employees and other Employees as determined by the Company or applicable benefit program who are eligible to participate, not including the Supplemental Workforce (collectively, the "**Eligible Employees**").[10]

---

[10] There is currently one Part-Time Employee employed by the Debtors, whom the Debtors have designated as an

16

34.     The Debtors seek authority, in the exercise of their discretion, to pay prepetition claims (if applicable), to honor obligations, and to continue programs, in the ordinary course of business and consistent with past practice, relating to the Employee Benefits Programs, subject to the Debtors' rights, if any, to modify or discontinue any Employee Benefit Programs to reduce applicable costs or the benefits provided thereunder.  Based on historical figures, the potential outstanding prepetition Employee Benefit Obligations owed by the Debtors as of the Petition are summarized in the chart below:

| Employee Benefit Obligations | Interim Amount | Final Amount (inclusive of Interim Amount) |
|---|---|---|
| Health Care Plans | $85,000 | $85,000 |
| Flexible Spending Program | $120 | $120 |
| Insurance Plans and Disability Plans | $0 | $0 |
| Voluntary Benefit Plans | $0 | $0 |
| 401(k) Savings Plan | $250,000 | $250,000 |
| Severance Program | $0 | $0 |
| Total Employee Benefit Obligations | $335,120 | $335,120 |

A.      **Health Care Plans**

35.     Eligible Employees can participate in Employee Benefit Programs providing medical insurance coverage (the "**Medical Plans**"), dental insurance coverage (the

---

Eligible Employee for purposes of the Employee Benefit Programs. All other Eligible Employees are Full-Time Employees.

"**Dental Plans**"), and vision insurance coverage (the "**Vision Plans**" and collectively with the Medical Plans and Dental Plans, the "**Health Care Plans**").

36.    The Medical Plans and Dental Plans are self-insured by the Debtors with the Medical Plans administered by Cigna Healthcare ("**Cigna**"), with prescription drug benefits also administered by Cigna, and the Dental Plans administered by MetLife Inc. ("**MetLife**").  The Vision Plan is fully insured and offered through VSP Vision Care ("**VSP**" and, together with Cigna and Metlife, the "**Health Benefit Providers**").  Eligible Employees may participate in the Health Care Plans on the first day of the month following their date of hire.  The eligibility criteria for each Health Care Plan is the same.  Approximately 160 Eligible Employees are enrolled in the Medical Plans, approximately 168 Eligible Employees are enrolled in the Dental Plans, and approximately 148 Eligible Employees are enrolled in the Vision Plan.[11]

37.    Under the Medical Plans, Cigna pays the covered Eligible Employee's healthcare costs directly to the doctor or other healthcare provider (other than any required deductible or similar payment) and then seeks reimbursement from the Debtors on a monthly basis (the "**Health Benefit Claims**").[12]  Cigna estimates the amount due for each Health Benefit Claim and at the end of each calendar year performs a reconciliation to determine actual claim amounts. Each month the Debtors pay Cigna the estimated amount of Health Benefit Claims plus a premium based on the number of participating Eligible Employees and a health benefit advisory fee for the

---

[11] The number of Employees participating in the Health Care Plans is as of May 2019 and, as a result, includes certain employees that were subsequently terminated during the Debtors' June reduction in force.

[12] The Health Benefit Claims may include fees to the Health Benefit Providers for the administrative services they provide to Employees who subscribe to the Health Care Plans (the "**Health Benefit Fees**").  Historically, the Health Benefit Claims do not include an itemized entry for Health Benefit Fees. However, out of the abundance of caution, to the extent the Health Benefit Claims include any Health Benefit Fees, the Debtors seek authority to pay all such administrative fees and expenses due and owing to Health Benefit Providers in the ordinary course of business.

