## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------x
:
**In re**                                    :          **Chapter 11**
:
**INSYS THERAPEUTICS, INC.,** *et al.,*       :          **Case No. 19-11292 (KG)**
:
          **Debtors.**[1]                    :          **Joint Administration Requested**
:
------------------------------------------------------x

## DECLARATION OF ANDREW G. LONG IN SUPPORT OF
## <u>DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF</u>

I, Andrew G. Long, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Executive Officer ("**CEO**") of Insys Therapeutics, Inc. ("**Insys**," and collectively with its above-captioned debtor affiliates, the "**Debtors**") and have served in this capacity since being appointed to it on April 15, 2019.  Prior to this position, I was the Chief Financial Officer ("**CFO**") of Insys since August 2017.  Prior to joining Insys, I served as Senior Vice President of Global Finance at Patheon for one and a half years, and Vice President of Finance for multiple divisions at Thermo Fisher Scientific for over nine years.  I have over three decades of experience in the life sciences, bio-pharma, and industrial sectors.

2.      I submit this declaration (the "**Declaration**") to assist the United States Bankruptcy Court for the District of Delaware (the "**Court**") and other parties in interest in understanding the circumstances and events that compelled the commencement of these chapter 11 cases (the "**Chapter 11 Cases**") by the Debtors on June 10, 2019 (the "**Petition Date**") and in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Insys Therapeutics, Inc. (7886); IC Operations, LLC (9659); Insys Development Company, Inc. (3020); Insys Manufacturing, LLC (0789); Insys Pharma, Inc. (9410); IPSC, LLC (6577); and IPT 355 LLC (0155).  The Debtors' mailing address is 1333 South Spectrum Blvd #100, Chandler, Arizona 85286.

support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

3.      I am generally familiar with the Debtors' day-to-day operations, books and records, and business and financial affairs.  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussion with other members of the Debtors' senior management, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtors and the pharmaceutical industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      To minimize the adverse effects on their business and preserve value, the Debtors have filed motions and pleadings on the Petition Date seeking various types of "first day" relief (collectively, the "**First Day Motions**").  The First Day Motions seek relief intended to preserve the value of the Debtors and maintain continuity of the Debtors' operations - which, as set forth below, is of the utmost importance in these Chapter 11 Cases, as the Debtors seek to maximize value for the benefit of their stakeholders.

5.      The First Day Motions seek to accomplish these goals by, among other things, (i) preserving the Debtors' relationships with their customers, vendors, suppliers, and employees; (ii) ensuring continued employee morale; and (iii) establishing certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, these Chapter 11 Cases.  I am familiar with the contents of each First Day Motion and believe that the relief sought therein is necessary to enable the Debtors to operate in chapter 11 with minimal

2

disruption or loss of productivity and critical to achieving a successful outcome for these Chapter 11 Cases.  The facts set forth in each First Day Motion are incorporated herein by reference.

6.      In addition, the Debtors are filing contemporaneously herewith a motion for approval of bidding procedures in connection with the sale of substantially all of the Debtors' assets, as more fully described herein (the "**Global Sale Process**").

7.      Part I of this Declaration is the preliminary statement.  Parts II and III of this Declaration provide an overview of the Debtors' businesses, organizational structure, operations, the circumstances giving rise to the commencement of these chapter 11 cases, and what the Debtors seek to accomplish in chapter 11.  Part IV describes the Debtors' prepetition Sale Process and the Global Sale Process.  Part V sets forth the relevant facts in support of the First Day Pleadings.

## PART I

## PRELIMINARY STATEMENT

8.      The Debtors are a specialty pharmaceutical company that develops and commercializes certain drugs and novel drug delivery systems for targeted therapies, with the goal of improving patients' quality of life and addressing unmet patient needs.  As of the Petition Date, the Debtors have two marketed products: SUBSYS® and SYNDROS®, each as described below, which provide substantially all of the Debtors' revenues as of the Petition Date.

9.      In addition, the Debtors are developing other differentiated product candidates, described below, by leveraging their capabilities in cannabinoid formulation and manufacturing and their proprietary sublingual and nasal spray drug delivery technology.  The Debtors expect that these product candidates are capable of generating future revenue streams, as well as offering solutions to patients with unmet needs.

WEIL:\97005116\26\53602.0003

10. As described below in more detail, the Debtors are facing extensive litigation relating to their SUBSYS® product ("**Subsys**"), which is a prescription opioid. As of the Petition Date, one or more of the Debtors have been named in approximately one thousand lawsuits, and the Debtors anticipate that additional lawsuits may be commenced in the future. Some of the litigation they are facing is common to all opioid manufacturers, while other claims are based on particular alleged activities of the Debtors' former executives, many of whom either pleaded guilty to or were convicted after trial of federal criminal activity relating to such activities. The expenses and settlement costs resulting from such litigation have been substantial, consuming large portions of the Debtors' revenue and liquidity.

11. At the same time, over the last few years, the Debtors' revenues from Subsys have been declining rapidly as a result of the increased national scrutiny of prescription of opioids by healthcare professionals, the resulting high-profile political and legal actions taken against manufacturers and distributors of opioids, and the specific news relating to the former executives' criminal activity. Moreover, although the Debtors have promising products in the pipeline, those products are not yet approved for production, require significant additional investment to bring to market, and are not expected to generate revenue in the near term. As a smaller company than some other opioid manufacturers, with over 90% of its current revenue coming from the sale of opioids, Insys could not withstand the concurrent negative impact of massive litigation costs and significant opioid revenue deterioration. These factors have caused a substantial cash drain on the company to the point where, despite the Debtors' best efforts, they risk running out of cash in 2019.

12. As described herein in more detail, for the last year or so, the Debtors, under their current management – which is new and was not involved in the conduct that is the subject

of the criminal proceedings involving the prior management team – have undertaken major initiatives to improve the Debtors' financial situation, including implementing numerous rounds of cost reductions and exploring various strategic transactions to generate liquidity.  These efforts, however, were insufficient to overcome the massive litigation costs and revenue decline that have plagued the Debtors' finances.

13.    This situation, including no end in sight to the litigation, led the Debtors to conclude that filing for chapter 11 protection is the optimal path for their stakeholders, as it best enables the Debtors to resolve their liabilities fairly and efficiently and achieve maximum value for their creditors.  The Debtors have developed a multi-pronged chapter 11 strategy to accomplish those goals.  On the one hand, they will maximize the value of their enterprise through exploring a sale of substantially all of their assets and pursuing affirmative causes of action.  On the other hand, they seek to preserve funds by moving to stay burdensome and asset-consuming litigation and to limit their time in chapter 11 through estimation of categories of claims to facilitate confirmation of a chapter 11 plan and distribution to creditors.  In other words, the Debtors seek to increase the cash value of their saleable and other assets, while preserving as much of that value as possible to pay claimants, rather than using it to fund unnecessary chapter 11 and other legal costs.  The specific mechanisms the Debtors are proposing in connection with these prongs are described in further detail herein.

14.    As discussed herein, after months of negotiations, the Debtors recently reached a consensual resolution of their liability to the United States by entering into a series of agreements with the U.S. Department of Justice (the "**DOJ**") and other federal agencies.  Importantly, the Debtors are hopeful that they can negotiate consensual resolutions with other large groups of their creditors in the near future.  They believe that the platform and tools available in

5

chapter 11 provide the greatest opportunity for such a result and the most successful outcome possible for all involved.

**PART II**

**THE COMPANY AND BUSINESS OVERVIEW**

A.    <u>**Debtors' Corporate Structure**</u>

      15.    There are seven Debtors in these Chapter 11 Cases: Insys, Insys Pharma, Inc., IC Operations, LLC, Insys Development Company, Inc., IPSC, LLC, IPT 355 LLC, and Insys Manufacturing, LLC.  As shown in the simplified corporate organization chart attached hereto as **<u>Exhibit A</u>**, Insys is the direct parent of Insys Pharma, Inc., which is the direct parent of each of IC Operations, LLC, Insys Development Company, Inc., IPT 355 LLC, and IPSC, LLC. Insys Development Company, Inc. is the direct parent of Insys Manufacturing, LLC.

      16.    Insys Therapeutics, Inc. was incorporated in Delaware in June 1990 and maintains its headquarters in Chandler, Arizona.  As of the Petition Date, Insys is a publicly traded company with its shares listed on the NASDAQ Global Market LLC ("**NASDAQ**") under the ticker symbol INSY.

      17.    As of the Petition Date, the Debtors employed 155 full-time employees, including 48 manufacturing employees, 38 sales and marketing employees, 34 employees engaged in research and development, and 35 employees in administration.

      18.    More information about Insys is available in its Form 10-K annual report, filed on March 13, 3019, as amended by Form 10-K/A (Amendment No. 1) on April 20, 2019, and in its Form 10-Q, filed on May 13, 2019.

6

B.    **The Debtors' Management**

19.    The Debtors' current senior management consists of:

| Name | Position(s) |
|---|---|
| Andrew G. Long | Chief Executive Officer and Director |
| Andrece Housley | Chief Financial Officer |
| Mark Nance | Chief Legal Officer and General Counsel |
| Venkat Goskonda, PhD | Chief Scientific Officer |
| Vikram Malhotra | Vice President of Corporate Development & Strategy |
| (Richard) Scott Warlick | Vice President of Manufacturing (Round Rock) |
| Danny Tuck, PhD | Senior Vice President - Quality Operations |
| Eric Kizior | Vice President of Commercial |
| Ahmend Elkashef | Vice President of Clinical Development |

20.    As discussed below in more detail below, in the last several years, the Debtors implemented an overhaul of their management and organization.

