# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| INSYS THERAPEUTICS INC., *et al.*,[1] | Case No. 19-11292 (KG) |
| Debtors. | (Jointly Administered) |
| | Re: D.I. 5, 49, 231, and 475 |

## STATEMENT AND LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(A), 363 AND 507(A) FOR (I) AUTHORITY TO (A) PAY CERTAIN PREPETITION WAGES AND REIMBURSABLE EMPLOYEE EXPENSES, (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS, AND (C) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) RELATED RELIEF

The Official Committee of Unsecured Creditors (the "Committee") of Insys Therapeutics Inc., *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" or the "Company"), by and through its undersigned counsel, hereby submits this statement and limited objection (the "Limited Objection") to the relief related to severance payments to be approved by a further order regarding the *Motion of Debtors Pursuant to 11 U.S.C. Sections 105(a), 363 and 507(a) for (I) Authority to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits, and (C) Continue Employee Benefits Programs, and (II) Related Relief* [D.I. 5] (the "Wages Motion"). In support of its Limited Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Insys Therapeutics (7886); IC Operations, LLC (9659); Insys Development Company, Inc. (3020); Insys Manufacturing, LLC (0789); Insys Pharma, Inc. (9410); IPSC, LLC (6577); and IPT 355, LLC (0155). The Debtors' mailing address is 1333 South Spectrum Blvd #100, Chandler, Arizona 85286.

23546874.1

**PRELIMINARY STATEMENT**

1.      Throughout these cases, the Debtors have acknowledged that the Company and certain of its employees engaged in bad acts prior to these cases. The Debtors could hardly hide from this reality, as several of their former employees and their former CEO pleaded guilty or were criminally convicted after trial for such bad acts just a month before the cases were filed. The Debtors and their counsel have assured this Court on several occasions, however, that the Debtors have cleaned house and "implemented an overhaul of their management and organization." *Declaration of Andrew G. Long in Support of Debtors Chapter 11 Petitions and First Day Relief* (the "Long Decl.") at ¶ 20 [D.I. 11]; *see also, In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) (June 11, 2019), Trans. at ¶ 22 (the "First Day Trans.") (describing prepetition management changes at Debtors and noting that "all-in-all, most of the Insys management team and the commercial organization including the sale force is new to the company since 2015 as is the vast majority of the debtors' employees."). The Debtors also attest to "take all allegations of past wrongdoing by former employees with the greatest seriousness." Long Decl. ¶ 34 and First Day Trans. at ¶ 13.

2.      Given the admittedly criminal conduct in which the Debtors and certain of their employees have historically engaged, the Committee is astounded that it must file this Limited Objection. As further described below, the primary open issue for the Committee regarding the Severance Program (as defined below) is the Debtors' refusal to provide an acknowledgment from the Debtors' Board of Directors (or other member of senior management) that the employees whom the Debtors propose to provide eight weeks of severance payments to were not engaged in criminal behavior. To put a finer point on it, the Committee specifically requested that a member of the Debtors' Board of Directors attest that:

> To the best of our knowledge, after reasonable inquiry, no individual who is listed as a potential recipient of any severance payment, has engaged in, or was complicit in, any criminal or other unlawful conduct at any time during his/her employment with the Company, nor did any such individual know, or should have known, about any such criminal or unlawful conduct during his/her employment with the company.

3. Particularly in light of the Debtors' assertions related to operational and management overhauls, it is entirely unclear – but deeply concerning – to the Committee why the Debtors have refused to provide a declaration or even engage in negotiating acceptable confirmatory language affirming that payments will not be made to individuals involved or complicit in criminal or other unlawful conduct. Instead, the Debtors have proposed that each employee to be provided severance will represent individually that he/she was not involved in any criminal or unlawful behavior. This is far from acceptable for obvious reasons.

## STATEMENT AND LIMITED OBJECTION

4. As the Court will recall, the Debtors filed the Wages Motion on the first day of these cases. The Wages Motion seeks, in part, to allow the Debtors to continue their pre-petition severance program (the "<u>Severance Program</u>"), but provides little information regarding such program and no details regarding its cost. Such program is not a written policy, but a *practice* based on years of service.[2] In early July, the Committee and the Debtors reached a resolution on the Wages Motion, other than the relief related to the Severance Program. As to the severance relief, the Debtors agreed to defer any hearing. *See* D.I. 262, ¶ 8 (carving out and adjourning

---

[2] Under applicable law, these types of severance claims are largely prepetition general unsecured claims. *See In re Hechinger Inv. Co. of Delaware*, 298 F.3d 219, 227 (3d Cir. 2002) ("Severance pay at termination based on length of employment is given in consideration of work performed both pre- and post-petition, and thus not all such pay is entitled to treatment as an administrative expense.").

