# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>INSYS THERAPEUTICS, INC. *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-11292 (KG)<br>(Jointly Administered)<br><br>**Obj. Deadline: Oct. 10, 2019 at 4:00 p.m.**<br>**Hearing Date: Oct. 22, 2019 at 10:00 a.m.** |

## MOTION FOR AN ORDER PURSUANT TO
## BANKRUPTCY CODE SECTIONS 105(a) AND 1112(b) CONVERTING
## THESE CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

The court-appointed[2] claimants' leadership team[3] in In re National Prescription Opiate Litigation, Case No. 17-md-02804, MDL No. 2804 (N.D. Ohio) (the "**Movants**"), by and through its counsel submit this motion (the "**Motion**") for an order pursuant to Bankruptcy Code sections 105(a) and 1112(b), immediately converting these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code and granting related relief. In support of the Motion, the Movants respectfully represent as follows:

---

[1] The above-captioned debtors in these cases (the "**Debtors**"), along with the last four digits of each Debtor's federal tax identification number, are: Insys Therapeutics, Inc. (7886), IC Operations, LLC (9659), Insys Development Company, Inc. (3020); Insys Manufacturing, LLC (0789); Insys Pharma, Inc. (9410); IPSC, LLC (6577); and IPT 355, LLC (0155). The Debtors' mailing address is 1333 South Spectrum Blvd. #100, Chandler, Arizona 85286.

[2] *See Plaintiffs' Renewed Motion to Approve Co-Leads, Co-Liaisons, and Executive Committee, In re: National Prescription Opiate Litigation*, Case No. 17-md-02804, MDL No. 2804, Jan. 4, 2018 (N.D. Ohio) (Dkt. No. 34); *see also* Margin Order Granting Dkt. No. 34 (Dkt. No. 37).

[3] The leadership team includes the three Co-Lead Counsel, the sixteen-member Plaintiffs' Executive Committee, and three Co-Liaison Counsel.

1

## **PRELIMINARY STATEMENT**[4]

The Debtors filed these cases approximately three and half months ago with the intent to sell substantially all of their assets. The sales are largely complete and the estates' only remaining tasks are to wind-down their remaining business, distribute the proceeds of their asset sales, and monetize and distribute contingent assets. These tasks are precisely within the bailiwick of a Chapter 7 trustee, who can, absent a consensual plan, handle these tasks most efficiently. Chapter 7 is therefore, the most logical and prudent path forward.

Despite weeks of negotiations between the Debtors, the Committee, the Movants and other parties, the Movants now observe that the constituent groups remain far from a consensus about relative claims values or plan structure. The end result is that the plan of reorganization recently filed by the Debtors is simply non-confirmable and there is little prospect for an alternative resolution being achieved before these estates become administratively insolvent.

In part, the stalemate is driven by the failure of the Debtors' most numerous and important creditors (in terms of claim size) to be represented on the Committee, as principals. Instead, marginal creditor groups in this opioid bankruptcy case, *e.g.*, trade creditors and personal injury plaintiffs, dominate the Committee. In addition, as demonstrated in the Disclosure Statement, the Debtors have maintained a preconceived and demonstrably false view of the size and strength of governmental units' claims (especially in light of recent developments outside these cases — including a recent state court judgment upholding governmental units' legal theories (including on joint and several liability), favorable U.S. District Court decisions on summary judgment and settlements between similarly situated defendants and municipalities that did not exist on the Petition Date). These circumstances have led to a Plan that simply does not

---

[4] Capitalized Term used but not defined in the Preliminary Statement have the meanings ascribed to them in the body of the Motion.

2

reflect the realities of the relative value and size of claims brought by the Debtors' creditors. Rather than further depleting an estate already woefully insufficient with further litigation, the cases should be converted and an independent and disinterested Chapter 7 trustee should be appointed to fairly resolve claims and make distributions consistent with the interests of all creditors, and not simply the unrepresentative few on the Committee, in mind.

While the Movants understand that various creditor groups support the Plan, the plain fact is that by dint of their outsized influence on a statutory committee, such creditor groups are slated to receive a substantial and improper windfall, to the detriment of, among others, the governmental unit creditors. While some municipalities may support the Plan, their limited number will not result in accepting governmental entity classes and the proposed Plan will not be confirmable.

