**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| INSYS THERAPEUTICS, INC., *et al.*,[1] | Case No. 19-11292 |
| Debtors. | Jointly Administered |
| | Objection Deadline: October 17, 2019 at 4:00 p.m.<br>Hearing: October 22, 2019 at 10:00 a.m. |
| | Related to Docket Nos. 612, 613 |

**OBJECTION OF THE CHUBB COMPANIES TO THE DISCLOSURE STATEMENT
FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY INSYS
THERAPEUTICS, INC. AND ITS AFFILIATED DEBTORS**

ACE Property and Casualty Insurance Company, Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, Federal Insurance Company, Chubb Custom Insurance Company and Chubb Indemnity Insurance Company (and together with each of their affiliates and successors, the "Chubb Companies"), by and through their undersigned counsel, hereby object (the "Objection") to the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation Proposed by Insys Therapeutics and Its Affiliated Debtors* [Docket No. 613] (the "Disclosure Statement") and, in support of the Objection, the Chubb Companies respectfully state as follows:

## BACKGROUND

### A.    The Bankruptcy Case

1.     On June 10, 2019 (the "Petition Date"), Insys Therapeutics, Inc. and certain of its affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Insys Therapeutics, Inc. (7886); IC Operations, LLC (9659); Insys Development Company, Inc. (3020); Insys Manufacturing, LLC (0789); Insys Pharma, Inc. (9410); IPSC, LLC (6577); and IPT 355, LLC (0155). The Debtors' mailing address is 410 S. Benson Lane, Chandler, Arizona 85224.

title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

2.     Upon information and belief, since the Petition Date, the Debtors continue to act as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     On September 17, 2019, the Debtors filed the Disclosure Statement.[2]

4.     Concurrently therewith, the Debtors also filed their *Joint Chapter 11 Plan of Liquidation of Insys Therapeutics, Inc. and Its Affiliated Debtors* [Docket No. 612] (the "Plan").

**B.     The Insurance Programs**

5.     Prior to the Petition Date, the Chubb Companies issued certain insurance policies (as renewed, amended, modified, endorsed or supplemented from time to time, collectively, the "Policies") to one or more of the Debtors, as named insureds.

6.     Pursuant to certain Policies (together with any agreements related thereto, the "ACE Insurance Program"), ACE Property and Casualty Insurance Company, Westchester Surplus Lines Insurance Company and Illinois Union Insurance Company provide, *inter alia*, environmental, products liability, umbrella excess, technology and other insurance for specified policy periods subject to certain limits, deductibles, retentions, exclusions, terms and conditions, as more particularly described therein and the insureds, including one or more of the Debtors, are required to pay to the Chubb Companies certain amounts including, but not limited to, insurance premiums (including audit premiums), deductibles, funded deductibles, expenses, taxes, assessments and surcharges, as more particularly described in the ACE Insurance Program (the "ACE Program Obligations").

---

[2]     All capitalized terms used herein but not defined shall have the meanings ascribed to them in the Disclosure Statement.

7.     Pursuant to other Policies (together with any agreements related thereto, the "Chubb Insurance Program", and collectively with the ACE Insurance Program, the "Insurance Programs"),[3] Federal Insurance Company, Chubb Custom Insurance Company and Chubb Indemnity Insurance Company provide, *inter alia*, accident, automobile liability, crime, customarq, umbrella, workers' compensation, package, directors' and officers' excess, general liability and other insurance for specified policy periods subject to certain limits, deductibles, retentions, exclusions, terms and conditions, as more particularly described therein, and the insureds, including one or more of the Debtors, are required to pay to the Chubb Companies certain amounts including, but not limited to, insurance premiums (including audit premiums), deductibles, funded deductibles, expenses, taxes, assessments and surcharges, as more particularly described in the Chubb Insurance Program (the "Chubb Program Obligations," and collectively with the ACE Program Obligations, the "Obligations").

8.     The Debtors' Obligations are payable over an extended period of time and are subject to future audits and adjustments.

## C.    **The Coverage Dispute**

9.     In the Disclosure Statement, the Debtors present purported summaries of insurance coverage disputes, and specifically refer to certain disputes currently ongoing with one of the Chubb Companies.  *See* Disclosure Statement § 5.6(b)(ii).

10.    Therein, the Debtors do not accurately characterize the insurance coverage disputes or the positions the Chubb Companies have taken with respect to such coverage disputes.

---

[3]    The descriptions of the Insurance Programs set forth herein are not intended to, and shall not be deemed to amend, modify or waive any of the terms or conditions of the Insurance Programs.  Reference is made to the Insurance Programs for a complete description of their terms and conditions.

11.     For example, the Disclosure Statement does not advise of the relevant coverage terms, the facts alleged in the personal injury complaints, or the events that support the Chubb Companies' coverage determinations.

12.     Under the terms of the policies issued by Illinois Union Insurance Company, specifically policies G2757449A 002 and G2757449A 003 (collectively, the "<u>Chubb Products Liability Policies</u>")[4], no coverage is available unless the claims allege "bodily injury" or "property damage" that was caused by an "occurrence." *See* Chubb Products Liability Policies Insuring Agreement at § I(B)(1). Each policy defines the term "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See, id.* at § IV(T).

13.     Further, even if the "occurrence" requirement is satisfied,  no coverage is available under either policy if the personal injury claim falls within any exclusions to coverage. Under exclusion F, for example, the insurance does not apply to any claim arising out of an actual or alleged violation by the insured, or with the insured's consent, of any law or regulation imposing criminal penalties or liability. Exclusion F does not require an adjudication of criminal liability. As another example, exclusion Y negates coverage for any claim arising out of any insured's willful and intentional act of non-compliance with any rule or regulation promulgated by the FDA.