18

administrative services Cigna provides to Eligible Employees who subscribe to the Medical Plan (the "**Health Benefit Fees**").  The Debtors partially offset the cost of the Health Benefit Plans and Health Benefit Fees with the medical Deductions taken from participating Eligible Employees' paychecks.  Last month, the Debtors paid Cigna approximately $205,000[13] on account of Health Benefit Claims and Health Benefit Fees.  It is difficult for the Debtors to estimate with a degree of certainty the amount of estimated Health Benefit Claims that may be currently pending because of the nature of Cigna's claims funding process.  However, the Debtors estimate that approximately $85,000 (after applying Eligible Employee Deductions to offset costs) of Health Benefit Claims and Health Benefit Fees are outstanding as of the Petition Date, including unreimbursed amounts Cigna already paid to healthcare providers, as well as amounts for medical services provided to Eligible Employees but not yet paid by Cigna to the healthcare providers, all of which will come due in the Interim Period.  The Debtors seek authority to pay all Health Benefit Claims and Health Benefit Fees as they become due in the ordinary course of business.

B.      **Flexible Spending Program**

38.      The Debtors offer Eligible Employees the ability to contribute a portion of their pre-tax compensation to pay for certain health care expenses or dependent care expenses through a flexible spending program (the "**Flexible Spending Program**").  Eligible Employees may elect to participate in the Flexible Spending Program when they become eligible to participate in the Medical Plans, on the first day of the month following their date of hire.  As of the Petition Date, approximately twelve Eligible Employees participate in the Flexible Spending Program.

---

[13] Such amount is the total gross amount paid by the Debtors before the application of any Employee Deductions to offset costs.

39.     Pursuant to the Flexible Spending Program, the Debtors withhold funds from participating Eligible Employees' pre-tax payroll as Deductions based on such Eligible Employee's election, with maximum annual contributions of $2,700 for health care expenses and $5,000 for dependent care expenses.  Such Deductions are held in one of the Debtors' disbursement accounts and returned to the Eligible Employee if unused by the end of the calendar year for qualifying health care expenses or if the Eligible Employee is no longer employed by the Debtors and there remains unused program contributions.[14]  The Debtors estimate that they withhold an aggregate amount of approximately $1,400 per month from participating Eligible Employees in connection with the Flexible Spending Program.  As of the Petition Date, the Debtors hold approximately $4,100 relating to Eligible Employees' Deductions for the Flexible Spending Program.

40.     Participating Eligible Employees are provided debit cards to pay for eligible expenses and the cards are linked to a zero balance account in the Debtors' cash management system that is funded by the Debtors' disbursement account.  The third-party administrator of the Flexible Spending Program, Benefit Administrative Services International Corporation ("**Basic**"), receives automatically-generated reports reflecting the debit-card activity and if an expense is flagged as one that may not be reimbursable, upon Basic's request, the participating Eligible Employee is required to submit receipts to confirm that the applicable expense qualifies for reimbursement.  In consideration of administering the program, Basic charges the Debtors a

---

[14] A description of the Debtors' cash management system is set forth in the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, and 507 for (I) Authority to (A) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Honor Obligations Relating Thereto, and (C) Implement Ordinary Course Changes to Cash Management System, (II) Administrative Expense Priority for Postpetition Intercompany Claims, (III) Waiver or Extension of Time to Comply with Requirements of 11 U.S.C § 345(b), and (IV) Related Relief*, filed contemporaneously herewith.

20

quarterly administrative fee of $4.05 per Employee enrolled in the Flexible Spending Program. As of the Petition Date, the Debtors estimate that they owe Basic approximately $120 for administering the Flexible Spending Program, all of which will come due in the Interim Period.

41.     The Debtors seek authority to pay all prepetition amounts owed to Basic and to continue honoring the Flexible Spending Program, including with respect to amounts deducted from Eligible Employees' pay prepetition and to return any Eligible Employee's unused Deductions when such Eligible Employee is no longer employed by the Debtors, in the ordinary course of business during the Chapter 11 Cases.

### C.     Insurance Plans and Disability Plans

42.     The Debtors provide Eligible Employees with basic life and accidental death & dismemberment insurance coverage including a $100,000 term life policy (the "**Basic Life and AD&D Insurance Plan**") at no cost to the Employee.  The Debtors also offer Eligible Employees the opportunity to purchase additional life insurance coverage and additional AD&D coverage, which may be purchased in increments of $10,000, up to the lesser of $500,000 and an amount not to exceed seven times the Eligible Employee's basic annual earnings (the "**Supplemental Associate Life and AD&D Insurance Plans**" and, collectively, with the Basic Life Insurance and AD&D Insurance Plan, the "**Insurance Plans**").  Eligible Employees may participate in the Insurance Plans on the first day of the month following their date of hire.