C.    **Overview of the Debtors' Operations and Assets**

21.    The Debtors' primary operations include research and development (including preclinical and clinical trials and studies), manufacturing, marketing, and sales in support of certain drugs and novel drug delivery systems for targeted therapies. As of the Petition Date, the Debtors have two commercially marketed products.

22.    SUBSYS®. Subsys is an opioid pain medication indicated for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. Subsys is the first and only breakthrough pain medication approved by the U.S. Food and Drug Administration ("**FDA**") for cancer patients offered as a sublingual (under the tongue) spray that delivers fentanyl, an opioid agonist absorbed underneath the tongue. The Debtors believe that Subsys is an important, differentiated treatment option for patients and physicians relative to other transmucosal immediate-release fentanyl ("**TIRF**") products due to its rapid onset of action

(patients can administer it in less than one minute and it provides pain relief as little as five minutes), improved bioavailability, most complete range of dosage strengths, and ease of administration.  The Debtors commercially launched Subsys on March 26, 2012.

23.    SYNDROS®. SYNDROS® ("**Syndros**") is a prescription medicine used to treat (1) loss of appetite and anorexia associated with weight loss in people with AIDS and (2) nausea and vomiting caused by anti-cancer medicine (chemotherapy) in patients whose nausea and vomiting have not improved with conventional anti-nausea and vomiting medicines.  Syndros is the first and only FDA-approved liquid dronabinol (a synthetic cannabinoid medication), which allows for fast absorption, flexible dosing, and a potential solution for patients who may prefer a liquid medication.  The Debtors commercially launched Syndros in July 2017.

24.    The Debtors are also developing other product candidates (their "**Pipeline Products**"), including cannabinoid line extensions and sublingual spray product candidates.  With their Pipeline Products, the Debtors seek to make available better solutions for providing relief around the conditions that burden patients' lives.  The Debtors' Pipeline Products are aimed at addressing conditions with unmet medical needs, such as (i) refractory pediatric epilepsy (including childhood absence epilepsy and infantile spasms), (ii) the genetic disorder Prader-Willi syndrome (which is a rare genetic disease characterized by insatiable appetite in children that often leads to obesity, type 2 diabetes, and premature death), (iii) anorexia-associated weight loss in cancer patients, (iv) agitation in Alzheimer's disease, (v) migraines, (vi) anaphylaxis (severe allergic reaction), (vii) acute pain, (viii) opioid dependence, and (ix) reversal of opioid-induced respiratory depression.  The Pipeline Products include the following, among other products in development:

WEIL:\97005116\26\53602.0003

25.    <u>Naloxone Nasal Spray</u>.    The Debtors' most advanced Pipeline Product candidate is a naloxone nasal spray.  This product candidate possesses unique pharmacological properties that may make it effective in treating overdoses due to illicitly manufactured fentanyl and other long-lasting opioid drug products.  The Debtors filed a New Drug Application for this product candidate with the FDA on April 30, 2019.

26.    <u>Epinepherine Nasal Spray</u>.  The Debtors are also developing an epinephrine nasal spray for the treatment of allergic reactions, including anaphylaxis.  This novel formulation and dosage form the potential to replace intramuscular injections.   In less medical terms, this product is a substitute to the common syringe that people with severe allergies often carry as a precaution.  The nasal spray delivery would provide similar relief without need for an injection.

27.    <u>Cannabinoid Oral Solution</u>.  The Debtors are also progressing with their Cannabidiol Oral Solution, a synthetic cannabidiol ("**CBD**"), with three clinical development programs currently underway, including two Phase 2 clinical trials.[2]  The Debtors anticipate that this CBD may be effective in treating refractory pediatric epilepsy (including childhood absence epilepsy and infantile spasms) and the genetic disorder Prader-Willi syndrome.

28.    <u>Buprenorphine Sublingual Spray</u>.    The Debtors are developing a buprenorphine sublingual spray for management of acute pain.  The Debtors believe that this product's proprietary sublingual technologies have the potential to provide a clinically meaningful therapeutic advantage over existing delivery methods for pain management.  The Debtors received a complete response letter from the FDA on Buprenorphine for acute pain, and no work is currently being done to further advance this asset.

---

[2] The Debtors' Phase 3 clinical trial, which had been underway, is currently halted.

WEIL:\97005116\26\53602.0003

29.     The Debtors maintain two manufacturing facilities under operating lease agreements, which are both located in Round Rock, Texas.  Such facilities are Drug Enforcement Administration-approved and FDA-inspected state-of-the-art dronabinol manufacturing facilities at which the Debtors produce dronabinol, the active pharmaceutical ingredient ("**API**") in their dronabinol product family, including Syndros.  The chemical materials for dronabinol API are sourced from independent suppliers and used to produce dronabinol through well-established chemical techniques involving a series of synthetic reactions and purification cycles.  The Debtors also have the capability to manufacture pharmaceutical CBD, an over 99.5% pure form of cannabidiol, in one of their Round Rock manufacturing facilities.

30.     The Debtors' ability to develop and market the products listed above is due in part to their intellectual property portfolio.  As of March 5, 2019, the Debtors owned a total of 94 worldwide patents and 62 patent applications, including 27 issued U.S. utility patents and 29 pending U.S. utility patent applications.  The U.S. patents and patent applications will expire between 2022 and 2039.  Some of the issued patents and pending applications, if issued, may also be eligible for patent term adjustment and patent term restoration, thereby extending their patent terms.

### D.     Debtors' Customers

31.     The majority of the Debtors' sales of Subsys and Syndros are to wholesale pharmaceutical distributors and specialty retail pharmacies.    Wholesale pharmaceutical distributors, in turn, sell the products to pharmacies, hospitals, and other customers, whereas specialty retail pharmacies sell the products directly to patients.  For the year ended December 31, 2018, three wholesale pharmaceutical distributors, AmerisourceBergen Corporation, McKesson Corporation, and Cardinal Health, Inc., individually comprised approximately 33%, 15%, and

10%, respectively, and two specialty retail pharmacies individually comprised 18% and 21%, of the total gross sales of Subsys and Syndros.

## E.    **Debtors' Competitors**

32.    The Debtors face competition from many different sources, such as pharmaceutical companies, including generic drug companies, biotechnology companies, drug delivery companies, and academic and research institutions.  Subsys is one of nine commercially available products in the TIRF market.[3]  There are also a number of established therapies and products already commercially available and under development by other companies that treat the indications which Syndros and the other Debtors' dronabinol product candidates are intended to treat.[4]  If these products are successfully marketed over the next few years, they could represent significant competition for Syndros.

## F.    **Debtors' Capital Structure and Liabilities**

33.    The Debtors have no funded debt and approximately $37 million in cash and cash equivalents and investments as of the Petition Date.  The vast majority of the Debtors'

---

[3] Some currently marketed products against which the Debtors directly compete include Teva Pharmaceutical Industries Ltd.'s FENTORA® and ACTIQ®, Sentynl Therapeutics' Abstral®, West Therapeutic Development, LLC's Lazanda®, and BioDelivery Science International, Inc.'s Onsolis®. Some generic fentanyl products against which Subsys competes are marketed by Mallinckrodt, Inc., Par Pharmaceutical Companies, and Actavis, Inc.

[4] For example, they compete or will compete against therapies and products such as AbbVie, Inc.'s Marinol® and Marinol® generics.  In addition, Par Pharmaceutical Companies markets an approved generic version of Marinol®, and Actavis, Inc. markets an authorized generic version of Marinol®.  Additionally, the Debtors are aware of companies that have received approval for the commercialization of chemotherapy-induced nausea and vomiting ("**CINV**") products, including Heron Therapeutics, Inc.'s Sustrol®, Tesaro, Inc.'s Varubi®, and Helsinn Therapeutics (U.S.), Inc.'s Akynzeo®.

WEIL:\97005116\26\53602.0003

liabilities are litigation-related claims, which are described below in more detail.  The Debtors also have liabilities relating to goods and services provided prior to the Petition Date.

## PART III

## EVENTS LEADING TO THESE CHAPTER 11 CASES

34.    Over the last several years, the Debtors have faced a litany of litigation relating to what has been commonly referred to as the "opioid crisis."  Recognizing the devastating consequences of this national epidemic of misuse and addiction to opioids on public health, the Debtors take all allegations of past wrongdoing by former employees with the greatest seriousness, and, as discussed below, have taken actions to address them.  Some of the litigation involving the Debtors is common to all manufacturers of opioid products and some is unique to the Debtors based on particular actions by the Debtors' prior management.  The cost of litigating and settling these claims has become overwhelming and unsustainable.  The legal expense associated with defending the Debtor in a single trial proceeding can exceed $10 million, with the trial itself accounting for approximately one-third to one-half of that figure.  At the same time, the Debtors' revenues have declined significantly over the last few years, while spending to advance their Pipeline Products has continued to be a drain on liquidity.  Notwithstanding the Debtors' efforts to cut costs and pursue liquidity-enhancing transactions, they determined that pursuit of these Chapter 11 Cases was the only path to avoid running out of money and to maximize recoveries for their numerous stakeholders.

A.    **LITIGATION**

(a)    **Overview**

35.    Since 2013, the Debtors have faced an onslaught of investigative inquiries and litigation claims by both the government and private parties in connection with the marketing of Subsys, which claims have continued to surge with the ongoing and heightened publicity

12

surrounding the national opioid epidemic.[5]   Many of these inquiries and lawsuits against the

Debtors (and certain of their former employees, officers, and directors) have focused on, among

other things, issues related to potential violations of the Anti-Kickback Statute and the Food, Drug

& Cosmetic Act through the sales and marketing of Subsys and the Debtors' business unit created

to secure prior authorizations required for insurance reimbursement of prescription costs for

patients, known as the "Insys Reimbursement Center" or the patient services hub. The government

and private parties allege, among other things, that this activity was illegal and that it led to

improper use of and reimbursement for Subsys.