"the Debtors' request for authority to continue and honor the Severance Program for non-insiders and to satisfy the related Severance Obligations.").[3]

5. Since then, the Debtors and the Committee have had on-again, off-again discussions about the Severance Program. To their credit, the Debtors agreed to the Committee's request to adjourn any hearing on the Severance Program until the conclusion of the Debtors' auction process, at which point the Committee believed more clarity would exist regarding available cash and the magnitude of needed wind-down operations. The auctions (other than for Subsys) have now largely concluded, and the result of the sales process has crystalized (*i.e.,* if the sales are approved and consummated, the estates will receive approximately $29.2 million in cash).

6. Following the auctions, the Debtors and the Committee began discussing the Severance Program again in earnest. On August 8th, one day after the announcement of the results of the two auctions, the Debtors provided the Committee with a new Severance Program proposal. The Debtors and the Committee engaged in discussions so that the Committee could try to understand the scope of, and basis for, the request. Then, very early in the morning of August 13th, the Debtors provided a revised Severance Program proposal that included new employees and dropped certain other employees from the proposal. In addition, and in response to the Committee's request, the Debtors provided a few bullet points for each employee regarding the type of work that such employee would be providing during the post-October 1

---

[3] The relief related to the Severance Program has been adjourned several times and is now set for hearing on August 22, 2019 at 2:00 p.m. (ET). *See Amended Notice of Agenda* [D.I. 443].

timeframe. Later in the day on August 13th, the Debtors further informed the Committee that the employee list would need to be further revised due to resignations.

7. Last night, the Debtors filed the *Debtors' Statement in Support of Postpetition Severance Program and Honoring Related Obligations* (the "Severance Filing") [D.I. 475]. In the Severance Filing, the Debtors publicly disclose – for the first time, three days before the scheduled hearing on the Severance Program – the vague contours of the Severance Program. Prior to such filing, all that had been made public to other parties in interest was the continual adjournment of approval of the Severance Program. *See* D.I. 230, 231, 326, 377, 443.

8. As described in the Severance Filing, the Debtors will seek approval of a Severance Program on August 22nd for certain key employees to assist in the wind-down efforts after the closing of the sales. The total amount of severance for these employees is approximately $500,000, subject to downward adjustment if one of the buyers closes and chooses to employ five (5) of these employees.[4]

9. To the Debtors' credit, they appear to have attempted to downsize the overall price tag of the Severance Program (versus the Debtors' expensive prepetition severance policy) and the Committee appreciates that effort. In the circumstances of these cases, however, the overall cost of the program – eight weeks' salary for each employee – does not end the inquiry. Instead, the Committee has at least three concerns regarding the Severance Program, and therefore objects to the Severance Program if these concerns are not addressed.

---

[4] As to the five (5) employees who may be hired by one of the buyers, the Committee believes that severance should only be approved when it is known whether severance is necessary for such employees, and only after the other issues raised herein are addressed in relation to these employees. The Debtors do not disclose the portion of the proposed Severance Program related to these five employees.

10. **First**, it is unfathomable to think, given the fraudulent and criminal conduct that occurred prepetition, that the Debtors would even consider paying severance to employees who engaged in, were complicit in, or knew or should have known about such conduct. To satisfy itself that such payments would never be made, the Committee asked for a written declaration from the Debtors (which would be sworn to by a representative member of the Board of Directors) confirming this requirement. It took the Debtors two days to consider this request and initially agree to it (which the Debtors would only agree to provide if the Committee did not object to the Severance Program). The Committee provided the specific language noted above for the Debtors' consideration. Following their initial agreement, however, the Debtors reversed course, and instead, have only offered a representation from each employee as to their lack of criminal or fraudulent conduct. Given the conduct that the Debtors have admitted occurred during the pre-petition period, this is laughable.

11. Moreover, the refusal to provide *any evidence* attested to by *any member* of the Debtors' Board of Directors or senior management – or to even engage in discussing an appropriate attestation with the Committee – does not instill any confidence that the Debtors' Board of Directors or senior management considered the potential engagement in, or knowledge of, bad acts by employees proposed to receive severance. The Debtors' position on this issue is especially confusing considering the multiple representations to this Court by the Debtors and their counsel that the Debtors take prior allegations of misconduct very seriously and that Debtors have generally cleaned house. *See* Long Decl. at ¶¶ 20, 34; First Day Trans. at ¶¶ 13, 22. Given these representations and the requirements placed on the Debtors by various

agreements with federal authorities,[5] the Committee frankly viewed its requested declaration as mundane.