The Movants appreciate that Chapter 11 is always expensive and that reaching a consensual deal does require the estates' professionals' time.[5] However, in these cases, the administrative costs have already consumed more than one quarter of what is likely the aggregate value of the entire estate. Even without a significant claims estimation process, the continued plan negotiation and confirmation process will result in a plan that allocates no meaningful assets other than to administrative claimants.

As it currently stands, the value of the estate is a known, finite number. The administrative costs, current and future, will consume a large percentage of the total value the estate has to offer. Conversion guarantees that distributable assets will be preserved and the Debtors' unsecured creditors will receive their due distributions, *pari passu*, as contemplated by the Bankruptcy Code after a Chapter 7 Trustee's claims reconciliation concludes.

---

[5] The Movants also appreciate the States that worked over the past several weeks to attempt to negotiate a consensual Plan; however the Plan and Disclosure Statement are woefully short of a confirmable Plan.

3

Pursuant to §1112(b), the Movants seek immediate conversion of these cases to Chapter 7 because: (i) the Debtors are suffering substantial or continuing losses to or diminution of the estate, (ii) there is no reasonable likelihood of rehabilitation of the Debtors' business—this is a liquidation case where no business rehabilitation is contemplated, and (iii) the Debtors are unlikely to effectuate the confirmation of a Chapter 11 plan. Now that the complicated sales of estate assets are complete, remaining in chapter 11 is not in the best interests of the estates or their unsecured creditors.

## JURISDICTION

1. This Court has jurisdiction to hear this matter and enter a final order granting the relief requested herein pursuant to 28 U.S.C. §§ 1334 and 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. This matter is a core proceeding 28 U.S.C. § 157(b)(2) upon which this Court has the authority to enter a final order.

3. The statutory and rule predicates for this Motion are 11 U.S.C. §§ 105 and 1112(b) and Rules 9014 and 1019 of the Federal Rules of Bankruptcy Procedure.

## STANDING

4. The Movants are parties-in-interest under the Bankruptcy Code and Bankruptcy Code sections 1112(b) and 1109(b).

## RELEVANT BACKGROUND

**A. General Case Background & Facts On The Ground.**

5. The Debtors filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on June 10, 2019 (the "Petition Date").

6. On the Petition Date, the Debtors filed the *Motion Of Debtors For (I) Entry Of Orders Pursuant To 11 U.S.C. §§ 105(A) And 502(C) (A) Establishing Procedures And Schedule For Estimation Proceedings And (B) Estimating Debtors' Aggregate Liability For Certain Categories O Claims, (Ii) Entry Of Protective Order, And (iii) Subordination Of Certain Penalty Claims* (Docket No. 29) (the "**Estimation Motion**"). Following the appointment of the Official Committee of Unsecured Creditors (the "**Committee**"), the Debtors engaged in negotiations with the Committee and certain state attorney generals (the "**State AGs**"), in an effort to resolve the objections of the State AGs to the preliminary injunction motion and objections to the Estimation Motion. The Debtors and the Committee sought to design a global case protocol to reach a consensual resolution for these Chapter 11 cases.

7. The Committee comprises of one opioid litigation co-defendant, two hospital plaintiffs, one insurer plaintiff, and five personal injury plaintiffs. *See* Docket No. 88. The largest group of the Debtors' creditors, states, cities, counties, Native American Tribes, and towns, were not selected to sit on the Committee, although two separate groups of cities and counties were subsequently permitted to sit on the Committee with *ex officio* status.

8. On June 30, the Debtors filed the *Notice of Filing Proposed Agreed Order Regarding Estimation Motion, Pi Motion and Approving Case Procedures*, (Docket No. 189) (the "**Global Case Protocol**"). The Global Case Protocol was agreed to by the Debtors, the Committee, and State AGs. The protocol was intended to hold the Estimation Motion and PI Motion in abeyance and, according to the Debtors, "maximize value, encourage settlement and reach resolutions in furtherance of a consensual chapter 11 plan."

9. On July 2, 2019, the court entered an order approving the Global Case Protocol in the adversary proceeding. *See Agreed Order Regarding Estimation Motion, PI Motion and*

*Approving Case Procedures*, Adv. Proc. 19-50261, (Docket No. 45). The Global Case Protocol provided for mediation sessions run by the Debtors and the Committee in order to aid settlement discussions and craft agreements necessary to confirm a Chapter 11 plan.