14.     Another significant aspect of the policies is Endorsement 16, which is titled "Batch Occurrence (Lot of Goods and Advisory Communication)." By means of the endorsement, all

---

[4]     Chubb Products Liability Policy No. G2757449A 002 is attached hereto as **Exhibit A**.  Any description or summary herein of the terms of the Chubb Products Liability Policies and/or the Insurance Programs is provided for convenience purposes only as the exact language used in each of the Policies and related agreements varies.  The Policies and related agreements themselves contain the exact provisions, terms and/or conditions.  Nothing herein is intended to alter, modify or otherwise affect the terms and conditions of the Chubb Products Liability Policies or the Insurance Programs.  The Chubb Companies will provide complete copies of the Policies and related agreements to this Court upon request.

claims made after the publication of an "advisory communication" relating to the same known or suspected hazard of the insured's "product" are deemed to be made as of the publication date of the first "advisory communication."  The endorsement further provides that, as a condition precedent to coverage for such claims, Insys must notify the Chubb Companies of the "advisory communication" within 60 days of the date of publication or the end of the policy period, whichever is longer. Because Chubb learned that advisory communications regarding Subsys (a drug made by Insys) had been published during the period of time covered under the 2016-2017 policy term, policy G2757449A 002 is the relevant policy for determining the availability of coverage for Subsys-related claims. Of note, Insys never notified the Chubb Companies of any advisory communications relating to Subsys, including the advisory communications published during the 2016-2017 policy period.

15.    Insys was named as a defendant in Subsys-related personal injury complaints that were filed before facts emerged with consistency as to Insys's marketing scheme and criminal conduct. As to these complaints, the Chubb Companies agreed to provide a defense as to certain actions under the 2016-17 policy under reservations of rights to deny coverage. In September 2018, the United States of America filed its Second Superseding Indictment against Insys executives and managers. The Second Superseding Indictment alleged that the defendants engaged in a pattern of racketeering activity comprised of the following crimes: distribution of a controlled substance in violation of the Controlled Substances Act, 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1346 (honest services fraud), and 18 U.S.C. § 1343 (wire fraud). After the United States filed the Second Superseding complaint, other executives, including Insys's president and CEO, entered guilty pleas to charges of criminal conspiracy to bribe and provide kickbacks to prescribers of Subsys, and wire and mail fraud. Several of the personal injury claimants thereafter amended their civil

complaints against Insys to parallel the criminal proceedings, alleging conspiracy, bribery, payment of illegal kickbacks, and fraud.

16.     A criminal jury convicted John Kapoor and other Insys executives and managers in May 2019.[5] The jury returned a guilty verdict and found that the defendants, each an executive or manager of Insys, violated the RICO Act, a law imposing criminal penalties and liability, and that each agreed that they or another conspirator would commit crimes such as mail fraud and wire fraud.

17.     The Chubb Companies have since denied coverage to Insys for personal injury complaints that assert the same intentional criminal wrongdoing as alleged in the criminal trial. The complaints do not satisfy the "occurrence" requirement and otherwise fall within the policy exclusions.

18.     The Chubb Companies also denied coverage to Insys for complaints filed by municipalities and tribes (defined as SMT Group Claims). Those claims seek damages for economic loss of the entity, and not for bodily injury or property damage. In addition, the SMT Group Claims do not satisfy the "occurrence" requirement and otherwise fall within the policy exclusions.

19.     The Chubb Companies have not denied coverage as to any complaint that alleges accidental, non-excluded conduct by Insys. The Chubb Companies only denied coverage for complaints that allege injury, damage or loss caused by non-accidental conduct, or excluded conduct. Insys is not entitled to coverage under the Chubb Products Liability Policies for injury

---

[5]     The jury in the criminal trial convicted Kapoor (Insys's founder and chairman), Richard Simon (National Director of Sales), Michael Gurry (Vice President of Managed Markets), and Joseph Rowan and Sunrise Lee (regional sales directors). Alec Burlakoff (Vice President of Sales) and Michael Babich (CEO and President) entered guilty pleas prior to trial.

caused by non-accidental conduct or excluded conduct. Contrary to the Debtors' intimation in the Disclosure Statement, the Chubb Companies' denials of coverage comport with the policy terms and case law, and do not constitute breach of contract, bad faith, or unfair insurance practices.

20.    In light of the foregoing, the Chubb Companies object to the Debtors' characterization of the relevant coverage disputes as set forth in the Disclosure Statement.

**D.    The Disclosure Statement and Plan**

**1.    The Insys Liquidation Trust and the Victims Restitution Trust**

21.    Beyond misrepresenting the details of the coverage disputes, the provisions of the Disclosure Statement and Plan demonstrate myriad additional defects. Among other things, they call for the substantive consolidation[6] of the Debtors, impermissible gerrymandering of voting classes and the untenable creation of the Insys Liquidation Trust and the Victims Restitution Trust (with the illusory promise of funding from the Chubb Companies and other insurers) to hold certain funds for the benefit of the Debtors' creditors.

22.    Per the Disclosure Statement and Plan, the Debtors' Insurance Rights and Products Liability Insurance Rights (as defined in the Plan) are to be transferred to the Insys Liquidation Trust and the Victims Restitution Trust, respectively.[7] *See* Disclosure Statement § 1.4; Plan §§ 5.8(c) and 5.9(c).