43.     The Debtors' Insurance Plans are offered through Prudential Group Insurance ("**Prudential**").  The Debtors pay premiums in connection with the Basic Life Insurance Plan and AD&D Insurance Plans.  The Supplemental Associate Life Insurance and AD&D Insurance Plans are funded solely by Deductions taken from participating Eligible Employees' paychecks, and then such funds are transferred directly to Prudential.

21

44.     The Debtors also provide Eligible Employees with short-term disability coverage (the "**Short-Term Disability Plan**") through Prudential, with such coverage fully funded by the Debtors' payment of applicable premiums.  Eligible Employees are automatically enrolled in the Short-Term Disability Plan on the first day of the month following their date of hire.  When a claim is duly made, the Short-Term Disability Plan will pay Eligible Employees sixty percent (60%) of pre-tax weekly earnings (up to a maximum of $2,000 per week) for up to eleven weeks. The Debtors incur approximately $4,000 per month in premiums for the Short Term Disability Plan.

45.     The Debtors also offer Eligible Employees access to long-term disability coverage (the "**Long-Term Disability Plan**" and, together with the Short-Term Disability Plan, the "**Disability Plans**") through Prudential.  Eligible Employees are automatically enrolled in the Long-Term Disability Plan the first day of the month following their date of hire.  The Long-Term Disability Plan is similarly fully-insured by Prudential and the premiums paid by the Debtors. When a claim is duly made, the Long-Term Disability Plan will pay Eligible Employees sixty percent (60%) of their monthly base earnings, up to a maximum of $7,000 per month. The Long-Term Disability Plan has a ninety day benefit elimination period, meaning an Employee who qualifies to receive benefits pursuant to the Long-Term Disability Plan must wait ninety days before the benefits will be paid out, assuming the Employee still qualifies for benefits at the conclusion of the elimination period.  The Debtors incur approximately $2,500 per month in premiums for the Long Term Disability Plan.

46.     As of the Petition Date, the Debtors estimate that they do not owe Prudential any amounts on account of prepetition premiums in connection with the Insurance Plans and the Disability Plans.

D.      **Voluntary Benefit Plans**

47.      The Debtors provide Eligible Employees with the opportunity to participate in certain voluntary benefit plans, including (a) travel assistance provided by AXA Assistance USA, Inc., (b) a legal assistance program administered by LegalShield, (c) an identity theft protection program administered by ID Shield, (d) automobile and home insurance provided by MetLife, (e) accident insurance administered by Cigna (the "**Cigna Accident Plan**"), (f) pet insurance provided by Nationwide Mutual Insurance Company, and (g) a confidential program administered by ComPsych through Prudential designed to assist Employees and their family members with personal issues, such as those that affect their physical and mental well-being, as well as their career and relationships (the "**Employee Assistance Program**" and, collectively with the programs listed in (a) through (f), the "**Voluntary Benefit Plans**").

48.      With the exception of the Employee Assistance Plan,[15] the Voluntary Benefit Plans are funded entirely by the participating Eligible Employees.  Generally, no amounts in connection with the Voluntary Benefit Plans are withheld from Employee paychecks, and Eligible Employees pay those amounts to the providers directly, except for the Cigna Accident Plan pursuant to which premiums are withheld from participating Eligible Employees' paychecks and then transferred directly to Cigna by the Debtors.  The aggregate cost for coverage under the Cigna Accident Plan is approximately $400 per month for all participating Eligible Employees, and all such amounts are funded by the Debtors through Deductions.

---

[15] The Employee Assistance Program is a complimentary benefit provided to Prudential insurance customers and, accordingly, is provided at no cost to the Debtors or Eligible Employees.

E.        **Vacation and Paid Time Off**

49.        The Debtors maintain policies for providing paid time off for Eligible Employees who are exempt from federal and state wage and hour laws based on their compensation and job duties (the "**Exempt Employees**") and those who are not exempt (the "**Non-Exempt Employees**"), in each case to the extent such Eligible Employees have completed their first ninety days of employment and either are Full-Time Employees or are Part-Time Employees. Such policies include paid time off for Full-Time Employees (the "**PTO Policy**"), sick days for Full-Time Employees and Part-Time Employees (the "**Sick Policy**"), paid holidays, bereavement pay, paid time off to vote, payment for absences due to witness duty, and payment for absences due to jury duty.