36.     Through the speaker program, certain Debtors paid healthcare professionals

to make presentations regarding Subsys.  As described further below, in connection with the

speaker program, Insys Pharma, Inc. pleaded guilty to five counts of mail fraud, and Insys

Therapeutics, Inc. entered into a deferred prosecution agreement concerning the same five counts

of mail fraud with the United States Attorney for the District of Massachusetts.

37.     Insys has taken significant steps to address past wrongdoing, and new

management has committed the Debtors to engaging only in marketing practices that strictly

comply with federal and state laws and regulations, including implementing an overhaul of key

personnel (as described below), and has focused extensively since then on instilling the highest

respect for fundamentally sound values among all of its employees.  Insys determined to take

responsibility for the past and to learn from it, while at the same time sustaining its investment in

research and development to continue advancing its Product Pipeline.  In fact, as described below

in more detail, on June 5, 2019, Insys entered into a Corporate Integrity Agreement and

---

[5] These lawsuits and inquiries are described in more detail in the Debtors' *Opening Brief in Support of their Motion for a Preliminary Injunction Pursuant to 11 U.S.C. § 105(a)*, to be filed contemporaneously herewith, or shortly thereafter.

WEIL:\97005116\26\53602.0003

Conditional Exclusion Release ("**CIA**") with the Office of Inspector General for the U.S. Department of Health and Human Services (the "**HHS-OIG**"), under which Insys has agreed to establish and maintain for a period of five years an extensive program intended to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other federal health care programs, and with the statutes, regulations, and written directives of the FDA.

38.     Certain Debtors are defendants in approximately one thousand actions brought before U.S. federal and state courts by numerous plaintiffs asserting claims related to Subsys. In addition, the Debtors are facing significant potential liabilities as a result of ongoing federal and state investigations and potential indemnification claims of officers and directors. These challenges have led to significant legal costs and expenses, which have had, and would have continued to have, a material adverse effect on the Debtors' financial condition.

39.     The various pending actions against, and other potential liability of, the Debtors related to Subsys can be, generally, categorized as follows:

- U.S. Government investigations and U.S and State Qui Tam litigation

- State Attorneys General investigations and litigation

- Municipality litigation

- Private insurance provider litigation

- Personal injury litigation

- Securities litigation

- Indemnification claims of officers and directors

WEIL:\97005116\26\53602.0003

(b)      **The DOJ Investigation and Resolution**

40.      Beginning in late 2013, the Debtors began receiving subpoenas and other requests for information relating to their sales and marketing of Subsys and the Insys Reimbursement Center from various government entities.  The Debtors have cooperated with these investigations and have produced a substantial number of documents in response thereto.

41.      Between August 2013 and October 2016, certain individuals (the "***Qui Tam Plaintiffs***") filed actions against Insys related to the company's marketing and sales of Subsys pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "***Qui Tam Actions***").[6]  The United States and the states of California, Colorado, Indiana, Minnesota, New York, North Carolina, and Virginia intervened in part and declined to intervene in part in certain of the Qui Tam Actions. The United States' Complaint in Intervention, which was ordered unsealed on May 11, 2018, brings claims on behalf of the HHS-OIG, the Centers for Medicare & Medicaid Services (Medicare program), and the Defense Health Agency (TRICARE program) (the "**DOJ Civil Action**").  The Debtors' continuing discussions with federal agencies with respect to the federal investigations culminated in a resolution on June 5, 2019, described further below.[7]  As part of such resolution, the DOJ agreed to move to dismiss the United States' claims with prejudice in the *Qui Tam* Actions, excepting certain claims for attorneys' fees and retaliation claims.

42.      In addition to the DOJ Civil Action, the DOJ commenced criminal investigations against Debtors Insys Pharma, Inc. and Insys Therapeutics, Inc. (the "**DOJ**

---

[6] The Qui Tam Actions include: *United States ex rel. Guzman v. Insys Therapeutics, Inc.* (CV 13-5861 JLS (AJWx)), *United States ex rel Doe v. Insys Therapeutics, Inc.* (CV 14-3488 JLS (AJWx)), *United States ex rel. Andersson v. Insys Therapeutics, Inc.* (CV 14-9179 JLS (AJWx), *United States ex rel. Erickson v. Insys Therapeutics, Inc.* (CV 16-2956 JLS (AJWx), and *United States ex rel. Doe v. Insys Therapeutics, Inc.* (CV 16-7937 JLS (AJWx)).

[7] In their negotiations with the DOJ, the Debtors have been represented by outside counsel, Covington & Burling LLP.

WEIL:\97005116\26\53602.0003

**Criminal Actions**," and, together with the DOJ Civil Action, the "**DOJ Actions**").  Additionally, HHS-OIG considered a potential action to exclude Insys from participation in certain federal healthcare programs, such as Medicare and Medicaid (the "**HHS-OIG Potential Action**").

43.     On August 8, 2018, the Debtors announced an agreement in principle with the United States, through the DOJ, to resolve the DOJ Actions (the "**2018 Agreement in Principle**").  Pursuant to the 2018 Agreement in Principle, the Debtors agreed to a minimum liability exposure of $150,000,000 over five years, with the potential for additional contingency-based payments associated with certain events that could require additional payments of up to $75,000,000.

44.     After months of negotiations, on June 5, 2019, the Debtors, the DOJ and the HHS-OIG agreed to a global resolution of the DOJ Actions and the HHS-OIG Potential Action, and in connection therewith entered into several interrelated, interdependent agreements and related documents, including:

45.     <u>Settlement of DOJ Civil Action</u>: To resolve the DOJ Civil Action, the United States and the Debtors entered into the Settlement Agreement with the United States (the "**DOJ Prepetition Civil Settlement Agreement**"), pursuant to which the Debtors agreed to a $195 million restitution payment, with $5 million of that paid within one day of the execution of the agreement, and the United States agreed to a release of certain civil claims against the Debtors.  In connection therewith, the parties agreed to the terms of a stipulation to be executed after the Petition Date and to be filed with a motion for approval pursuant to section 9019 of the Bankruptcy Code in this Court (the "**DOJ Stipulation**"), pursuant to which the Debtors agreed that the United States will have a $243 million allowed unsecured claim in the Chapter 11 Cases (capped at a $195 million recovery, including the $5 million prepetition payment) as the sole remedy for the

WEIL:\97005116\26\53602.0003

"Covered Conduct" (as defined in the DOJ Prepetition Civil Settlement Agreement) and for any breach by Insys of the DOJ Prepetition Civil Settlement Agreement (which breach would result in much higher claims under the terms of such agreement), the United States agreed that that there will be no successor liability in the case of 363 sales of Subsys, and both parties agreed to certain other releases.[8]

46.    <u>Resolution of the DOJ Criminal Actions</u>: To resolve the DOJ Criminal Actions, the United States Attorney for the District of Massachusetts entered into the Plea Agreement with Insys Pharma, Inc. (the "**Plea Agreement**") and the related Deferred Prosecution Agreement with Insys Therapeutics, Inc. (the "**DPA**"). Pursuant to the Plea Agreement, Insys Pharma, Inc. pleaded guilty to five counts of mail fraud on June 7, 2019. As part of the resolution, the parties agreed to resolve claims against Insys Pharma, Inc., through its guilty plea to five counts of mail fraud and a recommended sentence for Insys Pharma, Inc. to pay a $2 million fine and $28 million in forfeiture. Pursuant to the Plea Agreement, the first payment totaling $5 million was due to be paid ten days after the criminal sentencing of Insys Pharma, Inc., which has been set for July 10, 2019. Pursuant to the DPA, among other things, the United States agreed to defer prosecution against Insys of its criminal mail fraud actions for a term of five years if Insys abides by the terms of the DPA, with Insys's agreement that it is jointly and severally liable for the money owed by Insys Pharma, Inc. pursuant to the Plea Agreement, and with certain cooperation and compliance obligations.[9]

---

[8] Contemporaneously herewith, the Debtors will be filing the *Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Stipulation and Agreement Between the Debtors and the United States*, which describes the DOJ Prepetition Civil Settlement Agreement and the DOJ Stipulation in more detail.

[9] The Debtors anticipate the United States Attorney for the District of Massachusetts will assert a general unsecured claim, after the sentencing of Insys Pharma, Inc. on account of the Plea Agreement.

WEIL:\97005116\26\53602.0003

47.     <u>Resolution of HHS-OIG Potential Action</u>: To resolve the HHS-OIG Potential Action, the Debtors and HHS-OIG entered into the CIA, pursuant to which, among other things, the Debtors are required, for a five-year period, to comply with certain heightened monitoring and reporting obligations, and the HHS-OIG agreed not to exclude the Company from federal health care programs for the covered time period, if it complies with the terms of the agreement.   Pursuant to the CIA, the Debtors are required to take a number of actions which include, among other things: (a) ceasing the marketing and promotion of Subsys within 90 days of the effective date of the CIA or the divestiture of Subsys, whichever occurs first, and (b) divesting Subsys and its buprenorphine candidate product to a bona fide independent third party, and ceasing all business activities related to opioids within 12 months of the effective date of the CIA.

48.     In addition, on May 21, 2019, the HHS-OIG provided the Debtors with a letter (the "**OIG Side Letter**"), in which, among other things, the HHS-OIG acknowledged that Insys is likely to file for bankruptcy and stated that its general rule is that in an asset sale under section 363 of the Bankruptcy Code, a *bona fide* unrelated third party purchaser of assets is not subject to the obligations of the CIA.   The HHS-OIG also committed in the OIG Side Letter to work expeditiously with any purchaser of the Debtors' assets to make a determination about successor liability issues associated with the purchases stemming from the bankruptcy.