12. Instead, the Debtors' response and apparently their approach to awarding severance – given the criminal conduct that the Debtors engaged in during the prepetition period – demonstrates a lack of due diligence and a questionable exercise of fiduciary duties. Indeed, the Severance Filing provides that it is a disqualifying event if an employee is later determined to have "engaged in any criminal conduct with respect to the Company's commercial practices at any time during the Employee's employment with the Company." Severance Filing, at p. 7. This all but admits that the Debtors do not presently know or have not reasonably investigated whether the employees included in the Severance Program engaged in criminal or other bad acts. There simply cannot be any presumption with regard to the business judgment rule (*i.e.* the normal standard) in the face of such apparent ambivalence. The Committee, however, is not ambivalent about paying severance to employees who knew about or engaged in bad acts. The Committee suspects that the Debtors' general creditors would likewise be concerned. At bottom,

---

[5] One June 5, 2019, certain of the Debtors entered into a Corporate Integrity Agreement and Conditional Exclusion Release with the Office of the Inspector General of the United States Department of Health and Human Services. This agreement requires the Debtors, in their own words, to

> [E]stablish and maintain . . . an extensive program intended to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs and with the statutes, regulations, and written directives of the FDA. For example, the compliance program mandated under the CIA includes the appointment of a compliance officer and compliance committee, board compliance obligations, the establishment of written standards, and training and education requirements, among other elements.

*See Declaration of Andrew G. Long in Support of Debtors Motion for a Preliminary Injunction Pursuant to 11 U.S.C. § 105(a) and Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) Establishing Procedures and Schedule for Estimation Proceedings* at ¶ 17. It is incredible that the Debtors can institute these significant controls but remain unable to provide the simple declaration requested by the Committee.

until the Committee is satisfied that no employees to be paid severance were involved in or aware of the admittedly bad acts occurring at the Debtors, the Committee obviously must object.

13.     **Second**, and in a similar vein, the Committee is concerned about the lack of disclosure of the Severance Program to the Debtors' constituents.  Although the Committee was willing to work with the Debtors to develop an appropriate plan, the Committee believes such plan must be fully presented, on proper notice to all creditors, prior to approval.  The Debtors only presented the general contours of the Severance Program last night – three days before the hearing on such relief.  Moreover, the Severance Filing provides that there are operative documents governing the Severance Program and that control in the event of an inconsistency (and supply certain key defined terms such as "Employee" and termination without "Cause").  *See* Severance Filing, at pp. 6-7.  The Debtors have not filed these operative documents or provided them to the Committee.  Further, the Severance Filing does not fully disclose many key aspects of the Severance Program.  For example:

- How many employees are included in the program?
- Who are the proposed participants and what are their titles and duties?
- How long have the proposed participants been employed by the Debtors?
- What are the amounts of the proposed individual awards?
- What were the specific KERP payments received by each proposed participant?
- What will the non-revocable general release agreement that employees are required to sign provide?

14.     The Debtors must transparently present their proposed Severance Program and give creditors the opportunity to file an objection.

15.     **Third**, the Committee believes that the Debtors paid significant sums which likely approach $1.7 million in "retention bonuses" (out of total prepetition retention plan paying $4.8 million) to fourteen (14) of the employees who are part of the Severance Program prior to the bankruptcy filings.  These retention bonuses essentially required the employees to remain

8

with the Debtors until the sales close in October. The Committee asked the Debtors to reconsider the amounts proposed to be paid as severance to those individuals who received "retention bonuses." In response, the Debtors have told the Committee that they believe there is a meaningful difference between prepetition retention payments (which are, in the Committee's view, subject to avoidance) and post-petition severance (which the Debtors have admitted is a retention program for certain employees to stay the extra month or two following sale close until emergence). The Committee believes that all unsecured creditors should be given the opportunity to weigh in as to whether individuals who received substantial prepetition retention payments should receive the same severance package as other employees, because such employees already received a "stay" bonus.

**CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court (i) sustain this Limited Objection; and (ii) grant such other relief as the Court deems just and proper.

Dated: August 20, 2019
      Wilmington, Delaware

BAYARD, P.A.

*Erin R. Fay*
Justin R. Alberto (No. 5126)
Erin R. Fay (No. 5268)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: jalberto@bayardlaw.com
      efay@bayardlaw.com

-and-

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
Arik Preis
Mitchell P. Hurley
One Bryant Park
Bank of America Tower
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: dgolden@akingump.com
      apreis@akingump.com
      mhurley@akingump.com

*Co-Counsel for the Official Committee of Unsecured Creditors*