10. On August 5, 2019, the court entered an order appointing former Bankruptcy Judge Carey as mediator and setting mediation for August 13-20, 2019. *See* Docket. No. 398.[6] All parties to the mediation continued settlement discussions into September 2019.

11. On August 22 and August 23, and September 19, 2019, the Court entered Orders approving the sales of the Debtors' non-Subsys assets and businesses. *See* Docket Nos. 515 and 525.

12. On September 19, 2019, the Court entered the Order approving the sale of substantially all of the Debtors' remaining businesses and assets, including its Subsys assets. *See* Docket No. 641.

13. On September 17, 2019, the Debtors and Committee filed the "**Plan**" and "**Disclosure Statement**". *See* Docket Nos. 612[7] and 613[8]. The Plan separates the Debtors' unsecured creditors generally into five separate classes, its unliquidated unsecured litigation creditors into four separate classes, sets so-called "negotiated" claim estimates for each group and treats each class dramatically differently in terms of the quantum and type of distribution they would receive from the Plan as a result of the "**Plan Settlement**" with the "**Settling Creditors**."

---

[6] References to "Docket No." made herein are to filings on the docket for the above captioned jointly administered case, *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG).

[7] *Joint Chapter 11 Plan Of Liquidation Of Insys Therapeutics, Inc. And Its Affiliated Debtors* (the "**Plan**").

[8] *Disclosure Statement For Joint Chapter 11 Plan Of Liquidation Proposed By Insys Therapeutics, Inc. And Its Affiliated Debtors* (the "**Disclosure Statement**").

14. The Movants are not currently Settling Creditors, nor are the vast majority of the Debtors' scheduled creditors or creditors that will eventually file claims prior to the December 9, 2019 Governmental Bar Date.

15. Among other obvious issues, under the Plan, the personal injury claimants (class 8), a group of unsecured creditors with exactly the same priority claims as all other opioid litigants, would have the ability, post confirmation, to receive full value for their allowed claims. Additionally, using the Debtors' estimates, trade creditors (class 3) will receive at least six percent in cash on the effective date, while other unsecured creditors (especially when accounting for administrative expense drain) are likely to receive a far smaller percentage recovery and in significantly less certain currency.  *See* Docket No. 613, at 44 -45.

16. The Disclosure Statement also provides that the Settling Parties have agreed to a claims estimate for class 7 (the States, Municipalities, and Tribes class) of $597 million in the aggregate, and that this aggregate estimate supports the allocation of the estates' assets under the Plan.  *See* Disclosure Statement, at 43.  The remaining creditor classes (other than personal injury claimants and the U.S. DOJ) have an aggregate negotiated claims estimate of $425 million.  Notwithstanding the breakdown in these purportedly *agreed to and negotiated* claims estimates, the non-PI, non-U.S. DOJ classes, which all have equal priority claims to the States, municipalities and Tribes stand to receive over 55% of all real, non-speculative value under the Plan.

17. The claims estimates, however, are not agreed to by the Movants, and recent public events alone demonstrates that such estimates are woefully out of touch with the realities of the relative strength of claims; the states', municipalities', and tribal claims predominate other types of unsecured litigation claims.  By way of example only:

a. On August 26, 2019, an Oklahoma State court entered a judgment against certain opioid manufacturers. *See State v. Purdue Pharma LP*, No. CJ-20170816, 2019 WL 4019929 (Okl. Dist. Aug 26, 2019) (the "**Oklahoma Public Nuisance Judgment**") (attached hereto as **Exhibit B**). In the Oklahoma Public Nuisance Judgement, the Court concluded that "(a) the Defendants engaged in false and misleading marketing of both their drugs and opioids generally; and (b) this conduct constitutes a public nuisance under extant Oklahoma law." *Id.* at *12. The court also found that nuisance could be abated and that the "sum necessary to carry out the Abatement Plan in *year one* is the sum of **$572,102,028**. *Id.* at *20 (emphasis added). Extrapolating this sum out to twenty years (which the Court did not do) would be, alone, approximately $11.4 billion. This is for one state, as against one group of defendants, who were ordered to pay the entirety of year one of the Abatement Plan, notwithstanding the fact that they did not, alone, create the opioid crisis in Oklahoma. The municipalities' and tribes' public nuisance theories, which are one among other theories raised by these litigants, largely track the theory upheld in the Oklahoma Public Nuisance Decision.[9]

b. On September 3, 2019, District Judge Dan Aaron Polster entered opinions denying several motions for summary judgment filed by pharmaceutical manufacturers, distributors and pharmacies in the "Track one" opiate litigation, rejecting defendants' arguments regarding causation, conspiracy, preemption, marketing of generics and *de minimis* liability. *See*, *e.g.*, *In re National Prescription Opiate Litigation*, No. 17-md-2804 (N.D. Ohio Sept. 3, 2019) (the orders are attached hereto as **Exhibits C-F**). Importantly, the Debtors were included as Track one defendants prior to their severance from the Track one cases after the Petition date.