---

[6]    While not specifically relevant to the Chubb Companies' concerns, the Debtors have failed to demonstrate any of the factors required for obtaining substantive consolidation. Indeed, the Third Circuit Court of Appeals has articulated that, absent consent, a proponent of substantive consolidation must prove either that (i) pre-bankruptcy, the entities to be consolidated "disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity"; or (ii) after filing for bankruptcy, the entities' assets and liabilities "are so scrambled that separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). Aside from certain conclusory averments made in the Disclosure Statement, the Debtors have not established any of the foregoing factors. *See, e.g.*, Disclosure Statement § 6.1(b)

[7]    The Insys Liquidation Trust is to be established for the benefit of holders of Non-PI General Unsecured Claims, with such claims being administered and otherwise handled by the ILT Claims Arbiter while the

23.     Despite these provisions, the Disclosure Statement and Plan expressly note that neither the Insurance Rights Transfer nor the Products Liability Insurance Rights Transfers shall be an assignment of any insurance policy itself. *See* Disclosure Statement § 1.4; Plan §§ 5.8(c)(vii) and 5.9(c)(vii).

24.     To add to the internal conflict and confusion, the Plan later notes that "[a]ll insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as Assumed and Assigned Contracts, and shall vest in the Insys Liquidation Trust (other than the Products Liability Insurance Policies, which will vest in the Victims Restitution Trust) and continue in full force and effect thereafter in accordance with their respective terms." *See* Plan § 8.7.

25.     The Debtors also intend to seek the appointment of "Insurance Negotiators," purportedly to conduct negotiations with Insurance Companies and Products Liability Insurance Companies and recover Insurance Proceeds and Products Liability Insurance Proceeds, respectively, without providing for procedures for the same or for any anticipated coordination with applicable insurers, such as the Chubb Companies.

### 2.     Treatment of Insurance Policies Under the Plan and Disclosure Statement

26.     While the Disclosure Statement does not address insurance neutrality, the Plan provides:

> (a) Nothing contained in this Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any of the Insurance Companies or (b) any rights or obligations of the Debtors

---

Victims Restitution Trust is to be established for the benefit of holders of Allowed Personal Injury Claims, with such claims being administered and otherwise handled by the VRT Claims Arbiter.

arising out of or under any Insurance Policy. For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control.

(b) For the avoidance of doubt, nothing contained in this Plan, the Plan Documents, or the Confirmation Order shall operate to require any Insurance Company to indemnify or pay the liability of any Debtor or Liquidating Debtor that it would not have been required to pay in the absence of this Plan. This subparagraph (b) in no way modifies, alters or limits the rights and/or obligations set forth in subparagraph (a), above.

(c) None of (i) the Bankruptcy Court's confirmation of the Plan or approval of the Plan Documents, (ii) the Confirmation Order or any findings and conclusions entered with respect to confirmation, nor (iii) any estimation or valuation of any Claims, either individually or in the aggregate in the Chapter 11 Cases shall, with respect to any Insurance Company, constitute a trial or hearing on the merits or an adjudication or judgment with respect to any Claim or Cause of Action.

Plan § 5.11.

27.     Similarly, the Plan also notes that, with respect to insurance generally:

On or prior to the Effective Date, the Debtors may fund an upfront premium payment to purchase "tail insurance" to continue the Debtors' existing directors' and officers' insurance. All insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as Assumed and Assigned Contracts, and shall vest in the Insys Liquidation Trust (other than the Products Liability Insurance Policies, which will vest in the Victims Restitution Trust) and continue in full force and effect thereafter in accordance with their respective terms.

Plan § 8.7.

### 3.     **Treatment of Claims and Other Interests.**

28.     The Disclosure Statement and Plan provide for various Classes of Claims, including Insurance Related Claims (Class 4), Hospital and NAS Monitoring Claims (Class 5), DOJ Claims (Class 6), SMT Group Claims (Class 7) and Personal Injury Claims (Class 8). *See* Disclosure Statement § 1.4(a); Plan §§ 4.4, 4.5, 4.6, 4.7, 4.8.

29.     Claims in Classes 4, 5 and 6 are to be satisfied through distributions made by the Insys Liquidation Trust, while Class 8 Claims will receive distributions made by the Victims Restitution Trust.  Claims in Class 7, however, are to be satisfied from a combination of distributions from both.  Each of these Classes is unsecured.

30.     As to Priority Tax Claims, the Plan provides that such claims are to be paid on the Effective Date; yet all other Allowed Administrative Expense Claims are to be paid within 120 days of the Effective Date should the Liquidating Trustee not object, and at some point thereafter, should such an objection be lodged.  *See* Plan §§ 2.2, 2.5.

31.     Finally, with respect to executory contracts and unexpired leases, the Plan provides that, as of and subject to the occurrence of the Effective Date, except as otherwise provided in the Plan, each executory contract and unexpired lease of the Debtors not previously assumed, rejected, or assumed and assigned shall be deemed automatically rejected.  *See* Plan § 8.1.

## SUMMARY OF OBJECTION

32.     The Chubb Companies object to the Disclosure Statement for several reasons. First, they object because the Plan is patently unconfirmable, as discussed herein, and therefore the Disclosure Statement should not be approved.  Second,  the Disclosure Statement is objectionable because: (i) the Disclosure Statement and the Plan attempt to improperly alter or otherwise modify the terms of the Insurance Programs; (ii) the Plan contemplates an improper assignment of the Insurance Programs; (iii) while it appears that the Debtors seek to obtain the benefits of the Insurance Programs (*see* Plan §§ 5.11, 8.7), the Plan contains inconsistent provisions related thereto and further fails to address the fact that in order to do so, the Debtors' successors must remain liable for the Obligations under the Insurance Programs; (iv) the Disclosure Statement and Plan wholly disregard and mischaracterize applicable coverage defenses

and any disputes related thereto should be adjudicated and determined under the terms of the Insurance Programs and applicable non-bankruptcy law; and (v) the Disclosure Statement and Plan fail to provide that workers' compensation claims and direct action claims must continue to be administered, handled, defended, settled, and/or paid in the ordinary course of business, as required by applicable state law.