50.        The PTO Policy grants new Full-Time Employees an allotment of paid time off which accrues at a rate of 3.692 hours per bi-weekly pay period. After three years of eligible service, Full-Time Employees may be granted fifteen days of vacation each year.  Both Full-Time Employees and Part-Time Employees are granted paid time off under the Sick Policy on an accrued hours basis, at the rate of one hour of paid sick leave for every thirty hours worked by the Employee, up to a total of forty hours per calendar year.[16]  Under the Sick Policy and the PTO Policy, unused accrued hours are forfeited and do not carry over to future calendar years,[17] and no payments are made on account of unused hours unless otherwise required by state law.[18]

---

[16] Employees in California may accrue and use up to forty-eight hours of paid sick leave per year. Employees in Arizona may carry-over up to forty hours of paid sick leave per year, provided that Arizona-based Employees are still limited to the cap of using no more than forty hours of paid sick leave per year.

[17] In certain circumstances where an Employee was unable to take vacation days at the end of a year due to certain work constraints, the Debtors have allowed the Employee to rollover a limited number of vacation days.

[18] Employees in California do not forfeit vacation time at the end of the calendar year. However, California-based

24

IV.    **Severance Program**

51.    In their normal course of operations, the Debtors have a general practice of paying severance benefits to certain Eligible Employees terminated in covered circumstances, including a reduction in force, job elimination, change in control, or reorganization (the "**Severance Program**").  An Eligible Employee is entitled to severance under the Severance Program if such Employee is a party to an employment agreement with the Debtors, the Debtors enter into a separation agreement with the Eligible Employee providing for such benefits, or where the Eligible Employee is otherwise required to receive such benefits pursuant to state or local law requirements.  The Severance Program allows for flexible and discretionary benefit structures and the Debtors have historically provided salaried Eligible Employees with a severance payment in an amount (a) based on the Eligible Employee's length of service with the company or (b) determined pursuant to a pre-negotiated agreement between the Eligible Employee and the Debtors.  The Debtors are solely seeking authority to continue and honor the Severance Program after the Petition Date for non-insiders only and to make payments thereunder in the ordinary course, as such Severance Program  may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business (collectively, the "**Severance Obligations**").  For the avoidance of doubt, the Debtors are not requesting authority to and will not make any payments that fall outside the limitations of section 503(c), to the extent applicable.

---

Employees with fewer than three years of experience who have accrued fifteen days of vacation time do not accrue more vacation time until the vacation day balance is reduced below the fifteen day cap. After three years of eligible service, California-based Employees may not accrue more than twenty days of vacation time until the vacation day balance is reduced below the twenty day cap.

25

## V.    401(k) Savings Plan

52.     The Debtors maintain and administer defined contribution plans for the benefit of all Eligible Employees meeting the requirements of section 401(k) of the Internal Revenue Code (the "**401(k) Savings Plan**"), which are managed by Fidelity Management Trust Company ("**Fidelity**").  There are approximately 406 participants with current account balances greater than fifty dollars in the 401(k) Savings Plan.  The Debtors match 50% of an Employee's 401(k) contributions between zero and six percent (6%) of their gross annual earnings (the "**Matching Obligation**"). The Debtors accrue participating Eligible Employee's contributions through withholdings on a bi-weekly basis.  To satisfy, the Matching Obligation the Debtors make a single annual disbursement to Fidelity, which has historically been paid each April on account of the previous calendar year's Eligible Employee contributions.   The Debtors' Matching Obligation for 2018 has already been paid.  The Debtors seek authority to continue to honor their obligations pursuant to the 401(k) Savings Plan, including payment of the Matching Obligation in the ordinary course. The Debtors estimate that, as of the Petition Date, they will have accrued approximately $250,000 in connection with the Debtors' Matching Obligation for 2019, all of which will become due and owing during the Interim Period.