(c)     **State Related Investigations**

49.     The Debtors received information requests or subpoenas from at least fifteen states' offices of the attorney general (or similarly named and authorized office), which have ongoing investigations regarding the Debtors' sales and marketing practices related to Subsys and the Insys Reimbursement Center (the "**AG Investigations**").   In addition, the Debtors received an administrative subpoena from the California Insurance Commissioner.   The Debtors have been

cooperating with each of those investigations, and settled several claims before the Petition Date, including with the states of Oregon, New Hampshire, Illinois, and Massachusetts.  Insys is also a defendant in legal proceedings commenced by ten states' offices of the attorney general (the "**Attorney General Actions**").  The Attorney General Actions are in various stages of litigation.

### (d)    Municipality Litigation

50.    Certain Debtors have been named, together with various other defendants, including opioid manufacturers, distributors, prescribers, pharmacies, and others, in opioid-related complaints by various counties, states, Native American tribes, and third-party payers in many state and federal courts in approximately 32 states. The Debtors are defendants in approximately 1,000 of these cases (the "**Municipal Actions**").

51.    The majority of the Municipal Actions have been consolidated into Multidistrict Litigation No. 2804 (the "**MDL**") in the United States District Court for the Northern District of Ohio (the "**MDL Court**").  Most of the cases in the MDL are currently stayed while a limited number of cases proceed.  Specifically, the MDL Court has ordered two litigation tracks of five total cases for accelerated discovery, motion practice, and bellwether trials, the first of which is scheduled to begin on October 21, 2019.  Track 1 is comprised of three cases brought by plaintiffs located in the Northern District of Ohio.  Insys is named in those cases alongside approximately 23 Defendant Families.[10]  Track 2 includes claims of Cabell County Commission, West Virginia and City of Huntington, West Virginia.

52.    In addition, approximately 230 Municipal Actions against Insys are pending outside the MDL, mostly in state courts in Arizona, California, Connecticut, New York,

---

[10] "Defendant Families" are groups of related corporate entity defendants.

Oklahoma, Pennsylvania, South Carolina, Texas, and Virginia.  These cases are in various stages of motion practice and discovery.

### (e)    Private Insurance Litigation

53.    There are currently pending claims brought by, or on behalf of,[11] six insurance companies and seven self-funded health care plans (together, the "**Private Insurers**"). These proceedings are in various states of litigation.

### (f)    Personal Injury Plaintiff Litigation

54.    There are currently 28 personal injury lawsuits, including those that seek class action status, alleging a variety of claims, including negligent misrepresentation, failure to warn, wrongful death, loss of consortium, negligence, and fraud concerning Insys's marketing and sale of Subsys.

### (g)    Securities Litigation

55.    Insys, along with certain former officers, is a defendant in three pending federal securities litigation proceedings in federal courts in Arizona and New York.

### (h)    Indemnity Claims

56.    The Debtors are parties to prepetition indemnity agreements and other undertaking agreements with certain current and former executive officers and certain former members of the Insys Board of Directors (the "**Board**"), which require the Debtors to advance expenses (including attorneys' fees) incurred in connection with any legal proceeding related to their position, as well as indemnification for any and all expenses, actually and reasonably

---

[11] One of these suits is brought on behalf of Medicare Advantage Organizations, Independent Practices Associations, Management Service Organizations, Health Maintenance Organizations, and other downstream Medicare entities that had assigned their claims to plaintiffs.  This case assert RICO and common law fraud claims related to alleged overpayments by the assignors.

incurred, in connection with the investigation, defense, settlement, or appeal of such a proceeding, subject to certain limitations set forth in the agreements or as otherwise may be applicable pursuant to other documents or agreements or governing law.

57.     These indemnification agreements have become a drain on the Debtors' liquidity, as a number of the Debtors' former employees and former executives have been charged in criminal proceedings related to the above-referenced investigations.  A number of these former employees and executives have since pleaded guilty.  In addition, on May 2, 2019, the Debtors' founder and former President, CEO, and director, Dr. John N. Kapoor ("**Dr. Kapoor**"), and four other former employees were convicted on a criminal racketeering charge in federal court in Boston.  It is expected that they will appeal such convictions.

58.     In addition, certain of the Debtors' former officers and directors are defendants in two pending shareholder derivative law actions in Delaware and Arizona (together, the "**Derivative Litigation**").    Insys formed a Special Litigation Committee of its Board comprised of independent and disinterested directors to investigate and evaluate the claims in the Derivative Litigation.  The Special Litigation Committee currently is investigating whether the claims in the Derivative Litigation should be pursued on behalf of the Debtors' estates.  The Special Litigation Committee is working expeditiously to complete its investigation and expects to be in a position to make determinations within the next several weeks.  The Debtors are committed to maximizing value for the benefit of their estates consistent with their fiduciary duties and have been supporting, and intend to continue to fully support, the Special Litigation Committee as it concludes its investigation.

WEIL:\97005116\26\53602.0003

59.     As stated above, Insys and certain of its former officers are defendants in three pending federal securities litigation proceedings in federal courts in Arizona and New York. These proceedings are the subject of indemnification claims as well.

60.     The Company has paid many millions of dollars for such indemnification claims and the former officers and directors have asserted millions more in unpaid indemnification claims for legal costs incurred in the foregoing actions.  The Debtors will be entitled to seek to claw back the amounts paid upon the sentences of any such individuals who have pleaded guilty or have been convicted, and they intend to pursue such claw back claims vigorously.

**(i)     Other Investigations and Litigation**

61.     The Debtors are also plaintiffs in certain patent infringement lawsuits with TEVA USA related to Subsys, in which TEVA US is asserting certain counterclaims.  These lawsuits have been consolidated in Delaware as case C.A. No. 17-1303 (CFC).

62.     In addition to the Special Litigation Committee's investigation of the claims in the Derivative Litigation, the Debtors currently are in the process of investigating and evaluating other claims that the estates might have, including, but not limited to, potential avoidance or other claims.

**B.     DEBTORS' FINANCIAL CONDITION AND RESTRUCTURING EFFORTS**

**(a)     Decline in Business**

63.     At the same time as they have been facing massive litigation costs, the Debtors' revenues from Subsys sales, which at all times has made up at least 90% of their total revenue, have been declining significantly.  Subsys, along with the TIRF class in which it is classified, has experienced a significant downward trend for the past several years.  Specifically, based upon industry data available to the Debtors, since 2015, TIRF class prescriptions have

declined approximately 75%. Subsys is declining at a faster rate than the overall market, potentially due to the negative publicity surrounding the company.  Moreover, the Debtors believe that the nature of the pricing on their branded products such as Subsys and Syndros has adversely affected their overall market share and the revenue generated from such branded products.  This has been compounded by the fact that pharmaceutical product pricing has recently received increased governmental and media attention.  The Debtors believe that migration to lower-cost generics has resulted from this increased attention and focus.

64.     The Debtors' financial situation has also been impacted by the Debtors spending tens of millions of dollars in Research and Development ("**R&D**") costs to advance their Pipeline Products, which take years to develop before they even bring in a single dollar of revenue. The Debtors are currently using cash on hand and revenues from product sales both to run their current business, including Subsys and Syndros, and on R&D and other expenses related to development of the Pipeline Products.

65.     The massive litigation costs, decline in revenue, and spending requirements for the Pipeline Products have caused the Debtors to experience substantial operating losses, including operating losses in excess of $200 million in 2017 and $100 million in 2018.  Although the Debtors believe that their Pipeline Products have value and may generate significant revenue in the future, they determined that in light of their declining Subsys revenue and substantial litigation costs, they do not have sufficient liquidity to sustain their operations, R&D costs, and litigation expenses over the next few years until their Pipeline Products can bring in revenue.

66.     Further compounding the situation, the Debtors' auditors informed them in connection with the filing of the 2018 10-K that, notwithstanding management's efforts to reduce costs and the Debtors' bankers' efforts to identify liquidity-enhancing transactions, they would not

WEIL:\97005116\26\53602.0003

provide the Debtors with an unqualified going concern audit opinion for the Debtors' Form 10-K filed with the SEC in March. The going concern qualification negatively affected the Debtors' attempts to obtain funding.

      **(b)**      **Debtors' Efforts to Restructure**

      67.      As a result of such events leading to a deterioration of the Debtors' financial condition, the Debtors took certain actions to seek to ameliorate the situation. Specifically, the Debtors' management team has continually examined and implemented cost reduction initiatives to align operating expenses more closely with their reduced revenue. On July 12, 2018, the Debtors eliminated 45 positions through headcount reduction and role consolidation. The headcount reduction included 30 employees, the majority of which were sales and marketing employees, and represented approximately 9% of their workforce at the time. On and around November 1, 2018, the Debtors eliminated an additional 48 positions through further headcount reduction and role consolidation. The headcount reduction included 36 employees, the majority of which were sales and marketing employees, and represented approximately 13% of the Debtors' workforce at the time. On May 31, 2019, the Debtors eliminated an additional 8 positions that represented approximately 5% of the Debtors' workforce at that time.

      68.      Furthermore, to enhance their liquidity position, on November 5, 2018, the Debtors announced a process to review strategic alternatives for their opioid-related assets, including Subsys, and engaged JMP Securities LLC ("**JMP**") as their financial advisor to assist with this process. JMP engaged in an extensive marketing process for Subsys, which led to several offers. None of such offers, however, could be consummated quickly or provide sufficient near-term cash by themselves to enable the Debtors to "fund the gap" between their existing cash burn situation and the period in the future when they would expect to generate revenues.