c. On September 10, 2019, District Judge Dan Aaron Polster denied opioid manufacturers' and distributors' motions for summary judgment on the county plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") as well as Ohio's state analogue. *See Opinion and Order Regarding Defendants' Summary Judgment Motions on RICO and OCPA*, *In re* No. 17-md-2804 (N.D. Ohio Sept. 10, 2019) (attached hereto as **Exhibit G**).

d. There have also been a number of settlements between opioid manufacturers and municipalities, which are another indication of their inherent value. On August 20, 2019, Endo International Plc, an opioid manufacturer, announced a settlement with *two* counties and agreed to pay a total sum of $10 million and to provide up to $1 million of its products to the counties free of charge. *See Press Release*, dated August 20, 2019 (attached hereto as **Exhibit H**). On September 9, 2019, Mallinckrodt Plc, an opioid manufacturer announced a settlement in principle with *two* counties and agreed to pay a total sum of $24 million in cash and donate $6 million in generic products to the counties free of charge. *See Press Release*, dated September 9, 2019 (attached hereto as **Exhibit I**).

---

[9] For the purposes of this Motion we do not address the various *parens patriae* arguments between the States and their subdivisions,

18. Taking the multi-district litigation alone, approximately 895 municipalities (including cities, counties, towns, villages, etc.) and 65 Native American Tribes had initiated lawsuits against the Debtors pre-petition. None of the Committee, the Debtors, or any other party in interest will know how many (including how many in addition to these numbers) will file a proof of claim against the Debtors ahead of the December 9, 2019 Government Bar Date. While the general bar date passed on September 16, 2019, and the numbers of non-governmental unit claims filed have not yet been disclosed in an aggregate format, the Debtors disclosed that as of the petition date they knew of: (1) ten actions filed by states; (2) approximately 1,000 municipality actions in total (approximately 230 of which are outside the multi-district litigation); (3) six litigations brought by or on behalf of insurance companies; (4) twenty-eight personal injury lawsuits; and (5) three securities litigations.[10]  Again, taking these initial numbers, the claims of governmental units' predominate in both number and claim size in these cases, making the proposed Plan facially non-confirmable.

B. <u>**Summary of Administrative Expenses.**</u>

19. In the short history of this case, substantial administrative expenses have accrued and will continue to accrue through a confirmation hearing. The administrative expenses (solely as to professional *fees*) that are currently disclosed to the Court, laid out in detail below, are certainly millions less than the amount accrued today. More importantly, these expenses continue to accrue at a rate of several million dollars per month, and absent a conversion to Chapter 7, will continue at the rate for many months as the Debtors attempt to bring this case to conclusion. Given the lack of transparency into and timely disclosure of the fees of the Debtors' and Committee's professionals, the Movants' best guess is that approximately

---

[10] There have also been a number of motions seeking relief to file class proofs of claim in these cases, which are not discussed herein.

$9,638,122 in fees alone have been incurred for the months of June and July 2019.[11] Of course, these numbers do not account for accrued fees in August or September 2019. A summary of these fees are provided below:

- For the *twelve days* between June 19, 2019 and June 30, 2019, counsel for the Committee incurred $787,161.50 in fees. *See* Docket Nos. 540, 541. Committee counsel has not submitted any monthly fee applications beyond their first monthly fee application, which covered only twelve days of their retention. We are almost three months past this date; thus, the Committee fees are likely substantially higher.

- Through *July 31, 2019*, the financial advisor for the Committee incurred $1,055,540.5 in fees. *See* Docket Nos. 542, 583. We are almost two months past this date; thus, it stands to reason that the Committee's financial advisor's fees are substantially higher than this number.