## **OBJECTION**

## I.  **The Disclosure Statement Should Not Be Approved Because the Plan Is Patently Unconfirmable.**

33.  A disclosure statement should not be approved where the related plan is unconfirmable. *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (where "it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing") (quotations omitted).

34.  Here, paramount among the many deficiencies of the Plan is that it is not feasible under 11 U.S.C. § 1129.[8]

35.  Section 1129(a) establishes criteria the Plan must meet in order to be confirmed by this Court. The Plan fails to meet many of these criteria.

36.  Most significantly, it appears that a significant source of funding for the Plan is from the insurance coverage provided by the insurers. Indeed, the establishment of the Victims

---

[8]  The Chubb Companies recognize that at this time, the Debtors are only seeking approval of their Disclosure Statement; however, the Chubb Companies assert that this Objection is highly relevant at this stage because, as presented, the Plan is patently unconfirmable. As such, the Disclosure Statement detailing the provisions and operation of such Plan simply cannot be adequate. Moreover, there are serious issues with the Disclosure Statement itself that need to be addressed now rather than at confirmation.

Restitution Trust necessarily requires insurance companies to tender policies and/or proceeds for the benefit of the beneficiaries of each such Trust.

37.     The Plan fails to take into consideration the contractual defenses that the Chubb Companies and perhaps other insurers have under the terms of the Chubb Products Liability Policies, which defenses would provide complete insulation to the proceeds vesting in the Victims Restitution Trust, as required by the Plan.

38.     Without the Chubb Companies' and perhaps other insurers' tender of their respective policies and/or any proceeds thereof, the Plan is largely unfunded and, as such, is not feasible.

39.     To the extent that the Plan is to be funded based upon a settlement that involves action and assent by many parties, including, most importantly, insurers like the Chubb Companies, the Plan is not "feasible" as required by 11 U.S.C. § 1129(a)(11), particularly since there has been no any agreement reached by and between the Debtors and the Chubb Companies (or, upon information and belief, any other insurers).

40.     As it is premised upon untenable grounds, the Plan is not feasible under 11 U.S.C. § 1129 and the Disclosure Statement should therefore not be approved.[9]

---

[9]     The Plan also improperly gerrymanders certain classes in an attempt to satisfy the feasibility requirements set forth in 11 U.S.C. § 1129(a)(10). Per Section 1129(a)(10), a court shall only confirm a plan if at least one class of claims that is impaired under the plan has accepted the plan. By segregating various pools of unsecured and impaired claimants, the Debtors are attempting to increase their likelihood of obtaining an acceptance of at least one such class all while each of these claims should, in reality, be considered collectively as a whole.

Further, pursuant to 11 U.S.C. § 1123(a)(4), a plan shall "provide for the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment[.]" Here, the Plan and Disclosure Statement propose separate and distinct treatments for Classes 4, 5, 6, 7, and 8 by purporting to characterize each as a distinct class, yet these classes are all comprised of general unsecured claims. By providing for separate, distinct and imbalanced treatment, the proposed Plan violates Section 1123(a)(4).

41.    Furthermore, as explained below, the Plan is facially defective and unconfirmable for the following additional reasons:

a.    First, the Plan's process for payment of Priority Tax Claims is violative of the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii).  While Priority Tax Claims are to be paid upon the Effective Date (Plan § 2.5), all other Administrative Claims are subject to a four-month review period, which may be further extended by the Liquidating Trustee (Plan § 2.2).  Holders of Administrative Claims therefore are subject to a potentially indefinite waiting period while holders of Claims within their same class (and potentially within junior classes) may receive earlier distributions.

b.    Second, the Plan establishes contradictory procedures for the assumption and rejection of executory contracts and unexpired leases.  The Plan proposes that, unless otherwise provided for, as of the Effective Date, each executory contract and unexpired lease shall be deemed automatically rejected (*See* Plan § 8.1(a)); however, the Plan also contemplates a procedure for Cure Claims through which assumed contracts may ***or may not*** be listed on the Schedule of Assumed and Assigned Contracts (*See* Plan § 8.2(a) (emphasis added)).  Accordingly, the Plan establishes an illogical and circular process that leaves contract counterparties without conclusive guidance:  all contracts not expressly provided for are to be rejected, except for those that are to be assumed, but not otherwise provided for.[10]

---

[10]    Moreover, as discussed further herein, the Plan notes that all insurance policies shall be deemed to be treated as Assumed and Assigned Contracts and will vest in the Insys Liquidation Trust (other than the Products Liability Insurance Policies, which will vest in the Victims Restitution Trust) (*see* Plan § 8.7), but also provides that the Insurance Rights Transfer and Products Liability Insurance Rights Transfer shall not be an assignment of any insurance policy itself.  *See* Disclosure Statement § 1.4; Plan §§ 5.8(c)(vii) and 5.9(c)(vii).  This disconnect represents another patent ambiguity in need of clarification.

c.  Third, the Plan purports to provide for the Plan Settlement, but only includes certain Settling Creditors within the Settling Parties, excluding many, if not most, holders of Claims against the Debtors' estates and, as noted above, most importantly, insurers.

d.  Fourth, the Disclosure Statement and Plan note that all Non-PI General Unsecured Claims, which are inclusive of SMT Group Claims, will be administered and liquidated pursuant to the ILT Agreement. *See* Disclosure Statement § 1.4; Plan § 5.8(h)(iii)(i).  However, the Disclosure Statement and Plan go on to provide that Allowed SMT Group Claims will also receive Distributions from Products Liability Insurance Proceeds made by the Liquidating Trustee. *See* Disclosure Statement § 1.4; Plan 5.9(h)(ii)(i).  The Disclosure Statement and Plan accordingly appear to have the SMT Group Claims straddle both Trusts, and fail to provide for definite treatment of the same.

e.  Finally, fifth, the Plan includes Releases and an injunction subject to the following caveat: "[a]s of the date of filing, the Creditors' Committee and the Settling Creditors do not support th[ese] provision[s], but are still considering," (Plan, n. 10-13).  It is improper to solicit the Disclosure Statement at this stage with such a significant portion of the Plan still under negotiation, and with such ambiguity further obscuring the treatment of relevant Claims and interests.