## VI.    Other Employee Programs

53.     In addition to the foregoing, the Debtors have certain other practices, programs, and policies that provide benefits to their Eligible Employees, including, but not limited to, (a)  military leave program, (b) leave pursuant to the Family Medical Leave Act, and (c) additional entitlements where required under state law (collectively, the "**Other Employee Programs**").  The Debtors intend to continue and honor such practices, programs, and policies after the Petition Date, as such practices, programs, and policies may be modified, amended, or

26

supplemented from time to time in the ordinary course of the Debtors' operations.  As of the Petition Date, the Debtors do not owe any prepetition amounts in connection with the Other Employee Programs.

## Relief Requested Should be Granted

I.    **Payment of Employee Obligations is Warranted Under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.**

54.    The Court may grant the relief requested herein pursuant to sections 363 and 105(a) of the Bankruptcy Code.

55.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b) of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a sound business purpose exists for doing so.  *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that debtor show a "sound business purpose" to justify its actions under section 363 of Bankruptcy Code); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

56.    In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the

27

Bankruptcy Code.  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105; *see In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (applying section 105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical benefits, and business expense claims to debtor's employees).  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of a debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").  Courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See*, *e.g.*, *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus").

57.    The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to the continued operation of a debtor's business.  *See*, *e.g.*, *In re Just for Feet*, *Inc*., 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of Bankruptcy Code provides a statutory basis for payment of prepetition claims under the doctrine

28

of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is standard in the Third Circuit for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan).

58.     The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, is necessary for the Debtors' survival during chapter 11, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.  Authorizing the Debtors to pay or honor prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Indeed, without the relief requested herein being granted, the Debtors' Employees may seek alternative opportunities, perhaps with the Debtors' competitors.  The loss of valuable Employees would hinder the ability of the Debtors to meet their customer obligations and, likely, would diminish the ability of the Debtors to carry out their chapter 11 strategy successfully by maximizing the value of their assets.

59.     Indeed, the significance in retaining the Debtors' workforce further supports the Debtors' request to honor their obligations to their non-insider Salesforce Employees and pay the Salesforce Retention Bonus awards when they become due.  The Debtors believe that the Salesforce Retention Bonus constitutes an ordinary course business transaction that does not require Court approval.  Nevertheless, out of an abundance of caution and to avoid any unnecessary dispute, authority to honor such obligation is included in the Motion.  Honoring the Salesforce

29

Retention Bonus obligations is reasonable in the circumstances of these Chapter 11 Cases and is supported by a valid business purpose.  The Salesforce Employees are essential to the Debtors' revenue generating capacity and it is critical for the Debtors to maintain a workforce that will drive enterprise value and potentially be available to purchasers of the Debtors' assets.  Accordingly, the Debtors believe that payment of the Salesforce Retention Bonus during these Chapter 11 Cases should be approved.

60.    Moreover, the failure to satisfy certain prepetition obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' business.   The majority of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses.  Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the Health Care Plans and Insurance Plans, the Eligible Employees will not receive health coverage and, accordingly, may become obligated to pay certain health care claims.  The loss of health care coverage will result in considerable anxiety for Eligible Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency.   Additionally, as set forth above, Eligible Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.  Certain obligations are also entitled to priority treatment under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code and, therefore, payment at this time will not diminish the assets available for payment of general unsecured claims.

## II.     Payment of Certain of Employee Obligations Is Required by Law.

61.     The Debtors seek authority to remit Deductions and Payroll Taxes to the appropriate entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions, including contributions to the Employee Benefit Programs and child support and alimony payments, are not property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b).  Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks.  *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc. v. State of Mich* (*In re DuCharmes & Co.*), 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Deductions and Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize them to remit the Deductions and Payroll Taxes to the proper parties in the ordinary course of business.

## III.    The Debtors Do Not Seek to Make Severance Payments Outside Scope of Sections 503(c) of the Bankruptcy Code.

62.     By this Motion, the Debtors seek authority to continue the Severance Program and honor obligations arising thereunder with respect to Eligible Employees terminated postpetition in the ordinary course of business and in accordance with past practice.  For the

avoidance of doubt, the Debtors are not requesting authority to, and will not, make any payments that fall outside the limitations of section 503(c) of the Bankruptcy Code, to the extent applicable.