WEIL:\97005116\26\53602.0003

69.     As the extent of their funding gap became clearer, the Debtors also engaged Lazard Freres & Co. LLC ("**Lazard**") in December 2018 to advise the Debtors on capital planning and the evaluation of strategic alternatives related to the Debtors' opioid-related assets, as well as to explore other potential sale, financing, or partnership opportunities.  Notwithstanding the broad mandate Lazard was given to find a transaction for any of the Debtors' assets that could bring in sufficient liquidity to provide a long-term runway for the Debtors, the Debtors were unable to identify a transaction or group of transactions that would ensure the Debtors' long-term survival.

70.     Moreover, after determining that the offers they received were not likely, individually or combined, to enable them to avoid a chapter 11 filing, the Debtors decided that pursuing such transactions in a chapter 11 process would be most likely to maximize value. Accordingly, the Debtors did not consummate any such transactions, but are seeking to sell such assets through the Global Sale Process in the Chapter 11 Cases.

(c)     **Changes in Management**

71.     Beginning in April of 2017, Insys replaced half of the independent directors on its Board and several of its most senior management personnel, including the positions of CEO, CFO, and vice presidents of Commercial, Sales, Human Resources, and Clinical Development. The Debtors also restructured and realigned their sales force, focusing its members on physicians in medical oncology and pain management whose prescribing patterns support their products' approved indications and added additional new hires to the sales force, bringing additional experience with appropriate promotion of specialty pharmaceuticals to the company.

72.     In addition, in May of 2017, Insys announced a search to identify new board members in alignment with its vision to become the leader in the cannabinoids market and grow

WEIL:\97005116\26\53602.0003

the business.  Since then, Insys has continued to appoint independent members to its Board as well as new executives to the senior management team.

73.    On October 29, 2017, the Board accepted the resignations of Dr. Kapoor and Patrick P. Fourteau, as board members.  As part of his resignation, Dr. Kapoor agreed to place his shares of Insys, which represented approximately 59% of the outstanding shares of common stock of Insys, into an independent trust.  Effective as of February 27, 2018, Insys entered into a voting trust agreement with Dr. Kapoor (and certain of his beneficiaries) and an independent trustee.  During the term of this voting trust, Dr. Kapoor (and certain of his beneficiaries) do not have control over voting decisions over the shares of Insys common stock beneficially owned by Dr. Kapoor and the beneficiaries (except under limited circumstances).

74.    On April 15, 2019, the Debtors announced further leadership changes, including my appointment as CEO, and the appointment of a new CFO, Andrece Housley (who had been Insys's Corporate Controller), and a new Chief Scientific Officer, Dr. Venkat Goskonda (who had been Insys's Senior Vice President of Research and Development).  On May 22, 2019, John A. McKenna Jr., who has over 20 years of restructuring experience, joined the Board as an independent director.  Then, on June 5, 2019, the Board accepted the resignations of two of its members, Steven Meyer and Pierre Lapalme, who were, prior to their resignations from the Board, the longest-serving Insys directors.

75.    All in all, most of the Insys management team and the commercial organization, which includes the sales force, is new to the company since 2015; in fact, the vast majority of the Debtors' employees, which include physicians, researchers, and scientists with advanced academic degrees, are new to the company since 2015.

WEIL:\97005116\26\53602.0003

C.    **Goals of Chapter 11**

76.    The combination of the Debtors' liquidity situation and the substantial litigation they face led the Debtors to commence these Chapter 11 Cases.  The Debtors' goal in these Chapter 11 Cases is simple, although the mechanisms they may need to utilize to accomplish that goal are not so simple.  That goal is to maximize value for all of their stakeholders and treat all stakeholders fairly in a transparent and equitable process.  The Debtors also believe that the chapter 11 path will provide them the forum to be able to negotiate a consensual resolution with some or most of their creditor groups, as they did with the DOJ, and they welcome the opportunity to negotiate with their creditors during these Chapter 11 Cases.

77.    The first step to maximizing value is Lazard's work in finding the most valuable investments available for the Debtors' various assets – those value-maximizing transactions may come in the form of section 363 sales, but the Debtors are also open to other types of transactions that will allow them to provide the maximum return to their creditors.  The Debtors are filing contemporaneously herewith a motion for the approval of global bidding procedures in connection with the Global Sale Process.   The commencement of the Chapter 11 Cases gives the Debtors a much-needed breathing spell—one of the fundamental tenets of chapter 11—and will allow the Debtors to consummate sales of the Assets while preserving liquidity.

78.    The first step also includes the Debtors' analysis and pursuit of various affirmative claims to maximize value for the Debtors' estates, such as seeking a recovery of the indemnification claims they have paid over the last few years, as discussed above.  As also discussed, the Special Litigation Committee is investigating certain claims against their former directors and officers currently pending, and the Debtors are investigating bringing other actions they believe will bring in millions of dollars for the benefit of their creditors, including claims

WEIL:\97005116\26\53602.0003

against insurance carriers that the Debtors believe have wrongly denied coverage over the last few years.

79.     The second step to maximize value is to stop the bleed on litigation-related legal expenses.  Put simply, the Debtors have limited assets and they want to use those assets to pay creditors.   These Debtors, as much as or more than any, need the "breathing room" contemplated by the automatic stay under section 362 of the Bankruptcy Code.    As a result, the Debtors are seeking an injunction against the majority of litigation continuing against them during the Chapter 11 Cases.  This is a necessary step because some of that litigation may be subject to the "police powers" exception to the automatic stay.  As described in more detail in the Debtors' Complaint for Injunctive Relief, filed contemporaneously herewith or in the near future, allowing such litigation to continue would erode the Debtors' precious liquidity, enhancing the pockets of lawyers instead of creditors and distracting management's attention away from preserving the business and disposing of their assets for the benefit of all creditors.  It might also give certain of the Debtors' creditors (government units) an unfair advantage over other creditors.  The fact that the substantial goal of the litigation is to seek monetary damages from the Debtors, not to stop them from any wrongdoing that is currently harming the public, further supports this relief, as does the fact that the Debtors are likely to sell all of their assets in the near-term, including their opioid assets, rendering any injunctive relief unnecessary.  Moreover, the Debtors will be under the supervision of this Court for the near future.

80.     The third step in the Debtors' effort to maximize value is to implement a mechanism that will facilitate the proposal of a chapter 11 plan relatively quickly to enable the Debtors to begin making distributions to creditors sooner rather than later (in contrast to staying in bankruptcy a long time with substantial monthly costs associated therewith).  In light of the

WEIL:\97005116\26\53602.0003

significant amount of contingent and unliquidated claims they face, the Debtors believe that an open and transparent process that enables them to estimate their liability expeditiously and provides all creditors an opportunity to participate will maximize value while still protecting all parties' due process rights.   Accordingly, the Debtors are filing a motion requesting that the Bankruptcy Court adopt estimation procedures and estimate, pursuant to section 502(c) of the Bankruptcy Code, the Debtors' aggregate liability with respect to certain categories of claims related to Subsys to avoid undue delay in the administration of these Chapter 11 Cases. Implementing such an efficient process will afford the Debtors a full, fair, and reasonable opportunity to negotiate, propose, file, and solicit acceptances of a chapter 11 plan and make distributions to creditors, without prolonged and costly litigation over the value of such claims.

81.     While certain creditors may object to these mechanisms, and may feel stymied by the Debtors' bankruptcy, the Debtors believe that it is in the best interests of <u>all creditors</u> to proceed down this path.

## PART IV

### The Sale Process

**A.** **Prepetition Sale Process**

82.     In November of 2018, the Debtors announced that they had commenced a process to review strategic alternatives for their opioid-related assets, including Subsys, and previously had engaged JMP to serve as their investment banker in connection therewith.   To implement their sale strategy, the Debtors and JMP identified and contacted a broad array of parties that potentially could have the interest and ability to consummate a potential sale or license of rights with respect to Subsys (a "**Subsys Transaction**") on terms acceptable to the Debtors.

83.     In addition to a potential Subsys Transaction, in furtherance of their operational and financial goals, the Debtors continued to explore a comprehensive set of strategic

alternatives to increase the Debtors' liquidity and maximize value for the Debtors and their stakeholders.  In connection therewith, in December 2018, the Debtors engaged Lazard to, among other things, explore opportunities to engage in a strategic partnership or financing transaction with respect to some or all of the Debtors' Pipeline Products.  To implement their strategy, the Debtors and Lazard identified and contacted a broad array of parties that potentially could have the interest and ability to consummate transaction(s) with respect to some or all of the Pipeline Products on terms acceptable to the Debtors.   In connection with the Debtors' assessment of the possible need to file for chapter 11 protection, the marketing efforts with respect to a Subsys Transaction were transitioned to Lazard in April 2019.

84.    Although the Debtors negotiated potential sale transactions with numerous counterparties, they ultimately determined it was prudent to file chapter 11 at this time, before a stalking horse transaction could be fully negotiated.  The marketing process for the Debtors' assets has been, and is expected to remain, robust and thorough.  With the goal of maximizing value for all stakeholders, the Debtors and their advisors continue to engage in discussions with those parties that have expressed interest in any of the assets and to seek new interested parties.

**B.**    **Postpetition Sale Process**

85.    The postpetition phase of the Sale Process will consist of the potential sales of the Debtors' assets related to each of (i) Subsys, (ii) Syndros, and other assets related to CBD, (iii) Epinephrine, and (iv) Naloxone (collectively, the "**Assets**") through the Global Sale Process. The Debtors, in consultation with their advisors, developed procedures to govern various aspects of the postpetition Sale Process (the "**Bidding Procedures**").  The Bidding Procedures are designed to provide the Debtors with flexibility to run the postpetition Sale Process in a manner that will maximize the value of their assets for their stakeholders.