- Through *July 31, 2019*, nearly two months ago, the Debtors' various legal counsel incurred $4,430,924.90 in fees. *See* Docket Nos. 387, 528, 545, 602, 643, 644 648.[12] We are almost two months past this date; thus, these advisors' fees are substantially higher than this number.

- The Debtors' financial advisory professionals have not filed an application for reimbursement at this time.

- The Debtors' banker has incurred a $200,000 fee each month during these cases, and will receive approximately $2,950,000 in respect of its asset sales fee (with 50% crediting of its monthly fee beginning in October). *See* Docket No. 295.

### RELIEF REQUESTED AND BASIS FOR RELIEF

20. By this Motion, the Movants respectfully requests the entry of an order substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105(a) and 1112(b)(1) of the Bankruptcy Code, immediately converting these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.

---

[11] *See Second and Third Operating Reports* (Docket Nos. 425, and 554), disclosing but not apportioning "Restructuring Fees." It is not clear whether these fees include updated amounts for certain of the Committee's professionals as certain monthly fee applications for the month of July 2019 have not been filed.

[12] The Movants recognize that certain of these fees were incurred by legal counsel to the Debtors, such as litigation counsel, whose fees are not likely to increase (and likely will decrease) materially going forward.

**A.     Cause Exists to Convert These Cases to Chapter 7.**

21.     Section 1112(b) of the Bankruptcy Code, provides that, on request of a party in interest, and after notice and a hearing, "the Court shall convert a case to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause." 11 U.S.C. § 1112(b)(1) (emphasis added). Under section 1112(b), conversion or dismissal is *mandatory* upon a finding of "cause." *See* 11 U.S.C. § 1112(b)(1); *DCNC North Carolina I, LLC v. Wachovia Bank, N.A.*, Case No. 09-3775, 09-3776, 2009 WL 3209728, *6 (E.D. Pa. Oct. 5, 2009; *see also In re The Reserves Resort, Spa & Country Club LLC*, No. 12-13316 (KG), 2013 WL 3523289, *2 (Bankr. D. Del. July 12, 2013).

22.     Although "cause" is not defined, Section 1112(b)(4) provides a nonexclusive list of 16 "causes" for conversion. 11 U.S.C. § 1112(b)(4)(A)-(P); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 1662 n. 10 (3d Cir. 2012) ("the listed examples of cause are not exhaustive"); *In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 386 (E.D. Pa. 1991). At least two separate and independent grounds under § 1112(b)(4) exist here and demand conversion of these cases. Specifically, there is both: (A) a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation and (M) an inability to effectuate substantial consummation of a confirmed plan. 11 U.S.C. § 1112(b)(4)(A) and (M).

23.     If the movant establishes "cause", the burden then shifts to the Debtor to prove it falls within the § 1112(b)(2) "unusual circumstances" exception to §1112(b)(1)'s mandatory conversion. However, the Third Circuit instructs that "[c]ourts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization." *In re Brown*, 951 F.2d 564, 572 (3d Cir.1991)) (citing *In re Canal Place Ltd. Partnership*, 921 F.2d 569, 577 (5th Cir.1991)); *see also In re Woodbrook Assocs.*, 19 F.E. 312, 317 (7th Cir. 1994) ("The very

purpose of § 1112(b) is to cut short [the] plan and confirmation process where it is pointless."). If cause to convert or dismiss is present, the Third Circuit has indicated that it then chooses between conversion and dismissal based on "the best interest of creditors and the estate." *In re Am. Capital Equip.*, LLC, 688 F.3d at 161.

24. This Court should convert the Debtors' chapter 11 cases to chapter 7 cases because cause for conversion exists.

**B.   Cause Exists To Convert These Cases to a Chapter 7 Liquidation under §1112(b)(4)(A).**

    **1.   The Diminution of the Estate Satisfies § 1112(b)(4)(A).**

25. Conversion is warranted where a debtor is "suffering substantial or continuing losses to or diminution of the estate and there is no reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). The inquiry under 1112(b)(4)(A) is twofold. *In re Gateway*, 374 B.R. at 563. "First, the Court must look at the track record of the Debtor to determine if it is suffering losses or making gains. Second, the Court must determine whether rehabilitation is likely given the evidence presented at hearing." *Id*.

26. With respect to the first prong of the test, "[i]n the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow — including that resulting only from administrative expenses — effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of [continuing loss to or diminution of the estate]." *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004).