---

## II.    Even If The Plan Is Not Patently Unconfirmable, The Disclosure Statement Still Should Not Be Approved.

42.     Section § 1125 of the Bankruptcy Code provides that a plan proponent may not solicit acceptance or rejection of a plan unless, before such solicitation, the plan proponent transmits to the parties to be solicited, the plan and a disclosure statement, containing "adequate information," as defined in § 1125(a), which has been approved by the Bankruptcy Court, after notice and a hearing. *See* 11 U.S.C. § 1125(b).

43.     A disclosure statement contains "adequate information" if it provides information concerning the proposed plan of a kind and in sufficient detail that would enable a hypothetical reasonable investor typical of the holders of claims or interests of the relevant class to make an informed judgment about the plan. *See* 11 U. S. C. § 1125(a).

44.     Courts in the Third Circuit consistently refuse to approve disclosure statements that lack the information that a "reasonable hypothetical investor" would require to make an informed decision about the proposed plan. *See, e.g., Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417-18 (3d Cir.), *cert. denied*, 488 U.S. 967 (1988); *In re Route 202 Corp.*, 37 B.R. 367, 375 76 (Bankr. E.D. Pa. 1984); *In re Fierman*, 21 B.R. 314 (Bankr. E.D. Pa. 1982); *In re E. Redley Corp.*, 16 B.R. 429 (Bankr. E.D. Pa. 1982); *In re Civitella*, 15 B.R. 206 (Bankr. E.D. Pa. 1981).

### A.    The Disclosure Statement And Plan Improperly Alter The Terms Of The Insurance Programs.

45.     The Disclosure Statement and Plan contemplate a proposal that would improperly alter and essentially rewrite the terms of the Insurance Programs.

46.     As noted above, the Disclosure Statement and Plan provide for the appointment of

the ILT Claims Arbiter, which

> . . .shall have the power and authority to determine the following
> issues: (1) the appropriate allocation of Estate Distributable Value
> in Class 4 on account of (a) aggregate Third Party Payor Claims and
> (b) aggregate Insurance Ratepayer Claims, and (2) the appropriate
> allocation of Estate Distributable Value in Class 5 on account of (a)
> aggregate Hospital Claims and (b) aggregate NAS Monitoring
> Claims (but not allocation of Estate Distributable Value among
> individual holders of Third Party Payor Claims, Insurance
> Ratepayer Claims, Hospital Claims, or NAS Monitoring Claims)[.]

Disclosure Statement § 5.7(c); Plan § 5.8(h)(ii).

47.     Similarly, the VRT Claims Administrator is tasked with evaluating and determining

proofs of claim submitted by each holder of a Personal Injury Claim for determination of

eligibility, amount, and allowance of such Claim.  *See* Disclosure Statement § 5.7(c); Plan §

5.9(h)(i)-(ii).

48.     Notwithstanding the Debtors' express assertion that "[n]othing contained in this

Plan, the Plan Documents, or the Confirmation Order. . .shall in any way operate to, or have the

effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying. . .the

rights or obligations of any of the Insurance Companies," (Plan § 8.7), these provisions do just

that.

49.     In particular, neither the ILT Claims Arbiter nor the VRT Claims Administrator can

have the sole authority and responsibility for making determinations with respect to applicable

claims as these provisions improperly modify the terms of the Insurance Programs by rewriting

the terms of the Policies.

50.     In this case, the Chubb Products Liability Policies provide that the insurer controls

the defense and settlement of covered claims. *See, e.g.*, Chubb Products Liability Policies Insuring

Agreement § I(D) ("[The Chubb Companies] will have the right and duty to defend any suit

seeking damages to which this insurance applies. . .[and] may also at our discretion. . .settle and

claim or suit that may result.").[11]

51.     Moreover, the Chubb Products Liability Policies do not require the insurer to

indemnify a non-covered claim. *See, e.g.*, Chubb Products Liability Policies Insuring Agreement

§ I(A) ("[The Chubb Companies] will pay on behalf of the 'insured' those sums that the 'insured'

becomes legally obligated to pay . . . to which this insurance applies . . . [.]" ).

52.     As such, any provision of the Disclosure Statement and Plan providing for the ILT

Claims Arbiter's and/or VRT Claims Administrator's sole ability to determine and handle such

claims violates such provisions.[12]

53.     Indeed, neither the Debtors nor this Court can rewrite the Insurance Programs, but

rather, the Insurance Programs must be enforced as written. *See, e.g., In re WorldCorp, Inc.*, 252

B.R. 890, 897 (Bankr. D. Del. 2000) (a court may not "rewrite [a] contract to include terms that a

party wishes [it] had bargained for, but did not, prior to execution of the agreement."); *Coca-Cola

Bottling Co. of Shreveport v. Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991) aff'd, 988 F.2d

414 (3d Cir. 1993) ("Courts do not rewrite contracts to include terms not assented to by the

parties."); *In re Best Mfg. Grp. LLC*, 2012 WL 589643, at *6 (Bankr. D.N.J. 2012) ("Where the

---

[11]     The Chubb Companies reserve all rights with respect to the transfer of books and records contemplated in Plan § 5.13.  While the Plan does not expressly provide for the right to abandon or otherwise destroy such records, the Plan notes that the rights and other details of such transfers will be provided for under the Trust Transfer Agreement(s), which may not ever be filed or otherwise publicly available.  As noted above, the Policies provide the Chubb Companies with the right to control the defense and settlement of claims, which is necessarily inclusive of the Chubb Companies' need for access to records related to such claims.  To the extent the Trust Transfer Agreements or any other documents provide for rights to abandon or destroy records, such provisions are violative of the terms of the Insurance Programs, and the Chubb Companies reserve all rights with respect to the same.