63.     Satisfying the Severance Obligations and continuing to pay postpetition Severance Program does not implicate section 503(c) of the Bankruptcy Code because the Debtors are only seeking to pay such amounts for non-insiders and not such payments are outside the ordinary course of the Debtors' business.  *See* 11 U.S.C. § 503(c)(3) (prohibiting certain payments "outside the ordinary course of business").  Because section 503(c) of the Bankruptcy Code is not implicated, the Court may grant the requested relief if providing Severance Program satisfies the requirements of section 363(b) of the Bankruptcy Code.  *See In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 801 (Bankr. D. Del. 2007) (holding that compensation plans commenced within the ordinary course of business that do not implicate section 503(c)(1) are governed by the business judgment standard of section 363 of the Bankruptcy Code).  Accordingly, courts in this jurisdiction have permitted debtors to continue an existing Severance Program and pay severance obligations that become due in the ordinary course to employees who are terminated postpetition.  *See*, *e.g.*, *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. July 26, 2017); *In re Aspect Software Parent, Inc.*, No. 16-10597 (MFW) (Bankr. D. Del. Apr. 1, 2016); *In re RCS Capital Corporation*, No. 16-10223 (MFW) (Bankr. D. Del. Feb. 23, 2016).

64.     Further, the Debtors have sound business justification for providing severance to terminated Eligible Employees, in the ordinary course and consistent with the Debtors' customary practices, as it is critical to the Debtors' retention efforts and necessary to motivate the Eligible Employees to continue working for the Debtors.  The Debtors believe it is important to fulfill their obligations under the Severance Program to reassure Eligible Employees that they intend to honor their obligations—both during and after their tenure with the Debtors —

including any Severance Obligations incurred postpetition.  Indeed, failure to honor the Severance Program will likely render the Debtors unable to incentivize any Eligible Employee to continue employment with the Debtors during the Chapter 11 Cases.  Immediate and unpredictable attrition could significantly impact the Debtors' ability to successfully reorganize.   The Debtors believe that the costs associated with the Severance Program, to the extent any are incurred postpetition, would greatly outweigh the potential negative consequences of failing to do so, including the hiring of replacement employees on a short-term, temporary basis, or accepting diminished proceeds due to an accelerated inventory liquidation.

65.      For the reasons stated, discretion to continue the Severance Program – like all of the relief sought in this Motion – is critical and necessary to assuage Eligible Employee fears and motivate the Eligible Employees to help achieve the Debtors' chapter 11 objectives. Accordingly, the requested relief should be approved.

### Bankruptcy Rule 6003(b) Has Been Satisfied

66.      Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  Fed. R. Bankr. P. 6003(b).  As described above and in the Long Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

33

## **Request for Bankruptcy Rule 6004(a) and (h) Waivers**

67.      To implement the foregoing successfully, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the Long Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## **Reservation of Rights**

68.      Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## **Notice**

69.      Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware (Attn:  Jane M. Leamy); (b) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office

for the District of Delaware; (f) the Department of Justice; and (g) any other party entitled to notice pursuant to Local Rule 9013-1(m) (the "**Notice Parties**").  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no further notice is required.

70.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

35

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 10, 2019
       Wilmington, Delaware

*/s/ Paul N. Heath*
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Zachary Shapiro (No. 5103)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Gary T. Holtzer (*pro hac vice* pending)
Ronit J. Berkovich (*pro hac vice* pending)
Candace M. Arthur (*pro hac vice* pending)
Olga F. Peshko (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