WEIL:\97005116\26\53602.0003

86.     To implement their chapter 11 strategy in an optimal manner, and obtain approval of the Bidding Procedures, the Debtors are filing a global bidding procedures and sale motion for the Assets (the "**Global Bidding Procedures and Sale Motion**") contemporaneously herewith.  The Bidding Procedures set forth and the relief requested in the Global Bidding Procedures and Sale Motion are designed to achieve the maximum interest in the Debtors' Assets, with the ultimate goal of driving value for the benefit of the Debtors' economic stakeholders and preserving as many jobs as possible.

87.     The Bidding Procedures allow interested parties to submit bids for any individual Asset or combination of Assets, subject to the terms and provisions of the Bidding Procedures.  If, however, the Debtors determine that the bids for any of the Assets do not provide sufficient value for such Assets, the Debtors reserve the right not to sell such Assets pursuant to the Global Bidding Procedures and Sale Motion.

## PART V

### FIRST DAY MOTIONS

88.     The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving successful chapter 11 cases for the Debtors, and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.  Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions.  Below is an overview of each of the First Day Motions.

A.    **Administrative Motions and Applications**

(a)    **Joint Administration Motion**

89.    Pursuant to the *Motion of Debtors pursuant to Fed. R. Bankr. P. 1015(b) and Del. Bankr. L.R. Rule 1015-1 for Entry of Order Directing Joint Administration of Related Chapter 11 Cases* (the "**Joint Administration Motion**"), the Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only.  I believe that joint administration of these cases will save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.  Joint administration will also relieve the Court from entering duplicative orders and maintaining duplicative files and dockets.  Importantly, I do not believe that joint administration will adversely affect the Debtors' respective constituencies because this Motion only requests administrative—and not substantive—consolidation of the Debtors' estates.  Based on the foregoing, I believe that the relief requested in the Joint Administration Motion should be approved.

(b)    **Epiq Retention Application**

90.    Pursuant to the *Application of Debtors for Authority to Appoint Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date* (the "**Epiq Retention Application**"), the Debtors request entry of an order appointing Epiq Corporate Restructuring, LLC ("**Epiq**") as claims and noticing agent (the "**Claims and Noticing Agent**") in the Debtors' Chapter 11 Cases, which will entail Epiq assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of any proofs of claim filed in the Debtors' Chapter 11 Cases.   The terms of Epiq's retention are set forth in the

32

Engagement Agreement attached to, and filed contemporaneously with, the Epiq Retention Application.

91.     I understand Epiq is one of the country's leading chapter 11 administrators, with experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases.  I believe that Epiq's rates, as described in the Epiq Retention Application, are competitive and reasonable given Epiq's quality of services and expertise.  Given the complexity of these Chapter 11 Cases and the number of creditors and other parties in interest involved in these Chapter 11 Cases, I believe that appointing Epiq as the Debtors' claims and noticing agent will maximize the value of the Debtors' estates for all its stakeholders. Based on the foregoing, I believe that the relief requested in the Epiq Retention Application should be approved.

**B.     Operational Motions Requesting Immediate Relief**

**(a)     Cash Management Motion**

92.     Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, and 507 for (I) Authority to (A) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Honor Obligations Relating Thereto, and (C) Implement Ordinary Course Changes to Cash Management System , (II) Administrative Expense Priority for Postpetition Intercompany Claims, (III) Waiver or Extension of Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Related Relief* (the "**Cash Management Motion**"), the  Debtors request: (i) authority, but not direction, to (a) continue their existing cash management system (the "**Cash Management System**"), including, without limitation, the continued maintenance of existing bank accounts (the "**Bank Accounts**") and business forms, (b) implement changes to their Cash Management System in the ordinary course of business, including, without limitation,

33

opening new or closing existing Bank Accounts, (c) continue to perform under and honor postpetition intercompany transactions in the ordinary course of business, and (d) honor obligations with respect to service fees and chargebacks in connection with existing agreements with the Banks; (ii) administrative expense priority for postpetition Intercompany Claims; (iii) a waiver or an extension of the time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank Accounts; and (iv) related relief.

93.     In the ordinary course of their business, the Debtors have historically used the Cash Management System to collect and transfer funds generated by their operations and to disburse funds to satisfy obligations efficiently.  The Cash Management System is tailored to meet the Debtors' operating needs as a specialty pharmaceutical company.  It enables the Debtors to collect and disburse cash generated by their business, pay their financial obligations, control and monitor corporate funds and available cash, invest available capital, reduce administrative expenses, and obtain accurate account balances and other financial data efficiently.  As detailed in the Cash Management Motion, the Cash Management System includes thirty-three (33) Bank Accounts, which together facilitate four (4) principal cash functions: (i) cash collection, (ii) cash investment, (iii) disbursements to fund the Debtors' operations, and (iv) disbursements for employee payroll.

94.     In light of the Debtors' corporate structure, the Cash Management System relies in part on the Debtors' ability to engage in intercompany transactions in the ordinary course of business ("**Intercompany Transactions**"), which in turn give rise to intercompany receivables and payables (each, an "**Intercompany Claim**").  The Intercompany Transactions include fees charged by certain Debtors to other Debtors on account of intercompany provision of goods or services, including management support services, contract manufacturing services, claims and

business relationships management, and intercompany sales of manufactured products.   The Debtors generally account for and record all Intercompany Transactions and Intercompany Claims in their centralized accounting system, the results of which are recorded concurrently on the Debtors' balance sheets and regularly reconciled.  The accounting system requires that all general ledger entries be balanced at the legal entity level, and, therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet.  This results in a net balance of zero when consolidating all intercompany accounts.

95.    In the ordinary course of business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts certain periodic service charges and other fees, costs, and expenses charged by the Banks in connection with the maintenance of the Cash Management System (such charges and fees, the "**Bank Fees**").  It is difficult for the Debtors to calculate the precise amount of prepetition Bank Fees due as of the Petition Date because of the fluidity of Bank Account funding and activity, which is exacerbated by the Debtors' currently underway transition from JPM Bank Accounts to Western Alliance Bank Accounts.  I believe payment of any prepetition Bank Fees is in the best interests of the Debtors and all parties in interest in these Chapter 11 Cases, as it will prevent unnecessary disruptions to the Cash Management System and ensure that the Debtors' receipt of funds is not delayed.

96.    The efficient and economical operation of the Debtors' businesses requires that the Cash Management System continue during the pendency of the Chapter 11 Cases.  Given the volume of transactions processed through the Cash Management System each day and the fact that each of the Debtors operates different, interdependent aspects of the Debtors' business, requiring the Debtors to adopt new, segmented systems at this early and critical stage of these

WEIL:\97005116\26\53602.0003

cases would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to their business operations. I believe that any such disruption would have a severe and adverse impact upon the Debtors' reorganization efforts.

97. For the foregoing reasons, I believe that granting the relief requested in the Cash Management Motion is appropriate and in the best interests of the Debtors' estates and creditors.

**(b)     Employees Motion**

98. Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a) for (I) Authority to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits, and (C) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "**Employees Motion**"), the Debtors request (i) the authority, but not direction, to pay and honor certain prepetition claims and obligations, in the exercise of their sole discretion, relating to the business practices, programs, and policies for their employees and supplemental workforce, including, among other things: (a) Unpaid Compensation, Deductions, and Payroll Taxes; (b) compensation for the Supplemental Workforce; (c) Reimbursable Expenses; (d) the Amex Program; (e) Employee Benefit Programs; (f) the Severance Program; (g) the 401(k) Savings Plan; and (h) the Other Employee Programs (each as defined herein, and collectively, the "**Employee Obligations**"), and (ii) related relief.

99. As described more fully in the Employees Motion, I believe that compensation of the Debtors' approximately 156 Employees (including 155 full-time employees and 1 part time employee), and a Supplemental Workforce of approximately twelve, is critical to the Debtors' continued operations and successful reorganization, given that they perform a wide variety of critical functions, including sales, marketing, clinical development, research and

development, quality operations, manufacturing, information technology, administrative, compliance, legal, finance, and management-related tasks. I believe that any delay in paying or failure to pay the prepetition Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial.

100.    I understand that the vast majority of the Employees rely exclusively or primarily on the compensation and benefits they receive through the Compensation and Benefits Programs to pay their daily living expenses and support their families. I believe Employees will face significant financial consequences if the Debtors are not permitted to pay or continue to administer the Compensation and Benefits Programs in the ordinary course of business. Further, the failure of the Debtors to honor their Employee Obligations in connection with the Compensation and Benefits Programs would likely result in attrition at a time when the Debtors need their workforce to perform at peak efficiency. Without the relief requested in the Employees Motion, otherwise-loyal Employees may seek other employment opportunities, thereby putting at risk the Debtors' continued operations. Accordingly, I believe that the Debtors should be authorized to satisfy the Employee Obligations.

101.    I similarly believe that payment of prepetition amounts incurred in connection with the Debtors' Reimbursement Programs is necessary because any other treatment of Employees would be highly inequitable and risk alienation of the Debtors' workforce. Employees who have incurred expenses in reliance on the Debtors' historical practice of reimbursing Employees for such expenses should not be forced personally to bear the cost, especially because those Employees incurred such expenses for the Debtors' benefit, in the course

WEIL:\97005116\26\53602.0003

of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

102.    As part of the overall compensation of their Employees, the Debtors maintain various programs to incentivize Employee performance.  The Debtors have instituted a quarterly bonus program (the "**Commission Bonus Program**") pursuant to which they make payments to qualifying non-insider, non-senior management, sales Employees (the "**Salesforce Employees**") approximately forty-five days after the end of each quarter.  Payments under the Commission Bonus Program are based on the identification by Salesforce Employees of appropriate patients for the Debtors' commercial pharmaceutical products, the sales of such pharmaceutical products, and various other metrics as determined in advance by an executive director for the Debtors' commercial business and the compensation committee of the Board.