27. There can be no reasonable dispute that the Debtors: (i) have ceased or shortly will cease business operations; (ii) have sold substantially all of their assets[13] and have no ongoing corporate operations; and (iii) currently have a significant negative cash flow. The

---

[13] The Movants note that the estates' professionals have proceeded in a swift and efficient manner as it relates to selling the estates' assets.

Debtors are or will shortly be a shell with no operations and no prospective ability to produce cash or any other value that offsets their continuing expenses.

28. Movants recognize that the sales process was necessary, and necessarily resulted in significant expense. Nor do Movants criticize the results of that process. But, the Debtors, the Committee and their advisors continue to incur significant administrative expenses which have not, and likely will not, produce any similarly concrete benefit to creditors. As an example, a substantial amount of fees were likely incurred negotiating the specifics of the Plan and Disclosure Statement on file now. But, these tasks are far from complete. Both of these documents are subject to a number of legitimate creditor challenges which will require further estate resources to litigate, negotiate and resolve, even before the expense of revision to these documents and the expenses associated with ultimate court and creditor approval. The estate, already tiny compared to the claims asserted against it, simply cannot bear the weight of such expenses.

29. The Debtor has sold its only revenue-generating operations, and thus, the Debtors' estates will necessarily be cash flow negative going forward. The Debtors' most recent monthly operating report shows the Debtors, on a consolidated basis were cash flow negative for the month of July, 2019. *See Monthly Operating Report for Reporting Period July 1, 2019-July 31, 2019* (Docket No. 554) (showing the Debtors incurred a net loss of $11,397,530 from operations for the relevant period); *Initial Monthly Operating Report* (Docket No. 164) (showing the Debtors forecasted a net loss of $22,205,000 by the end of August). According to their Consolidated Cash Flow Forecast in the Initial Monthly Operating Report, the Debtors project they will only have $15,000,000 on hand by the end of August (though this number has been amplified by the proceeds of the assets sales). This is less than half of the approximately

$37,000,000 available to the estates just two months ago, when not considering the asset sales. *See In re Gateway*, 374 B.R. at 564 (finding a substantial and continuing diminution of the estate where there was a "sharp decline" in the Debtors' cash position); *In re BH S&B Holdings, LLC*, 439 B.R. 342 (Bankr. S.D.N.Y. 2010) (finding a substantial and continuing diminution of the estate where Debtors continued to incur monthly losses and there was no indication of further third party funding).

30.  While the results of the Debtors' assets sales necessarily improved the Debtors' cash position, those proceeds are the final positive blip (other than future contingent royalties that are uncertain at best) against a tidal wave of administrative expenses.  While the incompleteness of the public disclosures necessarily understates the administrative burn rate to date, the Movants know that approximately $10 million in professional fees likely have been incurred *from the mid-June filing to the end of July 2019*.  The fees incurred only by the Debtors' and Committee's **lead** legal professionals, *which were not incurred in the context of a contested plan process*, were $1.8 million[14] per month and $1.85 million[15] per month, respectively.  Thus, the cash position of the estates diminishes materially with each passing week.  In the context of a contested confirmation, the estates' professional fees will surpass these approximated burn rates, potentially significantly, to the further detriment of creditors.  Even at the current administrative expense burn rate, the Debtors' and Committee's legal professionals will incur approximately $6 million in additional fees between now and confirmation, assuming the confirmation process proceeds without contest.

---

[14]  This number reflects the monthly burn rate should it reflect the approximate amount of fees incurred for the month of July 2019 as disclosed in Docket No. 545.

[15]  This number reflects the monthly burn rate should it reflect the approximate amount of fees incurred for the twelve days between June 20, 2019 and June 31, 2019.

### 2. As There Is No Likelihood of Rehabilitation, The Second Prong of §1112(b)(4)(A) is Satisfied.

31. The Debtors also fail the second prong of the test because they are not seeking to rehabilitate. When considering a motion under Bankruptcy Code section 1112(b), "rehabilitation" means an ability to re-establish the debtor-entity on a firm sound financial basis. *See In re BH S&B Holdings, LLC*, 439 B.R. at 347 ("rehabilitation means to put back in good condition and reestablish on a sound basis.").