[12]     The Chubb Companies reserve all rights to further object to the appointment of the ILT Claims Arbiter, VRT Claims Administrator and the VRT Insurance Negotiator.  Such appointments may effect a material modification of the Policies.

terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written").

54.     Accordingly, to the extent that the Plan seeks to alter, amend or re-write the terms and conditions of the Insurance Program, the Disclosure Statement should not be approved.

55.     Moreover, the Plan contains provisions which provide for the release of claims and other causes of action, the vesting and transfer of assets in the Trusts free and clear of liens, releases of certain third-parties, and exculpation and injunctions against certain actions. *See*, Plan Article X.[13]

56.     While the Plan purports to provide that nothing in the Plan, the Plan Documents, or the Confirmation Order, shall operate or have the effect of modifying insurance policies (Plan § 5.11), various provisions of the Disclosure Statement and Plan, including, but not limited to those provisions identified above, in fact modify the Policies.

57.     Finally, the Disclosure Statement and Plan contemplate an improper transfer of proceeds under the Insurance Programs between the Trusts resulting in a further impermissible modification of the terms and conditions of the Insurance Programs.

58.     Indeed, the Disclosure Statement and Plan purport to (i) transfer rights and proceeds between the Trusts, as opposed to the Policies themselves, and (ii) potentially split the proceeds of certain Policies between the Trusts, without ever providing for the retention of the Obligations thereunder.

---

[13]     As discussed above, with respect to the provisions relating to the Releases and injunctions, the Plan notes that "[a]s of the date of filing, the Creditors' Committee and the Settling Creditors do not support th[ese] provision[s], but are still considering," (Plan, n. 10-13) which further obscures the potential treatment of relevant claims and interests.

59.     The Policies are part of the Insurance Programs and inseparable from the balance of the respective Insurance Program. *See infra.*

60.     Any such attempt to transfer rights under the Insurance Programs between the two separate Trusts (which the Plan currently provides) would result in the Chubb Companies being forced to insure two separate and unrelated entities under the same Policies.

61.     This improperly modifies and contradicts the terms of the Insurance Programs, and should not be permitted.

**B.     The Disclosure Statement and Plan Provide for an Improper Assignment of Insurance Policies, Including the Insurance Programs.**

62.     The Insurance Programs may not be assigned without the prior written consent of the Chubb Companies; however, to the extent an assignment to the Trusts is found acceptable, such an assignment, as proposed, nevertheless remains improper as the Plan fails to provide the Chubb Companies with the benefit of a channeling injunction.

63.     As noted above, the Plan[14] provides that:

> All insurance policies to which any Debtor is a party as of the Effective Date ***shall be deemed to be and treated as Assumed and Assigned Contracts***, and shall ***vest in the Insys Liquidation Trust (other than the Products Liability Insurance Policies, which will vest in the Victims Restitution Trust)*** and continue in full force and effect thereafter in accordance with their respective terms."

Plan § 8.7 (emphasis added).

---

[14]     The Chubb Companies note that certain defined terms provided for in the Disclosure Statement and Plan are inconsistent and in need of refinement.  By way of example, certain insurers, including the Chubb Companies, may be included in both the terms "Insurance Companies" and "Products Liability Insurance Companies" notwithstanding the Disclosure Statement's and Plan's distinct treatment of both terms.  Further, "Insurance Rights" are rights under all Insurance Policies, but "Products Liability Insurance Rights" are limited only to rights under Products Liability Insurance Policies.  Insurance Rights accordingly should be limited to exclude any Products Liability Insurance Rights to provide for consistent application throughout both documents.

64.     To the extent that the Debtors under the Disclosure Statement and Plan seek to transfer or assign the Insurance Programs to the Trusts or entities not otherwise covered under the Insurance Programs, such transfer or assignment cannot occur without the express written consent of the Chubb Companies.

65.     Pursuant to 11 U.S.C. § 365(c), a debtor may not assume or assign an executory contract if applicable law excuses the counterparty from accepting performance from or rendering performance to an entity other than the debtor and such party does not consent to the assumption or assignment.  11 U.S.C. § 365(c)(1)(A) and (B).

66.     Applicable non-bankruptcy law does, in fact, prohibit the assignment of insurance policies without the insurer's consent.  *See, e.g., Allied Corp. v. Frola*, No. 87-462, 1992 U.S. Dist. LEXIS 15778 (D.N.J. Oct. 6, 1992) (holding that insurance policies are not assignable without the consent of the insurers); *Touchet v. Guidry*, 550 So. 2d 308, 313 (La. App. 1989) (holding that an insurance policy is a personal contract between the insurer and the named insured; and that, ". . . coverage terminates when the contract is assigned or transferred without the consent, permission, and approval of both contracting parties") (citations omitted); *Shadid v. Am. Druggist Fire Ins. Co.*, 386 P.2d 311 (Okla. 1963) (noting the importance of an insurer's consent to an assignment of an insurance policy, and holding that the policy does not pass to the purchaser simply by a sale of the insured property); *see also*, Chubb Products Liability Policies Insuring Agreement at § VI(M).