36

**<u>Exhibit A</u>**

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
-------------------------------------------------------x
                                    :
In re                               :      Chapter 11
                                    :
INSYS THERAPEUTICS, INC., et al.,   :      Case No. 19-_____ (___)
                                    :
           Debtors.¹                :      Jointly Administered
                                    :
                                    :      Re: D.I. ____
-------------------------------------------------------x
```

INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363
AND 507(a) (I) AUTHORIZING DEBTORS TO (A) PAY CERTAIN
PREPETITION WAGES AND REIMBURSABLE EXPENSES, (B) PAY AND
HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS, AND (C) CONTINUE
EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**"),[2] dated June 10, 2019, of Insys Therapeutics, Inc.

and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in

possession (collectively, the "**Debtors**"), pursuant to sections 105(a), 363 and 507 of title 11 of

the United States Code (the "**Bankruptcy Code**") for entry of an order authorizing, but not

directing, the Debtors to pay and honor certain prepetition claims and obligations, continue

programs, and maintain funding, in the exercise of their discretion, relating to, among other things,

their Employee Compensation Obligations, Employee Benefit Programs, and Other Employee

Programs, all as more fully set forth in the Motion; and the Court having jurisdiction to consider

the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Insys Therapeutics, Inc. (7886); IC Operations, LLC (9659); Insys Development Company, Inc. (3020); Insys Manufacturing, LLC (0789); Insys Pharma, Inc. (9410); IPSC, LLC (6577); and IPT 355, LLC (0155).  The Debtors' mailing address is 1333 South Spectrum Blvd #100, Chandler, Arizona 85286.

[2] Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

*Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and upon the Long Declaration, filed contemporaneously with the Motion, and the record of the Hearing; and it appearing that no payments under section 503(c) are being sought in the Motion or granted herein; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis, as provided herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a), 363, and 507(a) of the Bankruptcy Code, to pay and honor all prepetition obligations associated with the Employee Obligations and to continue programs and maintain funding in the ordinary course of business, to the extent requested in the Motion, including, but not limited to: (a) Unpaid Compensation, Deductions, and Payroll Taxes; (b) compensation for the Supplemental Workforce;

2

(c) Reimbursable Expenses; (d) the Amex Card Program; (e) Employee Benefit Programs; (f) the Severance Program; (g) the 401(k) Savings Plan; and (h) the Other Employee Programs; provided that, the Debtors are authorized, but not directed, to pay only amounts due and payable as of the Petition Date and amounts that are or become due and payable during the Interim Period in an aggregate amount not to exceed $733,120, unless otherwise ordered by this Court; and provided, further, that payments for wages, salaries, or commissions, and sick leave earned by an individual Employee shall not exceed $13,650, other than by permission of this Court pursuant to the relief requested herein.

3.      Nothing contained in the Motion or this Interim Order shall be deemed as authorizing or approving (a) any payments or transfers that violate section 503(c) of the Bankruptcy Code or (b) the Debtors to cash out unpaid vacation upon termination of an Employee, unless applicable non-bankruptcy law requires such payment.

4.      The Debtors are further authorized, but not directed, to modify or discontinue any benefit program to reduce or eliminate program expenses or the benefits provided thereunder, at any time, in their sole discretion without prior Court approval to the extent permitted by the applicable agreement or law.

5.      The Debtors and any applicable third parties are further authorized to continue to allocate and distribute Deductions and Payroll Taxes to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' stated policies and prepetition practices.

6.      The Debtors are further authorized, but not directed, to pay all processing and administrative fees associated with and all costs and expenses incidental to payment of the Employee Obligations.

3

7.      Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

8.      Nothing contained in the Motion or this Interim Order, nor any payment made pursuant to the authority granted by this Interim Order, is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

9.      The requirements of Bankruptcy Rule 6003(b) have been satisfied.

10.     Under the circumstances of these Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a) and Local Rule 9013-1(m).

11.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

12.     The Debtors are authorized to take all action necessary to implement the relief granted in this Interim Order.

13.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Interim Order.

14.     The Final Hearing on the Motion shall be held on _____, **2019 at __:___ _.m. (Prevailing Eastern Time)** and any objections or responses to the Motion shall be in

4

writing, filed with the Court, and served upon (a) the proposed attorneys for the Debtors, (i) Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer,

Esq., Ronit J. Berkovich, Esq., and Candace M. Arthur, Esq.), and (ii) Richards, Layton & Finger,

P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: John H.

Knight, Esq., Paul N. Heath, Esq., and Amanda R. Steele, Esq.); and (b) the Notice Parties; in each

case, on or prior to **_____, 2019 at 4:00 p.m. (Prevailing Eastern Time)**.


Dated: _____, 2019
       Wilmington, Delaware

                                            _____
                                        THE HONORABLE _____
                                        UNITED STATES BANKRUPTCY JUDGE

5