103.    The Debtors also maintain an annual corporate incentive bonus program, for the benefit of all Employees (including insiders of the Debtors and sales Employees who are considered senior management and excluding sales Employees eligible for the Commission Bonus Program and the Supplemental Workforce) (the **"Annual Incentive Program"**).  Payments made under the Annual Incentive Program are based on individual employee performance evaluated by the head of the respective department and the Chief Executive Officer at the end of the calendar year, coupled with various metrics established by the Compensation Committee of the Board of Directors of Insys.   I believe these incentive programs are critical to incentivize Employees and will lead to increased revenues for the Debtors by maximizing Employee productivity.

104.    With respect to the Supplemental Workforce, I believe the Debtors require the services provided by the Supplemental Workforce engaged through the Supplemental Workforce Agencies.  The Supplemental Workforce includes independent contractors who have

expertise related to the Debtors' operations.  I believe that it is necessary to satisfy the Debtors' obligations owed to the Supplemental Workforce Agencies to ensure their Supplemental Workforce continues to provide uninterrupted critical services and so that the Supplemental Workforce Agencies will continue to assist the Debtors with their staffing needs.

105.    I understand that for each applicable pay period, certain amounts are deducted from each Employee's gross pay, including, without limitation, garnishments, 401(k) contributions, child support, spousal support, service charges and similar deductions, and other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans as discussed in the Motion.  In addition to the Deductions, federal and state laws require the Debtors to withhold amounts from an Employee's gross pay related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "**Withholdings**").

106.    I understand the Debtors reimburse certain Employees and all directors for their expenses incurred in connection with their employment duties, including business-related travel, business office expenses, mileage payments, business phone calls, gas for car rentals, postage, parking, taxis, and tolls (the "**Business-Related Expenses**" and the related programs, the "**Reimbursement Programs**")  I believe it is necessary for the Debtors to pay prepetition amounts under the Amex Credit Cards to prevent Employees from being held liable for any underlying purchases charged under the Amex Program, to provide assurance to Employees incurring Business-Related Expenses under the Amex Credit Cards that such expenses will be reimbursed, and to avoid any associated negative impact on the Employees' credit scores for unpaid amounts incurred on account of Business-Related Expenses.

WEIL:\97005116\26\53602.0003

107.    The Debtors maintain various employment benefit plans and policies, including, without limitation, a medical plan, a dental plan, a vision plan, Debtors-paid and Employee-paid life insurance, Debtors-paid and Employee-paid accidental death and dismemberment insurance ("**AD&D**"), Debtors-paid short and long term disability insurance, statutory disability benefit programs, health care and dependent care spending accounts, Employee-paid accident insurance, travel assistance, Employee-paid legal shield and identity theft assistance, grievance counseling, Employee-paid pet insurance, an Employee Assistance Program, Voluntary Benefit Plans, vacation and other paid time off policies, Employee discount programs, and other Employee programs (collectively, the "**Employee Benefit Programs**").

108.    I believe that the total amount sought to be paid pursuant to the Employees Motion is modest compared to the magnitude of the Debtors' overall business.  Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations.  Accordingly, I believe the relief requested in the Employees Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

(c)    **Insurance Motion**

109.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b) (I) for Authority to (A) Continue to Maintain their Insurance Policies and Surety Bonds and (B) Honor All Obligations with Respect Thereto, and (II) to Modify the Automatic Stay with Respect to the Workers' Compensation Policies* (the "**Insurance Motion**"), the Debtors request, on a final basis only, (i) authority, but not direction, to (a) continue to maintain and renew their Insurance Policies and the Surety Bonds and (b) honor their Insurance Obligations in the ordinary course of business during the administration of these Chapter 11 Cases and satisfy

40

any prepetition Insurance Obligations and Surety Premiums, and (ii) modification of the automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Policies (as defined below) against the proceeds of such policies only.

110.    In connection with the operation of the Debtors' business, the Debtors maintain a workers compensation program and various liability, property, and other insurance programs that provide the Debtors with insurance related to, among other things, general liability, products liability, professional liability, liability arising from conducting clinical trials, and property, automobile, and crime coverage through several insurance carriers (the "**Insurers**"). Continuation of these policies is necessary to the ongoing operation of the Debtors' business.

111.    The Debtors are also required to provide Surety Bonds to certain third parties (the "**Obligees**"), including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with licenses to conduct business as a pharmaceutical product developer, manufacturer, and wholesaler in the states of California and Maryland.  The Debtors estimate that no premiums related to the Surety Bonds are outstanding as of the Petition Date.  However, out of an abundance of caution, the Debtors seek authority to continue to provide Surety Bonds to the Obligees in the ordinary course of business, and to pay any related prepetition Surety Bond Obligations that may become due and payable during the Chapter 11 Cases.

112.    As required by applicable law in the jurisdictions in which they operate, the Debtors maintain insurance policies (the "**Workers' Compensation Policies**") covering claims arising from or related to employment with the Debtors (the "**Workers' Compensation Claims**").

WEIL:\97005116\26\53602.0003

113.    The Debtors' failure to pay prepetition obligations under the Workers' Compensation Policies could jeopardize their coverage and expose them to significant liability in fines by state workers' compensation boards.   In addition, the risk that eligible workers' compensation claimants would not receive timely payments for prepetition employment-related injuries could negatively impact not only the financial well-being of those claimants, but also the morale of the Debtors' active employees.   This could result in employee departures, causing a significant disruption in the Debtors' business with a materially adverse impact on the Debtors' operations, the value of their estates, and the interests of all parties in interest in the Chapter 11 Cases.   Accordingly, I believe the Court should modify the automatic stay with respect to valid Workers' Compensation Claims, as requested in the Insurance Motion.

114.    Through a variety of Insurers, the Debtors maintain various General Liability and Property Policies, which provide the Debtors with insurance coverage for liabilities relating to, among other things, products liability, property damage, automobile liability, crime, equipment, marine cargo, and various other property-related and general liabilities.  The General Liability and Property Policies help the Debtors manage the various risks associated with their business, and I understand that some of these Insurance Policies are also required by certain regulations, laws, and contracts that govern the Debtors' commercial activities.

115.    In addition to the General Liability and Property Policies, the Debtors participate in insurance policies that provide the Debtors with insurance coverage for directors' and officers' liability, fiduciary liability, employment practices liability, and professional liability (the "**Professional Liability Policies**").   As with the General Liability and Property Policies, the Debtors incur premiums under the Professional Liability Policies based upon fixed rates established by the Insurers, in addition to various deductibles.

116.     In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets from such risks, I believe it essential that the Debtors maintain these Insurance Policies on an ongoing and uninterrupted basis and that they obtain authority to pay all Insurance Obligations related thereto.  I believe the Debtors' use of estate funds to pay the Insurance Obligations is justified because such obligations are necessary costs of preserving the Debtors' estates.  Further, based on the Debtors' current circumstances, I believe it is unlikely that the Debtors will be able to renew or replace their existing Insurance Policies on terms more favorable than those currently offered by the Insurers, and the process of establishing new programs would also be burdensome and costly to the Debtors.  Consequently, I believe that continuation of these Insurance Policies is necessary to ongoing operation of the Debtors' business and the preservation of their estates.

117.     The Debtors employ or have employed certain insurance service providers, such as brokers, third-party administrators, and consultants (the "**Insurance Service Providers**"), to help them procure, negotiate, and evaluate the Insurance Policies.  Currently, the Debtors' only Insurance Servicer Provider is Marsh & McLennan Agency LLC ("**Marsh**").  Marsh assists the Debtors with the procurement and negotiation of certain Insurance Policies, and remits premium payments to the Insurers on behalf of the Debtors.  For administering the Insurance Policies, Marsh receives a fee (the "**Broker's Fees**") from the Debtors.

118.     Because Marsh is the Debtors' sole Insurance Provider and is intimately familiar with the Debtors and the Insurance Policies, I believe it essential that the Debtors obtain authority to pay all prepetition Insurance Obligations owed to Marsh and to continue to honor all of their obligations to Marsh.  I believe that the loss of Marsh as a broker (or even a temporary disruption in its services) would be detrimental to the Debtors' estates, because the Debtors would

WEIL:\97005116\26\53602.0003

need to shift some of their focus from administering their estates to managing the Debtors' multitude of Insurance Policies and the claims arising thereunder.

119.    In sum, I believe the Insurance Policies and Surety Bonds are essential to the Debtors' operations.  Consequently, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties-in-interest, and should be approved.

   **(d)**  **Critical Vendors Motion**

120.    Pursuant to the *Motion of the Debtors for Entry of an Order (I) Authorizing Payment of Certain Prepetition Claims of Critical Vendors, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief* (the "**Critical Vendors Motion**"),  the Debtors request entry of an order: (i) authorizing, but not directing, the Debtors to pay (a) non-priority, prepetition claims held by vendors whose goods and services are essential to the Debtors' operations (the "**Critical Vendors,**" and their claims the "**Critical Vendor Claims**") in an amount not to exceed the Critical Vendor Cap absent further order of this Court, (ii) confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the Debtors to pay prepetition amounts related to the Outstanding Orders, and (iii) granting related relief.  The Debtors expect that cash on hand and cash flows from ongoing business operations will be sufficient to pay such obligations.