32. An intention to "liquidate (rather than rehabilitate), demonstrates that there is no likelihood of rehabilitation." *In re BH S&B Holdings, LLC*, 439 B.R. at 347; *see also Loop Corp. v. U.S. Trustee*, 379 F.3d 511 (granting U.S. Trustee's motion after last round negotiations with lenders failed, and the debtors were cash flow negative, there mounting costs to the estate, and the plan of liquidation was evidence of a lack of likelihood of rehabilitation). The *BH S&B* court discussed that though a liquidation plan is permissible, courts have converted or dismissed cases on facts similar to *Loop* and *BH S&B*. *Id.* at 348 (citing *In re Natrl Plants & Lands Mgmt. Co., Ltd.*, 68 B.R. 394, 395 (Bankr.S.D.N.Y.1986) (converting chapter 11 case, in part, because the debtor's proposed liquidating plan conceded that the business would be terminated and the debtor was losing $60,000 per month in chapter 11). While the sales process was only recently completed, given (1) the administrative burn rate discussed above; (2) the legitimate disclosure and confirmation issues; and (3) the further administrative expenses that will be incurred in proceeding towards the confirmation of any Plan over a party-in-interests' objection, there is a very real likelihood that the cases will languish and, if they languish even for a short period of time, the estates will be entirely cannibalized.

33. The Debtors entered bankruptcy with the express intent to liquidate, not rehabilitate. No going concern buyers appeared and it was obvious from the outset that a true

15

reorganization was a "hopeless and unrealistic prospect." *In re Economy Cab & Tool Co., Inc.*, 44 B.R. 721, 724 (Bankr. D. Minn. 1984); *see also In re Gateway*, 374 B.R. at 567 (lack of purchaser interest in "going concern" purchase proves it is not in the best interests of creditors to remain in Chapter 11).

34. The Debtors' estates are paying millions a month to professionals to steward an empty ship and propose a non-confirmable plan. The remaining duties here — wind-down, contingent asset monetization, claims reconciliation and distribution — can all be done more cheaply and fairly by an independent and disinterested Chapter 7 trustee. Accordingly, cause exists to convert these cases to cases under chapter 7 of the Bankruptcy Code.

**C.     Cause Also Exists to Convert These Cases
        to a Chapter 7 Liquidation under §1112(b)(4)(M).**

35. Conversion is warranted where a debtor presents an "inability to effectuate substantial consummation of a confirmed plan." 11 U.S.C. § 1112(b)(4)(M). A "debtor's ability to effectuate a plan may well turn on practical considerations, including whether confirmation can be achieved." *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011); *see Loop Corp.*, 379 F.3d 511, n. 2 (8th Cir. 2004) (discussing bankruptcy court's skepticism about whether any plan would be confirmable as grounds for cause to convert) (citing *In re Fossum,* 764 F.2d 520, 521-22 (8th Cir.1985) ("A finding that the [debtors] were unable to effectuate any plan which would be confirmable is a proper basis for dismissal of the [debtors'] chapter 11 case."); *see also In re Lamar Estates, Inc.*, 6 B.R. 933 (Bankr. E.D. N.Y. 1980) (Debtors' inability to effectuate plans of reorganization sufficient cause to convert); *In re DCNC North Carolina I, LLC,* 407 B.R. 651, 665 (Bankr.E.D.Pa.2009) (same).

36. One of the purposes of Section 1112(b) is to weed out inappropriate chapter 11 cases at the earliest possible time. As the Seventh Circuit explained, "The very purpose of §

16

1112(b) is to cut short [the] plan and confirmation process where it is pointless." *In re Woodbrook Assocs.*, 19 F.R. 312, 317 (7th Cir. 1994) (citations omitted). Further, the Supreme Court has noted "[t]he preservation of business enterprises must not be at the expense of creditors." *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 119 n.14 (1939) (internal citations omitted); *see also In Re Gonic Realty Trust*, 909 F.2d 624, 626-27 (1st Cir. 1990) ("The court [in exercising its discretion under section 1112(b)] must exercise its sound judgment in reaching a determination and must ascertain that the decision is in the best interest of the creditors."). "The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state . . . '[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, Chapter 11 has lost its *raison d'ĕtre*.'" *In re Whiteshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir, 1985) (internal citations omitted).