67.     Similarly, insurers cannot be compelled to provide insurance coverage to any entity. *See Atwood v. Progressive Ins. Co.*, No. 950051089S, 1997 Conn. Super. LEXIS 2450, at *18 (Conn. Super. Ct. Sept. 3, 1997) (stating that "[i]nsurers should not, for example, be forced to assume coverage for a risk which at the time a policy was written was not fairly in its and the insured's contemplation"); *King v. Meese*, 43 Cal. 3d 1217, 1222 (Cal. 1987) (noting that "an

insurer may refuse to insure based on any permissible classification"); *Cummins v. Nat'l Fire Ins. Co.*, 81 Mo. App. 291, 296 (Mo. Ct. App. 1899) ("An insurance company may well refuse to insure some persons. They, like any other entity, have a right of choice as to who they will contract with and they can no more be forced to a change of the assured than the assured could be forced to accept insurance from some other company (in which he may have no confidence) than the one contracted with.").

68.    Therefore, because the Chubb Companies have not consented to any proposed transfer or assignment of the Insurance Programs, the Chubb Companies object to any and all such transfers or assignments at this time

69.    Some courts have found that insurance policies may be assigned to a trust created under 11 U.S.C. § 524(g) pursuant to a plan under 11 U.S.C. § 1123 without the consent of the insurer.  *See, e.g., In re Federal-Mogul Global*, 684 F.3d 355, 382 (3d Cir. 2012) (holding that anti-assignment provisions in insurance policies were preempted by § 1123(a)(5)(B) of the Bankruptcy Code to the extent they prohibit transfer to a § 524(g) trust); *In re W.R. Grace & Co*., 475 B.R. 34, 198-99 (D. Del. 2012) (holding that anti-assignment provisions in insurance policies were preempted by § 1123(a)(5)(B) in the context of the establishment of a § 524(g) trust).

70.    In this case, however, the Debtors are not proposing an assignment to a trust created pursuant to 11 U.S.C. § 524(g) and, as such, the consent of the insurers is mandatory.

71.    Even if the Court were to find the effect of the creation of the Trusts under the Disclosure Statement and Plan to be similar to the creation of a trust under § 524(g), the Disclosure Statement and Plan fail to provide for a channeling injunction or similar benefit for the Chubb Companies or any other applicable insurer. *See, e.g.,* Plan §§ 10.5-10.7.

72.     Accordingly, the assumption and assignment of the Insurance Programs is improper as presently proposed.

**C.     The Debtors' Successors Cannot Continue To Receive The Benefits Of The Insurance Programs Without Remaining Liable For The Obligations Thereunder.**

73.     Pursuant to the Sections 5.8, 5.9, 5.11 and 8.7 of the Plan quoted above, it appears that the Debtors seek to have the Trusts enjoy the benefits of the Insurance Programs, or at least the proceeds thereof; however, neither the Plan nor the Disclosure Statement adequately provides for the treatment of the Obligations thereunder.

74.     It is well-established that debtors (and their successors) cannot seek to receive benefits of a contract without being liable for obligations thereunder.  *See In re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007) (holding that a debtor must adopt the burdens of a contract if the debtor receives the benefits under such contract, recognizing that a debtor "may not blow hot and cold.  If he accepts the contract he accepts it *cum onere*.  If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.") (internal citation omitted); *Tompkins ex. rel. A.T. v. Troy Sch. Dist.*, 199 Fed. Appx. 463, 468 (6th Cir. 2006) (holding that it is a basic principle of contract law that a party to an agreement is constrained to accept the burdens as well as the benefits of the agreement); *St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp.*, 457 F.3d 766, 773 (8th Cir. 2006) (finding that a party who accepts the benefit of a contract must also assume its burdens); *Bhushan v. Loma Alta Towers Owner's Association, Inc.*, 148 Fed. Appx. 882, 888 (11th Cir. 2005) (stating "one who has accepted a contract's benefit may not challenge its validity in order to escape its burdens"); *In re Texas Rangers Baseball Partners*, 521 B.R. 134, 180 (Bankr. N.D. Tex. 2014) ("A debtor may not merely accept the benefits of a contract and reject the burdens to the detriment of the other party.").

75.     Further, each of the Insurance Programs is an integrated insurance program and therefore, each must be read, interpreted and enforced in its entirety. *See Huron Consulting Servs., LLC v. Physiotherapy Holdings, Inc. (In re Physiotherapy Holdings, Inc.)*, 538 B.R. 225 (D. Del. 2015) (reversing bankruptcy court decision which permitted debtor to assume one agreement between itself and another party, and not the related agreements; holding that all agreements must be assumed or rejected together); *Dunkin' Donuts Franchising LLC v. CDDC Acquisition Co. LLC (In re FPSDA I, LLC)*, 470 B.R. 257, 269 (E.D.N.Y. 2012) (holding that "two agreements [were] so interrelated, [that] they form[ed] a single overarching executory contract"); *In re Aneco Elec. Constr.*, 326 B.R. 197, 202 (Bankr. M.D. Fla. 2005) (finding "single, non-severable agreement" where contracts were between same parties and obligations of each party are mutually dependent upon the other); *In re Karfakis*, 162 B.R. 719 (Bankr. E.D. Pa. 1993) (stating "two contracts which are essentially inseparable can be, and should be, viewed as a single, indivisible agreement between the parties").

76.     Therefore, to the extent that the Debtors seek to vest the Policies in a successor to the Debtors and retain the benefits of the Insurance Programs, the entirety of each of the Insurance Programs must so vest and the Debtors' successor(s), including the Trusts, must remain liable for the Obligations thereunder.

77.     Furthermore, the Chubb Companies assert that the proposal that the Trusts enjoy the benefits of the Insurance Programs, or at least the proceeds thereof, is inconsistent with Plan §§ 5.8(c)(vii) and 5.9(c)(vii), which expressly state that the Insurance Rights Transfer and the Products Liability Insurance Rights Transfer are "not an assignment of any insurance policy itself."