121.    I believe that payment of Critical Vendors Claims is necessary for the Debtors to maintain operations, preserve the value of the Debtors' business, and enable the Debtors to function in the ordinary course.  The Debtors' Critical Vendors include third parties that provide ingredients, storage, monitoring, packaging, and distribution services for all of the Debtors' pharmaceutical products, including marketed products and the Pipeline Products, as applicable.  In

WEIL:\97005116\26\53602.0003

addition, certain Critical Vendors provide equipment and equipment-related services and manufacture the APIs into consumable pharmaceuticals for Subsys and certain Pipeline Products. Due to the highly regulated nature of the pharmaceutical industry, attempting to replace such Critical Vendors would be at best, time-consuming and costly, and at worst, not feasible.  I believe that failure by the Debtor make Critical Vendor payments could delay production of Subsys and Syndros, create shortages in the Debtors' supply chain, disrupt clinical trials, and significantly increase costs for the Debtors.  Therefore, I believe that making paying the Critical Vendor Claims to and maintaining favorable trade terms with the Critical Vendors is in the best interest of all parties in interest in these Chapter 11 Cases.

122.    Finally, the Debtors have certain orders outstanding with various manufacturers, suppliers, and vendors for goods or services ordered by the Debtors that will not be delivered until on or after the Petition Date (the "**Outstanding Orders**").  Certain vendors may refuse to provide goods or services to the Debtors unless the Debtors obtain an order of the Court confirming the administrative expense priority of the Outstanding Orders under section 503(b) of the Bankruptcy Code and granting the Debtors the authority, but not direction, to pay such amounts.  Absent such relief, the Debtors may be required to expend substantial time and effort to provide certain suppliers with assurance of administrative expense priority.  I believe that doing so could disrupt the continuous and timely flow of critical goods and materials to the Debtors, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors.

(e)    **Utilities Motion**

123.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. § 105(a) and 366 Requesting Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of*

WEIL:\97005116\26\53602.0003

*Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service* (the "**Utilities Motion**"), the Debtors request entry of an Order (a) approving the Debtors' proposed form of adequate assurance of payment to Utility Providers (as defined below), (b) establishing procedures for determining adequate assurance of payment for future Utility Services (as defined below) and (c) prohibiting Utility Providers from altering, refusing, or discontinuing Utility Service on account of the commencement of the Chapter 11 Cases or outstanding prepetition invoices.

124.    As more fully described in the Utilities Motion, the Debtors incur expenses for utilities, including electricity, natural gas, water, sewage, information technology, and waste. Approximately fifteen utility providers provide services directly or indirectly through a landlord to the Debtors (the "**Utility Services**"), which the Debtors rely on to provide Utility Services to their business offices, manufacturing and shipping facilities, and research and development facilities located in Arizona and Texas and to provide necessary support to their employees, vendors, and customers.  I believe that preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and restructuring process.  Any interruption in Utility Services—even for a brief period—may seriously disrupt the Debtors' ability to continue operations.  Such disruptions would adversely impact, among other things, the Debtors' sale efforts, manufacturing and testing of pharmaceutical products, and research and development. Therefore, I believe it is critical that Utility Services continue uninterrupted during these chapter 11 cases.  The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner and expect that cash flows from operations and cash on hand will be sufficient to do so.

WEIL:\97005116\26\53602.0003

125.    I believe the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies.    Moreover, I believe the proposed Adequate Assurance Procedures are reasonable because they will ensure that the Utility Services continue while providing a streamlined process for Utility Companies to challenge the adequacy of the Proposed Adequate Assurance or seek an alternative form of adequate assurance.    As a result, I believe that the relief requested in the Utilities Motion should be granted.

**(f)    Taxes Motion**

126.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a) for Authority to Pay Certain Prepetition Taxes and Fees* (the "**Taxes Motion**"), the Debtors request authorization, on a final basis only, to pay taxes, assessments, fees, and other related obligations (collectively, the "**Taxes and Fees**") in the ordinary course of business.    In the course of operating their business, the Debtors are obligated to pay an assortment of Taxes and Fees that are remitted periodically to various federal, state, and local taxing, regulatory, and other governmental authorities (collectively, the "**Taxing Authorities**"). The Taxes and Fees the Debtors typically incur fall into the following categories: (a) business and commercial activity taxes, (b) franchise taxes, (c) personal property taxes, and (d) regulatory and miscellaneous fees.

127.    The Debtors seek to pay certain Taxes and Fees, among other reasons, to prevent Taxing Authorities from taking actions that may interfere with the Debtors' administration of their Chapter 11 Cases. Such interference may include assertion of liens against the Debtors' property or assessment of penalties or interest on past-due Taxes and Fees.    Additionally, non-payment of the Taxes and Fees may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code.    Finally, continuing to pay fees owed to government agencies is necessary

WEIL:\97005116\26\53602.0003

to continue producing, selling, and marketing the Debtors' pharmaceutical products.  Accordingly, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business with minimal disruptions.

> **(g)    Customer Programs Motion**

128.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to (I) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices, and (II) Pay and Honor Related Prepetition Obligations* (the "**Customer Programs Motion**"), the Debtors request authority to (a) maintain and administer prepetition customer programs, promotions, and practices, and (b) pay and otherwise honor their obligations to customers relating thereto, whether arising prior to or after the Petition Date.

129.    Maintaining the goodwill of their Customers is critical to the Debtors' ongoing operations and the preservation and maximization of stakeholder value.  To preserve the Debtors' critical relationships with their Customers and maximize Customer loyalty, in the ordinary course of business, the Debtors provide certain incentives, discounts, and other accommodations to the Customers (collectively, the "**Customer Programs**" and the obligations incurred thereunder, the "**Customer Obligations**").  Many, if not all, of the Customer Programs are standard in the pharmaceutical industry.  Indeed, absent the ability to continue the Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing market share, negatively impacting their future business and revenue growth.  The Customer Programs include: (i) the Customer Discounts & Fees; (ii) the Product Return Policy, (iii) the Rebate Programs; (iv) the Patient Assistance Programs; and (v) the Chargeback Programs, each as described in the Customer Programs Motion.

130.    The ability to continue administering the Customer Programs without interruption is essential to the Debtors' valuable Customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders.   I believe that if the Debtors are unable to continue the Customer Programs or honor obligations thereunder, the Debtors risk alienating certain Customer constituencies, which then could form relationships with the Debtors' competitors, and the Debtors may suffer corresponding losses in Customer loyalty and goodwill that will harm their prospects for maximizing value for all stakeholders.

131.    Additionally, I understand that certain of the Customer Programs, such as the Rebate Programs and Chargeback Program, are requirements for the Debtors to have their products covered under Medicaid and Medicare, as well as to enter into the FSS contract. Moreover, certain of Debtors' Customer Programs that specifically benefit patients are highly valued by patients, and as a result are crucial to the Debtors' marketing of their products.  I believe that failing to continue the Customer Programs will place the Debtors at a significant competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the Chapter 11 Cases.  The relief requested in the Customer Programs Motion will pay dividends with respect to their business, both in terms of profitability and engendering goodwill, especially at this critical time following the filing of the Chapter 11 Cases.

132.    Accordingly, I believe that the Debtors have shown cause sufficient to warrant the authority to continue administering the Customer Programs and to honor any Customer Obligations relating thereto.

(h)    **NOL Motion**

133.    Pursuant to the *Motion of Debtors for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests*

WEIL:\97005116\26\53602.0003

*in the Debtors and Claiming a Worthless Stock Deduction* (the "**NOL Motion**"),  The Debtors seek to establish procedures (the "**Procedures**") to protect the potential value of the Debtors' consolidated net operating loss carryforwards ("**NOLs**") and other tax benefits (collectively, the "**Tax Attributes**") for use in connection with the reorganization of the Debtors.  The Procedures apply to (a) common stock of Insys (the "**Common Stock**") and options or similar rights (within the meaning of applicable Treasury Regulations) to acquire Common Stock (the "**Options**"), and (b) any claim (for income tax purposes) of a worthless stock deduction under section 165(g) of the Tax Code with respect to Common Stock (a "**Worthless Securities Deduction**") by a Majority Stockholder.

134.    The Debtors have certain Tax Attributes, including, as of the Petition Date, estimated NOLs in excess of $130 million and tax credits in excess of $14 million. The Tax Attributes are valuable assets. Absent any intervening limitations and depending on future operating results and the consummation of taxable asset dispositions by the Debtors, the Tax Attributes could substantially reduce the Debtors' U.S. federal income tax liability for current and future periods, including during the pendency of these Chapter 11 Cases.  The Tax Attributes are available to reduce the Debtors' federal income tax liability through the taxable year that includes the effective date of a chapter 11 plan and potentially thereafter.

135.    An ownership change pursuant to section 382 of the Tax Code (which is described further in the NOL Motion), or a claim of a Worthless Securities Deduction by a Majority Stockholder, prior to the effective date of a chapter 11 plan could significantly impair the Debtors' ability to use their Tax Attributes, thereby resulting in a significant loss of potential value to the Debtors' estates.  Therefore, I believe it is in the best interests of the Debtors and their stakeholders to restrict both the trading of Common Stock – including a transfer by way of a

50

forfeiture enforced by the DOJ or a sale compelled by the DOJ, the HHS-OIG, or NASDAQ – and any claim of a Worthless Stock Deduction that could result in an Ownership Change occurring *before* Insys's Tax Attributes are fully utilized.  Such a restriction would protect the Debtors' ability to use the Tax Attributes during the pendency of these Chapter 11 Cases or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtors' sale or ownership of their assets, which may be significant in amount.  Accordingly, I believe the Procedures are necessary to preserve the Debtors' ability to use their Tax Attributes in these Chapter 11 Cases for the benefit of their estates.

## Conclusion

136.    This Declaration illustrates the factors that have precipitated the commencement of the Chapter 11 Cases and the critical need for the Debtors to implement their restructuring.

WEIL:\97005116\26\53602.0003

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of June, 2019

Andrew G. Long
Chief Executive Officer

*Signature Page to First-Day Declaration*

**Exhibit A**

**Organizational Chart**