37. A Debtor is "unable to effectuate a plan where it 'lacks the ability to formulate a plan or to carry one out.'" *In re Babayoff*, 445 B.R. at 76 (citing *Hall v. Vance,* 887 F.2d 1041, 1044 (10th Cir.1989)). For example, courts have found that cause was present where a plan could not be confirmed due to the size and amount of certain creditor's claims. *See In re Local Union 722 Int'l Bhd. of Teamsters,* 414 B.R. 443, 453 (Bankr.N.D.Ill. 2009) (cause to convert was present where a single creditor held 78% of the unsecured debt and objected to the plan because his claim was impaired, making the plan not confirmable); *see also In re B & B West 164th Street Corp.,* 147 B.R. 832, 842 (Bankr. E.D.N.Y.1992) (cause to convert present where plan confirmation impossible over objection of creditor who controlled over one-third of a class).

38. Here, any plan along the lines of the Plan will not be confirmable if it is not fully consensual. Not only does the Plan smack of gerrymandering, but there are fundamental issues

about whether the Plan or any like it can satisfy the strictures of the Bankruptcy Code in the face of objections going to classification, unfair discrimination and best interests. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,* 987 F.2d 154, 158 (3d Cir. 1993) (gerrymandering "seriously undermines" confirmation requirements). The Committee, the Debtors and certain Settling Creditors have agreed to "negotiated" aggregate claims estimations and disparate treatment between creditors who all hold unsecured claims that share the same legal characteristics and priority. The Movants believe that the ways these "Settling Parties" have carved up the distributable value of the Debtors' estates is not consistent with the realities underlying claim value or the Bankruptcy Code. While the Movants understand that considerable time was spent attempting to negotiate a consensual Plan, it appears that not all those who were party to the negotiations consent, and by this motion it's clear that other parties, including the Movants, remain far apart from the Committee and the Debtors. Simply put, proceeding under the auspices of Rule 9019 when the "Plan Settlement" was cut by an unrepresentative Committee, the Debtors (who could have pursued a straight liquidating plan from the outset of these cases) and other case parties who hold no fiduciary duties to each other or members of their constituent creditor types strains credulity. Creditors should not have to bear the cannibalization of the Debtors' estates through administrative expenses by subjecting the parties to a contested confirmation hearing that will ultimately demonstrate that the Plan fails.

39. The only plan that could be confirmed that would not raise, among other fatal concerns gerrymandering, unfair discrimination, and best interests, would be a simple liquidating plan whereby all litigation claims are liquidated post-confirmation, any remaining assets are reduced to cash, and that cash is distributed pro rata to all unsecured claims equally — such a

plan is nothing more than a Chapter 7 liquidation.  No advantage is gained by conducting this process through a Chapter 11 plan.

40. While the complete exhaustion of the estates' value for administrative expenses might eliminate plan disputes among unsecured creditors, marching toward a plan that will pay nothing to unsecured creditors is not a legitimate purpose for continuation of a Chapter 11 case.

41. An independent Chapter 7 trustee should be appointed to oversee the ultimate liquidation of remaining assets, claim reconciliation, and eventual distributions.  Only with an independent Chapter 7 trustee will the remaining assets of the estates be preserved and distributed equitably to all of the creditors of the estates.

## **CONCLUSION**

42. WHEREFORE, the Movants request that the Court enter an Order substantially in the form attached hereto as **Exhibit A**: (i) immediately converting the Debtors' Chapter 11 cases to Chapter 7 cases, and (ii) granting such other relief as this Court deems just and proper.

Dated: September 25, 2019
Wilmington, Delaware

**SULLIVAN · HAZELTINE · ALLINSON LLC**

*/s/ William A. Hazeltine*
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
901 North Market Street, Suite 1300
Wilmington, DE 19801
Tel: (302) 428-8191
Fax (302) 438-8191
Email: bsullivan@sha-llc.com
　　　　whazeltine@sha-llc.com


-and-

**BROWN RUDNICK LLP**
David J. Molton (admitted *pro hac vice*)
Kenneth J. Aulet (admitted *pro hac vice*)
Gerard T. Cicero (admitted *pro hac vice*)
Seven Times Square, 47th Floor
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email: dmolton@brownrudnick.com
Email:  kaulet@brownrudnick.com
Email: gcicero@brownrudnick.com

- and-

**BROWN RUDNICK LLP**
Steven D. Pohl (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
Email: spohl@brownrudnick.com

-and-

**GILBERT LLP**
Scott D. Gilbert (admitted *pro hac vice*)
Craig J. Litherland (admitted *pro hac vice*)
1100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2277
Email: gilberts@gilbertlegal.com

*Special Insolvency Counsel to the Movants*