78.     Accordingly, the Disclosure Statement and Plan must be clarified in accordance with the foregoing so that insurers and all parties in interest can be meaningfully and adequately informed.

**D.    The Disclosure Statement And Plan Wholly Disregard And Mischaracterize Applicable Coverage Defenses And Any Disputes Related Thereto Should Be Adjudicated And Determined Under The Terms Of The Insurance Programs And Applicable Non-Bankruptcy Law.**

79.     The Coverage Dispute identified in Section 5.6 of the Disclosure Statement is mischaracterized.

80.     The Chubb Companies' right to enforce the language of the insurance contracts should not be altered by operation of bankruptcy.  The personal injury claimants and the SMT Group claimants filed their complaints against Insys before Insys sought the protections of chapter 11; Insys provided notice of the Personal Injury Claims and the SMT Group Claims to the Chubb Companies before Insys sought the protections of chapter 11; the Chubb Companies advised Insys of their coverage positions before Insys sought the protections of chapter 11.  The Debtors' act of filing petitions for relief in this Court does not alter those facts or the Chubb Companies' coverage positions.

81.     Furthermore, and as discussed at length above, there are material and legitimate disputes as to the existence of coverage for these matters.  The Disclosure Statement should set forth and clarify this fact, but it fails to do so.

82.     The Disclosure Statement fails to provide for even the possibility of such defenses, and instead proposes a Plan based entirely upon the funding of Trusts with the proceeds of relevant insurance policies.

83.     A Disclosure Statement and Plan premised on the funding of Trusts with the proceeds of insurance policies, but which wholly disregards and mischaracterizes applicable coverage defenses, is inadequate indeed.

84.      Further, the declarations for the Chubb Products Liability Policies establish that each policy was issued to Insys at its Chandler, Arizona address, and placed through an Arizona broker. The policy terms must be interpreted in accordance with the law of the state that has the most significant contacts to the insurance contract, and accordingly, applicable law and jurisdiction should be placed with Arizona.[15]

85.     Notwithstanding the declarations of the Chubb Products Liability Policies and applicable state law, the Plan expressly provides that the Insurance Rights Transfer and the Products Liability Insurance Rights Transfer "shall be governed by, and construed in accordance with, the Bankruptcy Code and the laws of Delaware, without regard to its conflict of laws principles." *See* Plan §§ 5.8(d)(viii) and 5.9(c)(viii).

86.     These sections of the Plan expressly conflict with and contradict the terms of the Insurance Policies and applicable non-bankruptcy law, and improperly grant greater rights to the Trusts than are available under the terms of the policies being assigned.  Further, these sections work an impermissible modification of the Insurance Programs, in direct contradiction to Plan Section 5.11 which allegedly preserves and leaves unaltered the terms of insurance policies.

87.     Accordingly, the Disclosure Statement and Plan must clarify that all rights, obligations, proceedings and disputes under insurance policies, including the Insurance Programs,

---

[15]     The Chubb Companies further reserve the right to contest the core nature of the coverage disputes under 28 U.S.C. § 157 and the Bankruptcy Court's jurisdiction to adjudicate the same.

should be adjudicated and determined under the terms of the Insurance Programs and applicable non-bankruptcy law.

> **E.     The Disclosure Statement and Plan Must Provide That Workers' Compensation Claims and Direct Action Claims Must Continue In The Ordinary Course**

88.     The Disclosure Statement and Plan do not provide for the handling of workers' compensation claims and direct action claims.

89.     Both workers' compensation claims and direct action claims are subject to state-law regulations that dictate the resolution of such claims, which cannot be modified by the terms of the Debtors' Plan. *See, e.g.*, *Ohio v. Mansfield Tire & Rubber Co. (In re Mansfield Tire & Rubber Co.)*, 660 F.2d 1108 (6th Cir. 1981) (finding that the administration of workers' compensation claims was a valid exercise of a state's police powers and exempt from the automatic stay provisions); *see also* La. R.S. 22:1269 (2012) (Louisiana grants injured persons a right of direct action against a tortfeasor's insurer, which, in several instances, may be brought against the insurer alone, or against both the insured and insurer jointly and *in solido*); Wis. Stat. § 632.24 (2012) (Wisconsin grants injured persons a right of direct action against a tortfeasor's insurer irrespective of whether liability is presently established or is contingent and to become fixed or certain by final judgment against the insured).

90.     Accordingly, the Disclosure Statement and Plan must clarify that workers' compensation and direct action claims may continue to be administered, handled, defended, settled, and/or paid in the ordinary course.

91.     Relatedly, the Disclosure Statement and Plan must also provide that the Chubb Companies may continue to so administer, handle, defend, settle, and/or pay covered claims in the ordinary course, and pursuant to the terms of the Insurance Programs.

## III.   <u>Reservation of Rights.</u>

92.   The Chubb Companies specifically reserve all of their rights with respect to the Insurance Programs and their right to assert additional objections to the Disclosure Statement and the Plan.

WHEREFORE, the Chubb Companies respectfully request that this Court (a) either (i) condition any approval of the Disclosure Statement to inclusion of the modifications requested herein, or (ii) deny the request for approval of the Disclosure Statement as it does not contain the adequate information required by 11 U.S.C. § 1125; and (b) grant such other relief as the Court deems appropriate

Dated: October 15, 2019

Respectfully submitted,

DUANE MORRIS LLP

By: */s/ Lawrence J. Kotler*
Lawrence J. Kotler, Esq. (DE 4181)
Drew S. McGehrin, Esq. (DE 6508)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
Telephone: 302-657-4900
Email: LJKotler@duanemorris.com
Email: DSMcGehrin@duanemorris.com

-and-

Wendy M. Simkulak, Esq.
30 South 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1000
Email: WMSimkulak@duanemorris.com

*Counsel for the Chubb Companies*